## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Abdo DOE, Hadeel DOE, Faiz DOE, Ebe DOE, Sam DOE, Ali DOE, and Fahad DOE, on their own behalf and on behalf of others similarly situated,<br><br><br>*Plaintiffs*,<br><br>– *versus* –<br><br>Markwayne MULLIN, Secretary, United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br><br>*Defendants*. | **Case No. 1:26-cv-02280-DEH**<br><br><br>**Oral Argument set for 4/16/26 at 10:00AM** |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION**

**TABLE OF CONTENTS**

                                                                                    **Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

    I.    Relationship to Related Case .................................................................................. 2

    II.    The March 3, 2026 Termination ............................................................................. 3

ARGUMENT ........................................................................................................................... 5

    I.    Plaintiffs Are Likely to Succeed on the Merits..................................................... 5

        A.    The Termination Violates the APA Because It Is Contrary to Law, In Excess of Statutory Authority, and Arbitrary and Capricious............................................... 5

        B.    The Termination Is Contrary to Law Because It Violates Equal Protection ............. 12

    II.    Yemeni TPS Holders and Applicants Face Irreparable Harm ......................................... 15

CONCLUSION......................................................................................................................... 18

## TABLE OF AUTHORITIES

**Cases**

*Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017) .................................................. 16

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) ........................................................ 7

*Centro Presente v. DHS*, 332 F. Supp. 3d 393 (D. Mass. 2018) .................................................. 13

*Conn. Dep't of Env't Prot. v. OSHA*, 356 F.3d 226 (2d Cir. 2004) .............................................. 15

*Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017) .................................... 14

*Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195 (2d Cir. 2006) ... 12

*Miot v. Trump*, No. 25-CV-02471 (ACR), 2026 WL 266413 (D.D.C. Feb. 2, 2026) .................... 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............... 6, 8, 9

*Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807 (N.D. Cal. 2025) ............................................... 9, 13

*NTPSA I*, Order Granting Pl.'s Mot. for Summ. J.797 F. Supp. 3d 1108 (N.D. Cal. 2025) ... 12, 13

*NTPSA v. Noem*, 798 F. Supp. 1008, 1032 (N.D. Cal. 2025) *NTPSA II* ........................... 12, 13, 15

*Refugee and Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19 (D.D.C. 2025) ................................................................................................................... 10

*Russello v. United States*, 464 U.S. 16 (1983) ................................................................ 7

*Saget v. Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...................................................... 12, 16

*Torres-Jurado v. Biden*, No. 19 Civ. 3595 (AT), 2023 WL 7130898 (S.D.N.Y. Oct. 29, 2023). 15

*United States v. Suquilanda,* 116 F.4th 129 (2d Cir. 2024) ................................................ 12

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) ................................................... 6, 7

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ......................... 12

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) .................................................. 7

**Statutes**

5 U.S.C. § 706(2)(A), (C) ................................................................................................ 7

8 U.S.C. § 1182(f) ........................................................................................................... 10

8 U.S.C. § 1254a(a)(4)(B) ............................................................................................... 17

8 U.S. C. § 1254a(b)(1)(C) ................................................................................................ 7

8 U.S.C. § 1254a(b)(3)(B) ......................................................................................... 1, 6, 7

8 U.S.C. § 1254a(c)(2)(B)............................................................................................... 9

**Rules**

Extension for the Designation of Syria for Temporary Protected Status, 83 Fed. Reg. 9,329 (Mar. 5, 2018) ............................................................................................ 11

Extension of the Designation of Syria for Temporary Protected Status, 84 Fed. Reg. 49,751 (Sept. 23, 2019)............................................................................................ 11

Extension and Redesignation of Yemen for Temporary Protected Status, 89 Fed. Reg. 56,765 (July 10, 2024) ............................................................................................ 11

Proclamation 10949, Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats, 90 Fed. Reg. 24,497 (June 4, 2025).................................................................................... 1, 9, 14

Termination and Re-Designation of Liberia for Temporary Protected Status, 69 Fed. Reg. 52,297, 52,298 (Aug. 25, 2004) ............................................................................ 6

Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309 (May 13, 2025)............................................................................................ 4

Termination of the Designation of Burma (Myanmar) for Temporary Protected Status, 90 Fed. Reg. 53,378 (Nov. 25, 2025)............................................................................................ 5

Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,699 (June 4, 2025)............................................................................................ 4

Termination of the Designation of Ethiopia for Temporary Protected Status, 90 Fed. Reg. 58,030 (Dec. 15, 2025) ............................................................................................ 5

Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 54,733 (Nov. 28, 2025)............................................................................................ 5

Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30,091 (July 8, 2025) ............................................................................................ 4

Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24,153 (June 6, 2025)............................................................................................ 4

Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30,088 (July 8, 2025) ............................................................................................ 4

Termination of the Designation of Somalia for Temporary Protected Status, 91 Fed. Reg. 1,547 (Jan. 14, 2026)..................................................................................................................... 5

Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,485 (Nov. 6, 2025) .................................................................................................... 4

Termination of the Designation of Sudan for Temporary Protected Status, 82 Fed. Reg. 47,228 (Oct. 11, 2017) ..................................................................................................... 11

Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45,400 (Sept. 22, 2025)................................................................................................................... 4

Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040 (Feb. 5, 2025) ........................................................................... 4

Termination of the 2021 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 43,228 (Sept. 8, 2025)................................................................................................ 4

Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10,402 (Mar. 3, 2026) ....................................................................................................... passim

**Regulations**

8 C.F.R. § 244.10 ................................................................................................................... 17

**INTRODUCTION**

For ten years, war has ravaged Yemen. Hundreds of thousands are dead. Millions have fled. Hospitals lie in rubble; children perish from cholera and starvation. The Department of State warns Americans not to travel there under any circumstances. The Secretary of Homeland Security knows how dangerous this situation is, yet proceeded to cancel Temporary Protected Status ("TPS") for Yemen. The termination notice, Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10,402 (Mar. 3, 2026) ("Notice"), concedes that extraordinary and temporary conditions continue to prevent Yemeni nationals from returning safely. It confirms what the world already knows: Yemen is not safe. The Secretary ordered over 3,000 people to go back anyway—with only 60 days' notice.

There is no lawful basis for this decision. Congress authorized termination only when underlying conditions "no longer" exist. 8 U.S.C. § 1254a(b)(3)(B). The Secretary's decision to terminate in the face of the finding that the underlying conditions still *do exist* is unprecedented in the history of the TPS program.

The termination is unlawful for additional reasons. It is part of a broader campaign—driven by discriminatory animus toward nationals of non-white and Muslim-majority countries—to dismantle a program Congress created. Since January 2025, the Department of Homeland Security ("DHS") has terminated TPS for thirteen countries, every one of them majority non-white. The Notice invokes Proclamation 10949, Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats, 90 Fed. Reg. 24,497 (June 4, 2025) ("Travel Ban"), which bars Yemenis from entering this country on the ground that Yemen is too dangerous. That same finding is now being used to justify stripping protection from people who are already here, vetted, and lawful, based on a freewheeling

1

executive determination of what is in the "national interest" that is unmoored from any statutory or regulatory criteria. The Secretary's reliance on national interest grounds to terminate TPS rests on an unexplained contradiction: Yemen is too dangerous to let anyone in, but safe enough to send everyone back. In effect, it treats Yemeni nationals who fled terrorist violence as though they were its agents.

Plaintiffs bring this action on behalf of a putative class of over 3,000 Yemeni TPS holders and applicants. On May 4, 2026, they will lose their protection from removal to a country that Defendants themselves found too dangerous to return, their lawful status, their work authorization, and their ability to provide for their families. Plaintiffs seek emergency relief to postpone the termination of TPS for Yemen pending resolution of their case on the merits.

## BACKGROUND

### I.    Relationship to Related Case

Per the Court's instructions to avoid unnecessary duplication, this brief incorporates by reference the arguments in the Memorandum of Law in Support of Plaintiffs' Motion to Postpone Effective Date of Agency Action in the related case, *Noor Doe, et al. v. Noem*, 1:26-cv-2103 (S.D.N.Y.), ECF No. 5, concerning (i) the applicable legal standard for postponement under 5 U.S.C. § 705; (ii) the statutory framework of TPS and its legislative history; (iii) the background of Yemen's TPS designation history from 2015 through 2024 and the contemporaneous country-conditions evidence; (iv) the first Trump Administration's prior efforts to end TPS protections; (v) the argument that Defendants' failure to undertake a good-faith review of country conditions and consult with appropriate agencies renders the termination preordained and thus contrary to law; (vi) the argument that Defendants' sixty-day transition period constitutes an arbitrary and

capricious break from decades of settled agency practice; and (vii) the balance of hardships and public interest weighing heavily in favor of postponement.

## II.    The March 3, 2026 Termination

On March 3, 2026, DHS published the Notice terminating Yemen's TPS designation, effective May 4, 2026. 91 Fed. Reg. 10,402. The Notice is unlike any TPS termination in the program's thirty-five-year history, because it explicitly acknowledges that extraordinary and temporary conditions still exist *and* that it would be unsafe for people to return to Yemen. Ex. 1 ¶ 12. The Notice first concedes: "[C]ountry conditions indicate that extraordinary and temporary conditions *continue to challenge Yemeni nationals' ability to safely return home*." 91 Fed. Reg. at 10,405 (emphasis added). And: "[W]hile Yemen *still experiences* extraordinary and temporary conditions, the termination of Yemen's Temporary Protected Status designation is required because it is contrary to the national interest." *Id.* at 10,404 (emphasis added). The Notice acknowledges but makes no effort to resolve or justify the contradiction as the statute would require:

> DHS acknowledges that there may appear to be some tension between its determination . . . that requiring the return of Yemeni nationals . . . does not pose a serious threat to their personal safety due to an armed conflict; and its separate determination . . . that extraordinary and temporary conditions in Yemen that prevent Yemeni nationals from returning in safety may remain.

*Id.* at 10,405.

This Administration has terminated TPS for twelve other countries. In every case, before ordering nationals to return, the Secretary affirmatively found that it was safe for them to do so, albeit in ways that legal challenges reasonably contest. Yemen is the only country where the Secretary did not make that finding—and terminated anyway. The contrast is set forth in the table below.

3

| Country | Eff. Date | Designation Grounds | Safety Finding (Termination Notice) |
|---|---|---|---|
| Venezuela (2023) | Apr. 7, 2025 | Extraordinary conditions | "[T]here are notable improvements in several areas such as the economy, public health, and crime that allow for [Venezuelan] nationals to be safely returned to their home country." 90 Fed. Reg. 9,042. |
| Afghanistan | Jul. 14, 2025 | Armed conflict; Extraordinary conditions | "[R]equiring the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety due to armed conflict or extraordinary and temporary conditions." 90 Fed. Reg. 20,310. |
| Cameroon | Aug. 4, 2025 | Armed conflict; Extraordinary conditions | "[W]hile certain conditions that led to the initial designation of TPS for Cameroon may continue, they do not pose a serious threat to individual safety due to ongoing armed conflict and do not result in Cameroonians being unable to safely return." 90 Fed. Reg. 23,699. |
| Nepal | Aug. 5, 2025 | Environmental disaster | The Secretary determined that Nepal "no longer continues to meet the conditions for the designation for [TPS] under INA section 244(b)(1)(B)"—i.e., there is no longer a substantial, temporary disruption of living conditions, and Nepal is no longer unable to handle adequately the return of its nationals. 90 Fed. Reg. 24,153. |
| Honduras | Sep. 8, 2025 | Environmental disaster | The Secretary determined that Honduras "no longer continues to meet the conditions for [TPS] under INA section 244(b)(1)(B)," finding that conditions in Honduras "have improved to the point where Hondurans can return home in safety." 90 Fed. Reg. 30,091. |
| Nicaragua | Sep. 8, 2025 | Environmental disaster | "[C]ertain conditions for the TPS designation of Nicaragua may continue; however, there are notable improvements that allow Nicaragua to adequately handle the return of its nationals." 90 Fed. Reg. 30,088. |
| Venezuela (2021) | Nov. 8, 2025 | Extraordinary conditions | "[T]here are notable improvements in several areas such as the economy, public health, and crime that allow for [Venezuelan] nationals to be safely returned to their home country." 90 Fed. Reg. 43,228. |
| Syria | Nov. 21, 2025 | Armed conflict; Extraordinary conditions | "[W]hile some sporadic and episodic violence occurs in Syria, the situation no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Syrian nationals." 90 Fed. Reg. 45,400. |
| South Sudan | Jan. 5, 2026 | Armed conflict; Extraordinary conditions | "Further, regarding the extraordinary and temporary conditions, there have been improvements in South Sudan's civil safety outlook, which would allow aliens to safely return to the country." 90 Fed. Reg. 50,485. |

4

| Burma | Jan. 26, 2026 | Extraordinary conditions | "[W]hile certain extraordinary and temporary conditions may remain, such conditions no longer hinder the safe return of aliens who are nationals of Burma to the country." 90 Fed. Reg. 53,380. |
|---|---|---|---|
| Haiti | Feb. 3, 2026 | Environmental disaster; Extraordinary conditions | "[T]here are no extraordinary and temporary conditions in Haiti that prevent Haitian nationals . . . from returning in safety." 90 Fed. Reg. 54,735. |
| Ethiopia | Feb. 13, 2026 | Armed conflict; Extraordinary conditions | "[T]he situation no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Ethiopian nationals," and extraordinary and temporary conditions "no longer hinder the safe return of aliens to Ethiopia." 90 Fed. Reg. 58,030. |
| Somalia | Mar. 17, 2026 | Armed conflict; Extraordinary conditions | "[W]hile some extraordinary and temporary conditions may exist in Somalia, they do not prevent Somali nationals . . . from returning in safety." 91 Fed. Reg. 1,550. |
| **Yemen** | May 4, 2026 | Armed conflict; Extraordinary conditions | Return "does not pose a serious threat . . . due to armed conflict," and "extraordinary and temporary conditions *continue to challenge* Yemeni nationals' ability to safely return home." 91 Fed. Reg. 10,403–05 (emphasis added). |

Despite these findings, the Secretary terminated TPS on the vague and unsubstantiated ground that permitting Yemeni nationals to remain is "contrary to the U.S. national interest." Notice, 91 Fed. Reg. at 10,404. The Notice gave Yemeni TPS holders sixty days—the statutory minimum—to wind down the lives they had built. *Id.* at 10,408.

## ARGUMENT[1]

I.       **Plaintiffs Are Likely to Succeed on the Merits**

    **A. The Termination Violates the APA Because It Is Contrary to Law, In Excess of Statutory Authority, and Arbitrary and Capricious**

         **i.    *The Secretary's finding that extraordinary and temporary conditions in Yemen continue to prevent safe return forecloses termination***

---

[1] Plaintiffs incorporate by reference the legal standard set forth in the *Noor Doe* brief. 1:26-cv-2103 (S.D.N.Y.), ECF No. 5 at 11.

The termination provision of the TPS statute is unambiguous in offering only a single criterion by which DHS would be authorized to terminate. The Secretary "shall terminate" a designation only if she finds "that the foreign state no longer continues to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3)(B). The Secretary found the opposite. The Notice found that Yemen "still experiences extraordinary and temporary conditions" and that those conditions "continue to challenge Yemeni nationals' ability to safely return home." Notice, 91 Fed. Reg. at 10,403–04. The Secretary terminated anyway.[2] An agency cannot act in contradiction of its own factual findings. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nor can it rely on a rationale the statute does not authorize to override the findings the statute requires. *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014).

The Notice confirms the point. It "acknowledges that there may appear to be some tension" between its finding that armed conflict no longer poses safety concerns and its separate finding that "extraordinary and temporary conditions continue to challenge Yemeni nationals' ability to safely return home." Notice, 91 Fed. Reg. at 10,405. But rather than extending TPS as the finding requires, the Notice asserts that "even assuming" such conditions remain, termination is justified on national interest grounds. *Id.* The statute does not authorize that override. A finding that conditions prevent safe return forecloses termination. The termination is therefore contrary to law

---

[2] Historically, when the armed conflict prong ends but extraordinary and temporary conditions preventing nationals from returning home safely persist, protection is preserved—not terminated. In 2004, when Liberia's armed conflict ended but extraordinary and temporary conditions remained, the Secretary redesignated under the extraordinary and temporary conditions prong rather than terminating. Termination and Re-Designation of Liberia for Temporary Protected Status, 69 Fed. Reg. 52,297, 52,298 (Aug. 25, 2004). Here, even accepting the Secretary's conclusion that armed conflict no longer applies, Yemen's designation should have continued under the extraordinary and temporary conditions prong alone.

6

and in excess of statutory authority under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(A), (C).

### ii. The Secretary's reliance on the "national interest" to terminate is contrary to law and exceeds statutory authority.

Plaintiffs incorporate by reference § I(B)(2) of the *Noor Doe* brief. 1:26-cv-2103 (S.D.N.Y.), ECF No. 5 at 16-19 and build on that foundation to explain why the termination's reliance on the national interest rationale is contrary to law and exceeds statutory authority.

Congress only allowed for the agency to consider "national interest" at the time of initial designation, and even then, only for the extraordinary-conditions designation provision at § 1254a(b)(1)(C). By contrast, the distinct termination provision only allows for termination when the Secretary determines that a country "no longer continues to meet the conditions for designation." § 1254a(b)(3)(B). That is dispositive of congressional purpose. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 454 (2002).

Under the Secretary's reading, TPS can be revoked for any country, at any time—even if every factual predicate for designation remains—based on a unilateral (and unsubstantiated) assertion of "national interest." That is the kind of "transformative expansion in [an agency's] regulatory authority" the Supreme Court has warned against. *Util. Air Regulatory Grp.*, 573 U.S. at 324. Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Further demonstrating agency understanding of this express congressional purpose, for thirty-five years, every TPS termination rested on a finding that

7

conditions had improved, and no termination relied on a mere assertion of national interest. Ex. 1 ¶ 5.

For thirty-five years, no Secretary invoked the national interest to terminate a TPS designation. Defendants' decision to do so is contrary to law and in excess of statutory authority.

> ### iii. The Secretary's reliance on the "national interest" to terminate is arbitrary and capricious

Even if the national interest were a permissible basis for termination—which, for the reasons above, it is not—the Secretary's analysis is arbitrary and capricious because it (1) fails to consider important factors identified in the Notice itself, and (2) relies on factors that are inapposite and irrational.

> #### a. The Secretary failed to consider important aspects of her own national interest analysis as applied to Yemeni TPS holders

An agency's action is arbitrary and capricious when it "entirely fail[s] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. *See also Miot v. Trump*, No. 25-CV-02471 (ACR), 2026 WL 266413, at *27 (D.D.C. Feb. 2, 2026), *cert. granted before judgment*, No. 25-1084, 2026 WL 731087 (U.S. Mar. 16, 2026) (finding the Secretary's failure to apply the national interest analysis to Haitian TPS holders arbitrary and capricious).

The Notice states that "'[n]ational interest' is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations (e.g., adverse effects on U.S. workers, impact on U.S. communities)." 91 Fed. Reg. at 10,406. Just listing criteria in support of a determination is not sufficient. The Secretary's failure to address, let alone analyze evidence

8

related to public safety, migration factors, immigration policy, and economic considerations as they specifically relate to Yemeni TPS holders was arbitrary and capricious.

**Public Safety:** The Notice lists "potential nexus to criminal gang membership" as a public safety consideration. *Id.* at 10,406. It offers no evidence that any Yemeni TPS holder has such a nexus, instead providing a vague reference to "administrative investigations" of unnamed individuals, without saying how many, for what, or what came of them. *Id.* at 10,407. That is speculation and not the "satisfactory explanation" the APA requires. *State Farm*, 463 U.S. at 43. Every Yemeni TPS holder has already passed DHS's own criminal history and security screening. *See* 8 U.S.C. § 1254a(c)(2)(B).

The Notice also ignores the public safety consequences of its own action. Stripping legal status from 2,810 people will drive them underground. People without legal status are less likely to report crimes, cooperate with law enforcement, or testify in court. *Nat'l TPS All. v. Noem*, Order Granting Pl.'s Mot. to Postpone, 773 F. Supp. 3d 807, 842 (N.D. Cal. 2025) ("*NTPSA I*").

**Migration Factors:** The Notice warns that TPS designations create "pull factors" attracting new migration. 91 Fed. Reg. at 10,407. But the Government's own Travel Ban categorically bars the entry of all Yemeni noncitizens, rendering that consideration moot. 90 Fed. Reg. at 24,499.

**Immigration Policy and Enforcement Prerogatives:** TPS holders are thoroughly vetted. Each has passed DHS's own background checks, security screenings, and criminal history reviews—many of them multiple times over a decade of re-registrations and extension. *See* 8 U.S.C. § 1254a(c)(2)(B). While they hold TPS, they are lawfully present, lawfully employed, and known to the government. Terminating their status converts them into enforcement targets overnight.

9

**Economic Considerations:** The economic contribution of TPS holders is substantial. Nationally, TPS holders are employed at a rate of 94.6% and participate in entrepreneurship at 14.5%, compared to 9.3% for U.S.-born workers. Ex. 2. They contributed over $2.2 billion in annual taxes, including nearly $1 billion to state and local governments. *Id.* Termination does not just harm TPS holders. It harms Americans. Fahad Doe, an FAA-approved Check Airman, lost his job the day the termination was announced. Ex. 12 ¶¶ 5-7. The Termination cost an American airline a trained, certified pilot. Ebe Doe is a clinical research specialist contributing to peer-reviewed cancer research; losing her costs American patients. Ex. 13 ¶ 7. The downstream effects are broader still. Yemeni nationals operate approximately half of New York City's roughly 15,000 bodegas. Ex. 3. TPS holders are embedded in these networks as owners, employees, and family members whose income supports these businesses. Removing them destabilizes an economic ecosystem that employs American workers and serves millions of Americans.

The Secretary's failure to analyze the Notice's own articulated factors as they relate to Yemeni TPS holders was arbitrary and capricious.

### b. *The national interest rationale improperly relies on factors that do not support termination*

The "national interest" rationale also fails because the factors the Secretary did consider in relation to Yemeni TPS holders are irrelevant and undermine her own conclusion.

**The Travel Ban:** The Notice invokes Proclamation 10949, which suspends entry of Yemeni nationals based on purportedly inadequate vetting. 91 Fed. Reg. at 10,406. But TPS holders are not seeking entry. They are already here, vetted, and certified by DHS as posing no security risk. The Travel Ban cites INA § 212(f), which authorizes the President to suspend entry, not to strip status from those already present. *See* 8 U.S.C. § 1182(f); *Refugee and Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 81 (D.D.C. 2025). DHS's own prior practice confirms

10

this distinction: it previously extended TPS for Syria despite a proclamation suspending Syrian entry, *see* 83 Fed. Reg. 9,329 (Mar. 5, 2018); 84 Fed. Reg. 49,751 (Sept. 23, 2019), and terminated TPS for Sudan based solely on country conditions without invoking that same proclamation, *see* 82 Fed. Reg. 47,228 (Oct. 11, 2017).

**Visa overstay data:** The Notice cites overstay rates for Yemeni nationals: 17.1% for B-1/B-2 visitors and 25.7% for F/M/J students. 91 Fed. Reg. at 10,407. But this data is irrelevant to TPS holders, who are already present and already lawfully authorized to remain. Overstay rates measure how many visitors fail to depart after their visas expire—a concern about future admissions, not current TPS holders. Moreover, DHS's overstay reports are notoriously overinclusive—capturing individuals who applied for relief but were not yet approved, as well as those misidentified due to tracking failures. Ex. 4 at 11-13; Ex. 1 ¶¶ 15–17. And the data undercuts the Secretary's conclusion: the Notice reports that Yemeni overstays fell from approximately 670 in 2024 to approximately 230 in 2025—yet DHS redesignated Yemen for TPS in 2024 when overstays were nearly three times higher. A declining trend cannot rationally support a new finding that Yemen's designation is contrary to the national interest.

**Terrorist organizations:** The Notice devotes substantial space to the Houthi Foreign Terrorist Organization ("FTO") designation and Al-Qaeda in the Arabian Peninsula's ("AQAP") presence in Yemen. 91 Fed. Reg. at 10,406-07. But Yemeni TPS holders, including several Plaintiffs, fled these groups—they are victims, not affiliates. The 2024 Redesignation explicitly recognized that many face persecution by "Houthi forces, AQAP, and other armed groups." 89 Fed. Reg. 56,765, 56,768 (July 10, 2024). TPS exists precisely to protect people who cannot safely return because of violence perpetrated by such organizations. Invoking the presence of terrorist

11

groups as a reason to terminate protection inverts the statute's logic. None of the Secretary's stated rationales can bear the weight placed on them. The termination is arbitrary and capricious.

In sum, the termination fails at every level of APA review. It is contrary to law because the Secretary terminated despite finding that the relevant statutory conditions persist. It exceeds statutory authority because the statute does not authorize termination on national interest grounds. And it is arbitrary and capricious because the Secretary relied on rationales that lack evidentiary support.

**B.  The Termination Is Contrary to Law Because It Violates Equal Protection**

Plaintiffs incorporate by reference § I(C) of the *Noor Doe* brief, 1:26-cv-2103 (S.D.N.Y.), ECF No. 5 at 16-19, and write separately to address the standard of review and additional analysis under *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

Courts apply strict scrutiny to assess government decisions motivated by discriminatory purpose. *Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006). The limited exception for deferential review adopted in *Trump v. Hawaii,* 585 U.S. 667 (2018), applies only to restrictions on entry into the United States and does not apply to TPS determinations, which concern individuals already in the country. *See Saget v. Trump,* 375 F. Supp. 3d 280, 367 (E.D.N.Y. 2019); *NTPSA I*, Order Granting Pl.'s Mot. for Summ. J., 797 F. Supp. 3d 1108, 1157 (N.D. Cal. 2025); *Nat'l TPS All. v. Noem*, 798 F. Supp. 1008, 1032 (N.D. Cal. 2025) (*NTPSA II*); *see also United States v. Suquilanda,* 116 F.4th 129, 140 (2d Cir. 2024) (applying strict scrutiny to equal protection challenge to domestic immigration law). Discriminatory purpose may be inferred from the totality of circumstances, including an action's impact, historical background, sequence of events, procedural departures, and decisionmaker statements. *Arlington Heights*, 429 U.S. at 266-268.

12

The termination of TPS for Yemen lies at the intersection of two forms of discrimination this Administration has pursued: racial animus toward non-white immigrants and religious animus toward Muslims. Since January 2025, the Administration has terminated TPS for thirteen countries. Every single one has a majority non-white population. Every Muslim-majority country with a TPS designation up for review—Yemen, Afghanistan, Syria, and Somalia—has been terminated. Meanwhile, the Administration has left the Ukrainian humanitarian parole program intact while suspending the equivalent programs for Cubans, Haitians, Nicaraguans, and Venezuelans. And while terminating protections for Yemenis, Somalis, and Haitians, it has expedited refugee admissions for white Christian Afrikaners from South Africa—a program so explicitly race-conscious that U.S. diplomatic cables asked whether "non-whites qualify." Exs. 8, 9; *see also* Compl. ¶ 134.

This is not an isolated act. It is the latest in a series that multiple federal courts have found infected with discriminatory animus. *NTPSA I*, Order Granting Pl.'s Mot. to Postpone, 773 F. Supp. 3d at 855–66; *NTPSA II*, 798 F. Supp. 3d at 1033-35; *see also NTPSA I*, Order Granting Pl.'s Mot. for Summ. J., 798 F. Supp. 3d at 1116-18 (denying government's summary judgment motion on equal protection claims). Defendants have never offered a lawful explanation for the shift in policy to mass-terminate TPS designations for non-white and Muslim populations. They cannot, because there is none. *See Centro Presente v. DHS*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) (plaintiffs plausibly alleged TPS terminations violated equal protection where terminations rested on an "unreasoned shift in policy").

The Notice's reliance on the Travel Ban deepens the inference of discriminatory intent. The Travel Ban is the successor to Executive Order 13769, which federal courts found to be motivated by anti-Muslim bias. *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 591–

13

92 (4th Cir. 2017). Every country on the current ban is majority-Muslim, majority non-white, or both. 90 Fed. Reg. at 24,499. The Secretary cited a policy rooted in anti-Muslim animus, one that survived judicial scrutiny only under the limited deference afforded to entry restrictions, as a basis for terminating TPS for a Muslim-majority country. The Travel Ban was designed to keep people out. The Secretary repurposed it to force people already here to leave.

The statements of the decisionmakers confirm what the pattern reveals. President Trump, who instructed the Secretary to end TPS, has singled out Yemenis in particular, claiming they are "very, very rough people" who "want to blow up our country" and branding Yemeni immigrants as "known terrorists." *Id.* ¶¶ 46-47. During his campaign, he promised to reinstate his previous ban on the entry of nationals from Muslim-majority countries and specifically named Yemen among countries whose nationals would be excluded. *Id.* ¶ 110. He has referred to African nations and Haiti as "shithole countries" while expressing preference for Norwegian immigrants and Afrikaners. *Id.* ¶ 130. He has repeatedly described immigration as "poisoning the blood of our country." *Id.* ¶ 124.

The President's animus is echoed by the agency who carried out his directive. Then-Secretary Kristi Noem publicly called for "a full travel ban on every damn country that's been flooding our nation with killers, leeches, and entitlement junkies." Ex. 5. Yemen was among the countries already subject to the Travel Ban she was advocating to expand, the same Travel Ban the termination notice cites as a national interest factor justifying termination. 91 Fed. Reg. at 10,406. The Secretary used dehumanizing language to advocate for the very policy instrument later cited to strip Yemeni TPS holders of protection. As one court observed, these statements "reflect the Secretary's animus against immigrants and the TPS program" and "perpetuate the discriminatory belief that certain immigrant populations will replace the white population."

14

*NTPSA II*, 798 F. Supp. 3d at 1034. Moreover, DHS has publicly embraced the term "remigrate," language with documented ties to white-nationalist movements advocating the forced removal of non-white populations from Western countries. Compl. ¶ 119. An agency adopts the vocabulary of white-nationalist ideology while executing a program of race-selective TPS terminations has disclosed its discriminatory purpose through its own words and actions. The record leaves little room for an alternative explanation.

## II.    Yemeni TPS Holders and Applicants Face Irreparable Harm

Plaintiffs incorporate by reference the legal standard and constitutional basis for irreparable harm in § II of *Noor Doe*. 1:26-cv-2103 (S.D.N.Y.), ECF No. 5 at 23. The harms Plaintiffs face are not abstract. They are immediate, irreversible, and will begin the moment the termination takes effect. Plaintiffs have established *per se* irreparable harm because they allege cognizable violations of their constitutional rights. "[T]he alleged violation of a constitutional right triggers a finding of irreparable injury." *Conn. Dep't of Env't Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004). That alone suffices. But the record goes further.

**Detention and Deportation:** On May 4, Plaintiffs lose their lawful status and become subject to arrest and removal. Ex. 7 ¶¶ 12, 29. "The deprivation of [a noncitizen's] liberty is, in and of itself, irreparable harm." *Torres-Jurado v. Biden*, No. 19 Civ. 3595 (AT), 2023 WL 7130898, at *5 (S.D.N.Y. Oct. 29, 2023). Removal means return to a country that Defendants found unsafe. For some Plaintiffs, it means death.

Faiz Doe documented Houthi war crimes—the forced recruitment of child soldiers as young as thirteen. The Houthis accused him of spying, surveilled his house, confiscated his phone, and imprisoned more than seven of his colleagues; two died in custody. If he is returned, he will be detained, interrogated, and almost certainly killed. Ex. 14 ¶¶ 3–14, 21–22. Ali Doe's father is

15

on a Houthi target list, and Ali's diplomatic passport identifies him as his father's son. If the Houthis find it, they will detain, interrogate, and torture Ali. Ex. 15 ¶¶ 3–12. Sam Doe fears forced military recruitment if returned to Yemen, and due to his father's work for the United Nations, he also fears detention. Ex. 16 ¶¶ 6–11. Abdo Doe has lived in the United States for twenty-seven years. If the Houthis learn he has spent nearly three decades in America, they will detain him. Ex. 17 ¶¶ 7–12, 15.

**Family Separation:** Many class members have U.S. citizen children who have never set foot in Yemen. *See* Ex. 18 ¶ 11. They "will confront the impossible choice of either leaving their [U.S. citizen] children behind or taking their children with them to a country [in] which they may not be safe." *Saget*, 375 F. Supp. 3d at 375. Hadeel Doe's baby is due in mid-May 2026, just days after TPS terminates. Her unborn son has a congenital heart defect, which may require specialized cardiac care immediately after birth. That care does not exist in Yemen. Her two other children— ages nine and two—are United States citizens. She has no one left in Yemen. Ex. 18 ¶¶ 4–12.

**Loss of Livelihood and Professional Standing:** Loss of the opportunity to pursue one's chosen profession constitutes irreparable harm. *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017). Fahad Doe, a flight instructor and FAA-approved Check Airman, has spent ten years building toward a commercial pilot career. He was one step from an airline position. The day the Notice was published, his employer terminated his employment in response to the TPS decision. Ex. 12 ¶¶ 5–11. Ebe Doe, a clinical research specialist, holds a medical degree and has passed Steps 1 and 2 of the United States Medical Licensing Examination. She is months from Step 3 and a residency application. If TPS terminates, she loses her job, her ability to sit for the exam, and the career she has spent years building. That work does not exist in Yemen. Ex. 13 ¶¶ 5–11, 17–18. Other Plaintiffs—a deli worker, a convenience store worker, a car service employee,

an educational psychologist—face the same loss. Exs. 15, 14, 18. Plaintiffs and class members will lose their livelihood and, in many cases, their health insurance and driver's license. *See* Ex. 17 ¶ 3; *see also Brewer*, 855 F.3d at 978 (loss of driver's licenses causes cascading and irreparable harms).

**Foreclosure of Alternatives:** On May 4, 2026, Plaintiffs lose their lawful status and work authorization. For TPS holders from countries not subject to the Travel Ban, other avenues of relief may remain. For Yemeni nationals, every one has been closed. On December 2, 2025, the United States Citizenship and Immigration Services ("USCIS") issued a directive halting the adjudication of affirmative applications for nationals of the Travel Ban countries, including Yemen. Ex. 10. If the termination takes effect, Plaintiffs cannot maintain their current status, and they cannot obtain a new one.

Additional barriers also prevent other means of legal reentry. On January 21, 2026, the Department of State's pause on all immigrant visa processing for nationals of seventy-five countries, including Yemen, went into effect. Ex. 11. Even if a Yemeni TPS holder managed to obtain an immigrant visa, it would not matter. Presidential Proclamation 10949 categorically bars the entry of all Yemeni nationals. They could not reenter the country. Ex. 7 ¶ 28.

The Government may suggest that Plaintiffs can still apply for relief in removal proceedings. But to access removal proceedings, a person must be first charged as removable—a process that often begins with arrest and detention. That is not a meaningful alternative.

For pending TPS applicants, the injury is also irreparable. While their applications are pending, applicants are protected from detention and deportation, and eligible for work authorization. *See* 8 U.S.C. § 1254a(a)(4)(B); 8 C.F.R. § 244.10. Sam Doe's pending TPS application is his only pathway to lawful status. Ex. 16 ¶¶ 3-4. His asylum application has been

17

frozen by USCIS's December 2, 2025, directive. The Government's 60-day timetable leaves individuals like Sam no time to pursue alternatives that no longer exist.

## CONCLUSION

For all the foregoing reasons this Court should grant Plaintiffs' motion and postpone the effective date of Defendants' unlawful termination of Yemen's TPS designation pending final resolution of this case.

Dated: March 25, 2026                                          Respectfully submitted,

 /s/ Razeen Zaman
Razeen Zaman
Helen Anne Schutz Lo*
Dinesh McCoy**
Phi Nguyen**
Niji Jain
ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY 10013
Tel: (212) 966-5932
rzaman@aaldef.org
alo@aaldef.org
dmccoy@aaldef.org
pnguyen@aaldef.org
njain@aaldef.org

Shayana Kadidal [SK-1278]
Angelo Guisado
Baher Azmy [BA-8406]
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6438
Fax: (212) 614-6451
kadidal@ccrjustice.org
aguisado@ccrjustice.org
bazmy@ccrjustice.org

*Counsel for Plaintiffs*

*\*Application for admission pending*

*\*\*Application for admission Pro Hac Vice forthcoming*

19

**CERTIFICATION OF WORD COUNT**

I hereby certify that the word count of this Memorandum of Law in support of Plaintiffs' motion to postpone complies with the word limits of Local Rules of the United States District Courts for the Southern & Eastern Districts of New York § 7.1(c) and United States District Judge Dale E. Ho, Individual Rules and Practices in Civil Cases § 4(c). According to the word-processing system used to prepare this Memorandum of Law, the total word count for all printed text exclusive of the material omitted under Loc. R S.D.N.Y & E.D.N.Y § 7.1(c) and U.S. Dist. J. Dale E. Ho, Individual Rules and Practices in Civil Cases § 4(c) is 5,413 words and 18 pages.

Dated: March 25, 2026

New York City, New York

/s/*Razeen Zaman*

Razeen Zaman

20