UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NOOR DOE, *et al.*,<br><br>   Plaintiffs,<br><br>     v.<br><br>MARKWAYNE MULLIN, Secretary, United States Department of Homeland Security, in his official capacity, *et al.*,<br><br><br>   Defendants. | Case No. 26 Civ. 2103 (DEH) |
| NOOR DOE, et al.,<br><br>   Plaintiffs,<br><br>     v.<br><br>MARKWAYNE MULLIN, Secretary, United States Department of Homeland Security, in his official capacity, *et al.*,<br><br>   Defendants. | Case No. 26 Civ. 2280 (DEH) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTIONS TO POSTPONE THE EFFECTIVE DATE OF AGENCY ACTION**

JAY CLAYTON
United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2713
*Attorney for Defendants*

MARK OSMOND
Assistant United States Attorney
 *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND...........................................................................................................................3

I.    STATUTORY BACKGROUND ........................................................................................3

II.   FACTUAL BACKGROUND: TPS FOR YEMEN ............................................................5

LEGAL STANDARD ..................................................................................................................8

ARGUMENT ...............................................................................................................................9

I.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS .............................9

        A.    Section 1254a Prohibits Judicial Review of TPS Terminations .............................9

        B.    Section 1252(f)(1) Precludes Plaintiffs' Requested Relief....................................17

II.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS
     ON THE MERITS, EVEN IF THE COURT COULD DECIDE THEM ...............................19

        A.    Plaintiffs' APA Claims Fail on the Merits............................................................19

               1.    The Secretary Lawfully Terminated Yemen's TPS Designation After
                    Considering the Relevant Factors ...............................................................19

               2.    The Secretary Terminated Yemen's TPS Designation After Appropriately
                    Considering Whether the Designation Continued to be in the "National
                    Interest".......................................................................................................25

               3.    The Secretary's Selection of a Sixty-Day Wind-Down Is Consistent with
                    the Statute.....................................................................................................26

        B.    Plaintiffs' Animus Claim Fails on the Merits........................................................27

III.  EQUITABLE FACTORS WEIGH AGAINST POSTPONEMENT.....................................33

CONCLUSION............................................................................................................................35

# TABLE OF AUTHORITIES

Page(s)

Cases

*Alliance for Hippocratic Medicine v. FDA*,
  No. 23-10362, 2023 WL 2913725 n.3 (5th Cir. Apr. 12, 2023)................................................ 18

*American Federation of Teachers v. Bessent*,
  152 F.4th 162 (4th Cir. 2025)................................................................................................. 13

*Bouarfa v. Mayorkas*,
  604 U.S. 6 (2024).................................................................................................................. 24

*California v. Grace Brethren Church*,
  457 U.S. 393 (1982).............................................................................................................. 18

*CASA de Maryland, Inc. v. Trump*,
  971 F.3d 220 (4th Cir. 2020)................................................................................................. 13

*CASA, Inc. v. Noem*,
  No. 25-1792, 2025 WL 2028397 (4th Cir. July 21, 2025)................................................. 14, 34

*Citizens to Preserve Overton Park, Inc.* v. *Volpe*,
  401 U.S. 402 (1971)......................................................................................................... 22, 25

*Const. Pipeline Co., LLC v. N.Y. State Dep't of Envtl. Conservation*,
  868 F.3d 87 (2d Cir. 2017) .................................................................................................... 22

*DCH Regional Medical Center v. Azar*,
  925 F.3d 503 (D.C. Cir. 2019)............................................................................................... 15

*DHS v. Regents of Univ. of Cal.*,
  591 U.S. 1,  (2020)...................................................................................................... 29, 30, 32

*Department of Commerce* v. *New York*,
  588 U.S. 752 (2019).............................................................................................................. 24

*Doe v. Noem*,
  No. 25-2995, 2026 WL 544631 (2d Cir. Feb. 17, 2026)................................................... 14, 15

*E. Bay Sanctuary Covenant v. Trump*,
  950 F.3d 1242 (9th Cir. 2020)................................................................................................ 14

*EPA v. Calumet Shreveport Ref., LLC*,
  605 U.S. 627 (2025).............................................................................................................. 10

*FDA v. Wages and White Lion Invs., L.L.C.,*
    604 U.S. 542 (2025) ................................................................................ 22, 27

*Friends of Animals v. Romero,*
    948 F.3d 579 (2d Cir. 2020) ........................................................................ 19

*Friends of Ompompanoosuc v. FERC,*
    968 F.2d 1549 (2d Cir. 1992) ...................................................................... 19

*Garland v. Aleman Gonzalez,*
    596 U.S. 543 (2022) ................................................................................ 17, 18

*Garland v. Ming Dai,*
    593 U.S. 357 (2021) ..................................................................................... 23

*Gill v. Whitford,*
    585 U.S. 48 (2018) ....................................................................................... 35

*Gilligan v. Morgan,*
    413 U.S. 1 (1973) ......................................................................................... 11

*Grand River Enterprise Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007) .......................................................................... 9

*Hassoun v. Searls,*
    976 F.3d 121 (2d Cir. 2020) ........................................................................ 14

*Immigrant Defs. L. Ctr. v. Noem,*
    145 F.4th 972 (9th Cir. 2025) ...................................................................... 19

*Info. Ctr. v. U.S. Dep't of Com.,*
    928 F.3d 95 (D.C. Cir. 2019) ....................................................................... 19

*Kaplan v. Rand,*
    192 F.3d 60 (2d Cir. 1999) .......................................................................... 14

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972) ..................................................................................... 27

*Lamar, Archer & Cofrin, LLP v. Appling,*
    584 U.S. 709 (2018) ..................................................................................... 10

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ..................................................................................... 21

*Make the Rd. New York v. Noem*,
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)....................................................... 18

*Maryland v. King*,
567 U.S. 1301 (2012)................................................................................................. 33, 34

*Mathews v. Diaz*,
426 U.S. 67 (1976)............................................................................................................. 27

*New Jersey v. Bessent*,
149 F.4th 127 (2d Cir. 2025)............................................................................................ 20

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982)........................................................................................................... 31

*Nken v. Holder*,
556 U.S. 418 (2009)..................................................................................................... 12, 34

*Noem v. Doe*,
No. 25-1083, 2026 WL 731088 (U.S. Mar. 16, 2026) ...................................................... 13

*Noem v. Nat'l TPS* Al*lianc*e,
145 S. Ct. 2728 (2025).............................................................................................. 2, 12, 33

*Noem v. NTPSA*,
146 S. Ct. 23 (2025)............................................................................................. 2, 12, 13, 33

*NTPSA v. Noem,*
150 F.4th 1000 (9th Cir. 2025)......................................................................................... 18

*NTPSA v. Noem*,
166 F.4th 739 (9th Cir. 2026)........................................................................................... 13

*Nouritajer v. Jaddou*,
18 F.4th 85 (2d Cir. 2021)................................................................................................ 24

*Paskar v. U.S. Dep't of Transp.*,
714 F.3d 90 (2d Cir. 2013)............................................................................................... 14

*Patel v. Garland*,
596 U.S. 328 (2022).......................................................................................................... 10

*Rajah v. Mukasey*,
544 F.3d 427 (2d Cir. 2008)............................................................................................. 28

*Ramos v. Mayorkas*,
   2023 WL 4363667 (9th Cir. June 29, 2023)...................................................................11

*Ramos v. Wolf*,
   975 F.3d 872 (9th Cir. 2020) ...................................................................................... 10

*Rezzonico v. H & R Block, Inc.*,
   182 F.3d 144 (2d Cir. 1999) ........................................................................................ 14

*Rostker v. Goldberg*,
   453 U.S. 57 (1981)........................................................................................................11

*Skagit County Pub. Hosp. Dist. No. 2 v. Shalala*,
   80 F.3d 379 (9th Cir. 1996) ......................................................................................... 16

*Starbucks Corp. v. McKinney*,
   602 U.S. 339 (2024)..................................................................................................... 35

*State of New York v. Admin. for Child. & Fams.*,
   No. 26 Civ. 172 (VSB), 2026 WL 673848 (S.D.N.Y. Mar. 10, 2026) ......................... 8

*Stephan v. United States*,
   319 U.S. 423 (1943)..................................................................................................... 17

*Students for Fair Admissions v. U.S. Mil. Acad. at West Point*,
   709 F. Supp. 3d 118 (S.D.N.Y. 2024) ........................................................................... 9

*Sussman v. Crawford*,
   488 F.3d 136 (2d Cir. 2007) .......................................................................................... 9

*Trump v. Boyle*,
   145 S. Ct. 2653 (2025)............................................................................................ 13, 33

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025)................................................................................................ 13, 35

*Trump v. Hawaii*,
   585 U.S. 667 (2018)............................................................................... 21, 27, 28, 29

*Trump v. Miot*,
   No. 25-1084, 2026 WL 731087 (U.S. Mar. 16, 2026) ............................................... 13

*U.S. Army Corps of Engineers v. Hawkes Co., Inc.*,
   578 U.S. 590 (2016)..................................................................................................... 15

v

*U.S. National Bank of Oregon v. Independent Insurance Agents of America, Inc.*,
    508 U.S. 439 (1993) ............................................................................................... 17

*United States R.R. Retirement Bd. v. Fritz*,
    449 U.S. 166 (1980) ............................................................................................... 29

*United States v. Nixon*,
    418 U.S. 683 (1974) ............................................................................................... 31

*United States v. Tohono O'odham Nation*,
    563 U.S. 307 (2011) ............................................................................................... 10

*United States v. Welden*,
    377 U.S. 95 (1964) ................................................................................................. 17

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ............................................................................................... 23

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977) ............................................................................................... 29

*We The Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir. 2021) ..................................................................................... 9

*Webster v. Doe*,
    486 U.S. 592 (1988) ............................................................................................... 21

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................................... 9

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ............................................................................... 34

*Yale New Haven Hospital v. Becerra*,
    56 F.4th 9 (2d Cir. 2022) ....................................................................................... 15

Statutes

1 U.S.C. § 204(a) ........................................................................................................ 17

5 U.S.C. § 704 ............................................................................................................. 15

5 U.S.C. § 705 ................................................................................................... 2, 8, 35

6 U.S.C. § 557 ............................................................................................................... 3

8 U.S.C. § 1157(e) ...................................................................................................... 23

8 U.S.C. § 1158(d)(2) ............................................................................................................... 35

8 U.S.C. § 1252(f)(1) ................................................................................................... 2, 17, 18, 19

8 U.S.C. § 1254a(b) ..................................................................................................................... 1

8 U.S.C. § 1254a(b)(1) ................................................................................................................. 3

8 U.S.C. § 1254a(b)(1)(C) ......................................................................................... 4, 25, 26, 33

8 U.S.C. § 1254a(b)(3)(A) ................................................................................................ 4, 21, 22

8 U.S.C. § 1254a(b)(3)(B) .................................................................................................. 4, 25, 26

8 U.S.C. § 1254a(b)(5)(A) ................................................................................................... passim

8 U.S.C. § 1254a(d)(2) ............................................................................................................... 26

8 U.S.C. § 1254a(d)(3) ................................................................................................................. 4

8 U.S.C. §§ 1158 ........................................................................................................................ 34

8 U.S.C. § 1158(d)(2) ................................................................................................................. 35

16 U.S.C. § 1536(b)(3)(A) .......................................................................................................... 23

28 U.S.C. § 1341 ......................................................................................................................... 18

33 U.S.C. § 2321a(b) .................................................................................................................. 23

42 U.S.C. § 1395ww(r)(3)(A) ..................................................................................................... 16

8 C.F.R. § 208.7 ......................................................................................................................... 35

8 C.F.R. §§ 208.4(a)(5)(iv) ........................................................................................................ 35

8 C.F.R. § 244.13(b) ................................................................................................................... 26

8 C.F.R. §§ 244.19 ....................................................................................................................... 4

Defendants (the "government") respectfully submit this memorandum of law in opposition to the motions filed by the plaintiffs in these two related putative class actions ("Plaintiffs") to postpone the effective date of agency action. *See* 26 Civ. 2103, Dkt. No. 5 ("First Motion"), 26 Civ. 2280, Dkt. No. 24 ("Second Motion").[1]

## PRELIMINARY STATEMENT

Congress created Temporary Protected Status ("TPS") to provide temporary protection to noncitizens who cannot safely return to their country because of natural disaster, armed conflict, or other "extraordinary and temporary conditions." 8 U.S.C. § 1254a(b). The Secretary of Homeland Security (the "Secretary") may designate a country for TPS only if the Secretary determines that certain statutory criteria justifying the designation are met. When a country is designated, eligible individuals who are present in the United States on the effective date and register with the government generally are temporarily protected from removal and receive work authorization. Consistent with the temporary nature of TPS, Congress dictated that the Secretary must regularly review a country's TPS designation and must terminate that designation if the Secretary determines that the conditions for the designation are no longer met.

Exercising that statutory authority, former Secretary Noem terminated the TPS designation for Yemen effective May 4, 2026. In accordance with statutory and regulatory requirements, the Secretary provided 60 days' notice of the termination, in a notice published in the Federal Register that explained the bases for the Secretary's decision. Plaintiffs bring this suit challenging the termination and asserting claims under the APA and the equal-protection guarantee of the Fifth

---

[1]   Secretary of Homeland Security Markwayne Mullin is automatically substituted for former Secretary Kristi Noem pursuant to Federal Rule of Civil Procedure 25(d).

Amendment's Due Process Clause. Plaintiffs moved to postpone the effective date of the Secretary's TPS termination under 5 U.S.C. § 705—motions governed by the same factors as motions for preliminary injunctions. The Court should deny Plaintiffs' motions.

As an initial matter, Plaintiffs' claims are barred by the TPS statute itself, which provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A). Indeed, the Supreme Court has twice stayed similar district court orders based on this jurisdictional bar, necessarily determining that the government would likely prevail in those cases. *See Noem v. Nat'l TPS Alliance* ("*NTPSA*"), 145 S. Ct. 2728 (2025); *Noem v. NTPSA*, 146 S. Ct. 23, 24 (2025). By extension, the same jurisdictional bar twice recognized by the Supreme Court precludes judicial review of Plaintiffs' claims here.

The Court also lacks jurisdiction because an additional statute, 8 U.S.C. § 1252(f)(1), bars the relief Plaintiffs seek. That statute strips district courts of "jurisdiction or authority to enjoin or restrain the operation" of specified statutory provisions, including the TPS statute. 8 U.S.C. § 1252(f)(1). An order postponing the effective date would have the practical effect of an injunction and thereby "enjoin" the operation of the TPS statute and, even if not, such an order would plainly be a "restrain[t]" on the TPS statute's operation.

Even if their claims were reviewable, Plaintiffs cannot demonstrate a likelihood of success on the merits. The Secretary's TPS determination was reasonable, reasonably explained, and based on the factors specified in the TPS statute, and it therefore clears the low bar for arbitrary-and-capricious review. In particular, the "national interest" criterion affords the Secretary wide discretion in making her decision. Any contrary conclusion would intrude upon the Secretary's

foreign-affairs and national-security judgments, where the executive branch is entitled to substantial deference.

The remaining equitable factors also favor the government, as the Supreme Court has twice found by granting stays for the termination of TPS for Venezuela. The government and the public share an interest in ensuring adherence to the congressionally prescribed process under which the Secretary carries out her responsibility to weigh the statutory factors governing TPS designations. In doing so here, the Secretary determined that the conditions for Yemen's TPS designation were no longer met and that the continuation of its TPS status was not in the national interest given concerns grounded largely in national security, public safety, and immigration policy. And while Plaintiffs have an interest in remaining in the United States, that interest, based in the TPS statute, was inherently temporary; the harm to them therefore results from the statute itself, not from the Secretary's action.

For these reasons and those discussed below, the Court should deny Plaintiffs' motions.

## BACKGROUND

### I.    STATUTORY BACKGROUND

The Immigration Act of 1990 established TPS to allow for temporary, discretionary shelter in the United States for qualifying nationals from designated foreign countries. Pub. L. No. 101-649, 104 Stat. 4978. The statute permits the Secretary, "after consultation with appropriate agencies," to designate countries for TPS if the Secretary determines that certain statutorily specified conditions are met. 8 U.S.C. § 1254a(b)(1); *see id.* § 1103; 6 U.S.C. § 557 (transferring authority from the Attorney General to the Secretary).

As relevant here, one condition is that "there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in

safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C). Another is that "there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety." *Id.* § 1254a(b)(1)(A).

Foreign nationals who receive and continue to qualify for TPS generally may not be removed from the United States and may work during the period in which their country is designated. *Id*. § 1254a(a)(1), (c). Initial TPS designations are discretionary and last "not less than 6 months and not more than 18 months." *Id.* § 1254a(b)(2).

At least 60 days before the end of the initial designation and any later extension, the Secretary, after consulting with appropriate agencies, must "review the conditions in the foreign state . . . for which a designation is in effect" and "determine whether the conditions for such designation . . . continue to be met." *Id.* § 1254a(b)(3)(A). If the foreign state "no longer continues to meet the conditions for designation," the Secretary "shall terminate the designation." *Id.* § 1254a(b)(3)(B).

A TPS termination "shall not be effective earlier than 60 days after the date the [Secretary's] notice is published or, if later, the expiration of the most recent previous extension." *Id.*; *accord* 8 C.F.R. §§ 244.19, 244.13(b). The Secretary has the "option" to establish a termination date "after such period after the effective date . . . as the [Secretary] determines to be appropriate in order to provide for an orderly transition." 8 U.S.C. § 1254a(d)(3).

Congress enacted a broad prohibition on judicial review of the Secretary's exercise of her TPS authority: "There is no judicial review of any determination of the [Secretary] with respect to

4

the designation, or termination or extension of a designation, of a foreign state under this subsection." *Id.* § 1254a(b)(5)(A).

## II.    FACTUAL BACKGROUND: TPS FOR YEMEN

On September 3, 2015, the Secretary designated Yemen for TPS based on a determination that there was an ongoing armed conflict in Yemen and that, due to that conflict, requiring Yemeni nationals to return would pose a serious threat to their personal safety. *Designation of the Republic of Yemen for Temporary Protected Status*, 80 Fed. Reg. 53,319 (Sept. 3, 2015). The designation was extended on that basis and on "extraordinary and temporary conditions." *Termination of the Designation of Yemen for Temporary Protected Status*, 91 Fed. Reg. 10,402–03 (Mar. 3, 2026) (the "Notice") (listing extensions).

On March 3, 2026, the Secretary published a Federal Register notice announcing that TPS for Yemen would be terminated effective May 4, 2026. *Id*. at 10,402. As the Notice explained, after reviewing country conditions in Yemen and consulting with appropriate federal agencies, the Secretary considered whether Yemen continued to meet the statutory conditions for TPS designation, including: (1) whether requiring the return of Yemeni nationals poses a serious threat to their personal safety due to ongoing armed conflict; (2) whether there are extraordinary and temporary conditions in Yemen that prevent Yemeni nationals from returning safely; and (3) whether permitting Yemeni nationals to remain temporarily in the United States is contrary to the national interest of the United States. *Id*. at 10,403.

The Secretary determined that the situation in Yemen no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Yemeni nationals. *Id*. The Notice stated that, although Yemen entered a prolonged violent conflict in 2014 and the conflict was considered by some in the international community to be a civil war in 2017,

5

conditions had improved notably since April 2022, when the United Nations brokered a nationwide truce between the warring parties. *Id*. at 10,403–04. The Secretary explained that violence significantly declined during implementation of the truce, including a cessation of Saudi-led coalition airstrikes and major ground offensives by both sides, and that although sporadic events continued along frontlines, the peace resulting from the truce remained in effect. *Id*. at 10,404. The Secretary also noted subsequent diplomatic developments in 2025, including renewed peace efforts by the U.N. Special Envoy and a September 2025 statement that "relative calm and stability continue to hold on the frontlines." *Id*. (internal quotation marks omitted). The Notice further observed that, in December 2025, the Southern Transitional Council took over two of the eight provinces in Yemen without apparent accompanying violence. *Id*. Based on those developments, the Secretary concluded that "the conflict in Yemen does not appear to pose a threat to the safety of returning Yemeni nationals." *Id*.

The Secretary also cited additional facts bearing on whether Yemeni nationals may safely return to Yemen. Of additional significance in evaluating conditions in Yemen and the ability of Yemeni nationals to safely return, the Notice stated that from 2018 through 2025, there were 142 applications for advance parole documents for travel back to Yemen, and that U.S. Immigration and Customs Enforcement is currently removing aliens to Yemen. *Id*.

With respect to extraordinary and temporary conditions, the Secretary acknowledged that notwithstanding "some improvements" in Yemen—such as the U.N. Development Programme's implementation of agricultural and water infrastructure projects to improve food security, expand irrigated land, and create employment opportunities—"country conditions indicate that extraordinary and temporary conditions continue to challenge Yemeni nationals' ability to safely

return home." *Id.* at 10,405. The Notice recognized that there may appear to be some tension between the Secretary's determination under the ongoing-armed-conflict prong and her determination under the extraordinary-and-temporary-conditions prong, but the Notice explained that these are two separate statutory bases, each requiring its own determination based on separate facts. *Id.* Thus, the Secretary found no inconsistency with respect to the finding that ongoing armed conflict does not prevent Yemenis from safely returning, even though other extraordinary and temporary conditions may continue to do so. *Id.*

Regardless of the presence of extraordinary and temporary conditions in Yemen, the Secretary determined that permitting Yemeni nationals to remain temporarily in the United States is contrary to the national interest. The Notice explained that "national interest" is an expansive standard encompassing, among other things, foreign policy, public safety, national security, migration factors, immigration policy, and economic considerations, and that the determination rests on the Secretary's expertise and discretionary judgment informed by consultation with appropriate U.S. government agencies. The Notice then explained various considerations that supported the Secretary's conclusion that permitting Yemeni nationals to remain temporarily in the United States is contrary to the U.S. national interest. *See id.* at 10,405–07.

For example, the Notice cited President Trump's June 4, 2025, proclamation suspending or limiting entry of nationals from certain countries, including Yemen, because Yemen "lacks a competent or cooperative central authority for issuing passports or civil documents" and "does not have appropriate screening and vetting measures." *Id.* at 10,406 (quoting 90 Fed. Reg. 24,497, 24,501 (June 4, 2025)). The Notice further stated that the U.S. embassy in Sana'a has been closed since February 2015, hindering local document verification, and that the State Department has

7

warned that competing authorities, including in Houthi-controlled areas, are issuing passports that several European countries have refused to accept since 2020. *Id*. The Notice also stated that the proclamation was further supported by the fact that Yemen "does not have physical control over its own territory." *Id*. (citation omitted). The Notice additionally explained that the de facto Houthi government rules Yemen's most historically populous northern regions; that Ansar Allah (also known as the Houthis) was designated a Foreign Terrorist Organization in March 2025; that the Houthis control areas encompassing 70 percent of Yemen's population, while the internationally recognized government controls the south and east; and that the Houthis are supported by Iran's Islamic Revolutionary Guard Quds Force. *Id*. at 10,406–07. The Notice further stated that Al-Qaeda in the Arabian Peninsula continues to pose a growing regional threat, is resurging and strengthening its operational capabilities, and is developing an opportunistic relationship with the Houthis, while Al-Qaeda in the Arabian Peninsula leaders in June 2025 called for the assassination of President Trump, Vice President J.D. Vance, and Elon Musk, among others. *Id*. at 10,407. Finally, the Notice stated that some Yemeni TPS applicants or beneficiaries had been under administrative investigation for risk to national security or public safety, or fraud-related concerns, and that Yemeni visa-overstay rates remained very high compared to the global average from fiscal years 2018 to 2024. *Id*.

The Secretary accordingly concluded that continuing to permit Yemeni nationals to reside in the United States under TPS is contrary to the U.S. national interest and that termination of Yemen's TPS designation is therefore required. *Id*.

## LEGAL STANDARD

"The standard for a stay of agency action under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction." *State of New York v. Admin. for Child. & Fams.*, No. 26 Civ. 172

8

(VSB), 2026 WL 673848, at *10 (S.D.N.Y. Mar. 10, 2026). Such an injunction is a form of relief that is "one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). Such relief "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Students for Fair Admissions v. U.S. Mil. Acad. at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (cleaned up). The plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

"When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021). Further, where, "as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," the party must demonstrate "a clear or substantial likelihood of success on the merits." *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007).

## ARGUMENT

### I.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS

#### A.    Section 1254a Prohibits Judicial Review of TPS Terminations

The TPS statute forecloses judicial review of the Secretary's TPS termination determinations, providing that "[t]here is no judicial review of *any determination* of the [Secretary] *with respect to* the designation, or *termination* or extension of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). Plaintiffs seek judicial review of the Secretary's determination to terminate Yemen's TPS designation. By foreclosing "judicial review," the statute forecloses Plaintiffs' claims. *Id.*

9

The "plain meaning" of the statute's "broad" terms confirms its broad sweep. *Patel v. Garland*, 596 U.S. 328, 345–47 (2022) (examining broadening terms in § 1252(a)(2)(B)(i)'s review bar and concluding that presumption of "'judicial review'" applies "when a statute is silent" but not when it contains "'specific language'" prohibiting judicial review). A "determination" is "the resolving of a question by argument or reasoning," "[t]he decision arrived at or promulgated," or "a determinate sentence, conclusion, or opinion." *EPA v. Calumet Shreveport Ref., LLC*, 605 U.S. 627, 643 (2025) (quotation marks omitted). The modifier "any"—in the phrase "any determination"—sweeps broadly and encompasses determinations "of 'whatever kind.'" *Patel*, 596 U.S. at 338. Indeed, the Supreme Court "has repeatedly explained, the word 'any' has an expansive meaning." *Id.* (citation omitted). The judicial-review bar thus "does not restrict itself to certain kinds of" determinations, but "prohibits review of any" determination regarding the Secretary's ultimate decision to designate, terminate, or extend a TPS designation. *Id.*

The term "respecting" likewise "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018); *accord Patel*, 596 U.S. at 338–39 (citing dictionary definition of word "regarding" as meaning "with respect to" and noting that the word also has a "'broadening effect'" (quoting *Lamar*, 584 U.S. at 717)); *United States v. Tohono O'odham Nation*, 563 U.S. 307, 312 (2011) ("in respect to" results in "broad prohibition"). Section 1254a(b)(5)(A) thus encompasses not just the designation, termination, or extension of a designation for TPS, but also any determination "relating to" the designation, termination, or extension. *Patel*, 596 U.S. at 339.

10

The broad bar on judicial review is consistent with the fact that TPS determinations concern "nation-state level" judgments about foreign countries. *Ramos v. Wolf*, 975 F.3d 872, 891 (9th Cir. 2020), *vacated*, 59 F.4th 1010, 1011 (9th Cir. 2023).[2] "[P]erhaps in no other area [do courts] accord[ ] Congress greater deference." *Rostker v. Goldberg*, 453 U.S. 57, 64–65 (1981); *accord Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (it is "difficult to conceive of an area of governmental activity in which the courts have less competence"). The TPS statute also lacks "substantive guidelines or restrictions on the manner by which the Secretary may reach her TPS determinations." *Ramos*, 975 F.3d at 891. Its bar on judicial review sweeps broadly because "the statute not only sets forth very few legal parameters on what the Secretary must consider in designating, extending, or terminating TPS for a foreign country, but also expressly bars judicial review over these determinations." *Id.*

Applying § 1254a(b)(5)(A) here is straightforward. Plaintiffs challenge the Secretary's "determination[s] . . . with respect to the . . . termination" of Yemen's TPS designation and therefore their claims fall squarely within the statutory bar. 8 U.S.C. § 1254a(b)(5)(A). Plaintiffs dispute the evidence and reasoning underlying the Secretary's determination, arguing, for example, that her decision was not based on an objective review of country conditions and instead was preordained and politically motivated. *See, e.g.*, First Motion at 5, 10 (complaining that Secretary's decision was "predetermined" and "politically driven" and not based on an "evidence-based review" in that it ignored evidence contradicting the suggestion that "Yemen has stabilized or become safe for return," including data concerning reliance on humanitarian assistance,

---

[2]    *En banc* review was granted, vacating the panel decision, but no *en banc* decision ever issued. *See Ramos v. Mayorkas*, 2023 WL 4363667 (9th Cir. June 29, 2023).

malnutrition, and internal displacement); Second Motion at 2 (incorporating the First Motion's arguments about "Defendants' failure to undertake a good-faith review of country conditions"). Plaintiffs also challenge the Secretary's decision to terminate Yemen's TPS designation to the extent it was based on her conclusion that its continuation was contrary to the national interest. First Motion at 16–19; Second Motion at 7–12. Because § 1254a(b)(5)(A) bars judicial review of "any" determinations concerning TPS terminations, these claims are not judicially reviewable.

The Supreme Court twice accepted this argument by granting stays that necessarily concluded that the government would likely succeed on the merits in its argument that arbitrary-and-capricious claims challenging the Venezuela TPS termination were unreviewable. *Noem v. NTPSA*, 145 S. Ct. 2728 (2025); *Noem v. NTPSA*, 146 S. Ct. 23, 24 (2025); *see Nken v. Holder*, 556 U.S. 418, 434 (2009) (applicant must make "'strong showing that [it] is likely to succeed on the merits'" to receive stay). The government's only argument that it would succeed on the APA claims was that § 1254a(b)(5)(A) barred those claims.[3] The Supreme Court thus necessarily accepted this argument—twice. And "every maxim of prudence suggests that [a lower court] should decline to take the aggressive step of ruling that . . . plaintiffs . . . are in fact likely to succeed on the merits right upon the heels of the Supreme Court's stay order necessarily concluding that

---

[3]   *NTPSA*, No. 24A1059 (U.S.), Gov. Stay Appl. 15–20 (filed May 1, 2025), https://www.supremecourt.gov/docket/docketfiles/html/public/24a1059.html; *NTPSA,* No. 25A326 (U.S.), Gov. Stay Appl. 16–19 (filed Sept. 19, 2025), https://www.supremecourt.gov/docket/docketfiles/html/public/25a326.html.

they were unlikely to do so."[4] *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 230 (4th Cir. 2020).[5]

The Supreme Court has advised that its decisions on interim relief "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025); *accord Trump v. CASA, Inc.*, 606 U.S. 831, 873 (2025) (Kavanaugh, J., concurring) (Supreme Court's interim orders often "effectively settle, *de jure* or *de facto*, the interim legal status of . . . executive actions nationwide"). The two *NTPSA* stay orders thus "control" in this case's preliminary posture. *Boyle*, 145 S. Ct. at 2654–55. The Supreme Court said that its decisions rested on the "parties' legal arguments." *NTPSA*, 146 S. Ct. at 24. To be sure, the Supreme Court has since granted certiorari before judgment in two TPS cases and has not yet ruled on the government's request for stays in those cases. *See Trump v. Miot*, No. 25-1084, 2026 WL 731087, at \*1 (U.S. Mar. 16, 2026); *Noem v. Doe*, No. 25-1083, 2026 WL 731088, at \*1 (U.S. Mar. 16, 2026). The decisions in those cases will likely control the application of the review bar in this case.

---

[4]    In addition to the TPS termination, the case before the Supreme Court also involved the vacatur of a previously granted TPS extension before its original expiration date. The district court had ruled for the plaintiffs on both their termination- and vacatur-based challenges. *NTPSA v. Noem*, 166 F.4th 739, 749 (9th Cir. 2026) ("district court . . . set aside the Venezuelan vacatur and termination"). That the case also involved this additional vacatur issue (not present here)—an issue on which the Ninth Circuit later ruled for the plaintiffs, *id.*—does not change that the Supreme Court necessarily found that the government was also likely to succeed on the TPS termination claim. *American Federation of Teachers v. Bessent*, 152 F.4th 162, 167–69 & n.3 (4th Cir. 2025) ("'likelihood of success on the merits' refers to the party's likelihood of success in the lawsuit" meaning the party "must prevail on multiple independent issues"). This is an even easier case for the government, because, unlike in the Venezuela case, the Secretary here had no need to use her inherent authority to vacate prior extensions of TPS before terminating them; she simply terminated TPS on the ordinary schedule provided by statute.

[5]    Rehearing *en banc* was granted by the Fourth Circuit, but the appeal was voluntarily withdrawn before an *en banc* decision was issued.

13

In the interim, the Court should continue to follow the Supreme Court's decisions granting stays pending certiorari.

When deciding the government's emergency motion for a stay pending appeal in a case involving the termination of Syria's TPS designation, the Second Circuit distinguished the two Supreme Court cases because they "involved a TPS designation of a different country, with different factual circumstances, and different grounds for resolution by the district court." *Doe v. Noem*, No. 25-2995, 2026 WL 544631, at *1 (2d Cir. Feb. 17, 2026). But those reasons do not make the Supreme Court's orders any less relevant, as the government's only argument on the APA claims in *NTPSA* was that 8 U.S.C. § 1254a(b)(5)(A) barred the claims. *See supra* n.3. The Supreme Court's stay orders should therefore be read to apply equally to this case.[6]

To avoid the statutory bar, Plaintiffs frame their claims as "collateral" and "process"-based challenges (First Motion at 12), rather than challenges to the Secretary's determination to terminate Yemen's TPS status. As Plaintiffs note, several courts—including a motions panel of the Second

---

[6]  Motions panel decisions of the Second Circuit do not have precedential effect in the same case, let alone in other cases. *See, e.g.*, *Hassoun v. Searls*, 976 F.3d 121, 134 (2d Cir. 2020) ("this court's opinion granting the government's motion for a stay pending appeal does not 'spawn[] any legal consequences' for the parties" and describing such rulings as "'persuasive, but not binding'" (quoting *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1264-66 (9th Cir. 2020)); *Paskar v. U.S. Dep't of Transp.*, 714 F.3d 90, 95 (2d Cir. 2013) ("A merits panel may revisit a decision made by a motions panel."); *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 149 (2d Cir. 1999) ("in ruling that we may revisit the motions panel's decision on jurisdiction, we join nearly every other Circuit that has considered this question." (collecting cases)); *Kaplan v. Rand*, 192 F.3d 60, 68 (2d Cir. 1999) (motions panel order from another case "is without precedential authority"). After the Supreme Court's intervention in *NTPSA*, the Ninth Circuit twice granted the government's motion for a stay pending appeal of a § 705 order postponing the termination of TPS designations for Honduras, Nepal, and Nicaragua. *NTPSA v. Noem*, No. 26-199, Dkt. No. 11.1 (9th Cir. Feb. 9, 2026); *Noem v. NTPSA*, No. 25-4901, Dkt. No. 19.1 (9th Cir. Aug. 20, 2025). Similarly, the Fourth Circuit has denied a request for interim relief on appeal by plaintiffs seeking postponement of the TPS terminations for Afghanistan and Cameroon. *CASA, Inc. v. Noem*, No. 25-1792, 2025 WL 2028397 (4th Cir. July 21, 2025).

Circuit, *see Doe*, 2026 WL 544631, at *1—have embraced this reasoning. *Id.* (citing cases). The TPS statute, however, provides no such workarounds, barring judicial review of "any determination" to terminate a country's TPS designation—regardless of the grounds on which the determination is being challenged. 8 U.S.C. § 1254a(b)(5)(A).

Fundamental administrative law principles confirm that interpretation. Under the APA, only "final agency action" is reviewable. 5 U.S.C. § 704. Agency actions that are "preliminary, procedural, or intermediate" are "subject to review" only on "review of the final agency action." *Id.* Such challenges to intermediate decisionmaking steps can only be brought in a challenge to the agency's final decision; they are not standalone claims. *See U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016). Thus, even when statutes merely bar review of an ultimate decision—without Section 1254a(b)(5)(A)'s expansive "any determination" "with respect to" formulation—courts have held that those judicial-review bars necessarily foreclose attacks on antecedent decisionmaking steps as well. As the Second Circuit has said, "if a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, *or procedurally defective*." *Yale New Haven Hospital v. Becerra*, 56 F.4th 9, 20 (2d Cir. 2022) (quotation marks omitted). Any other interpretation "would eviscerate the statutory bar, for almost any challenge to [a determination] could be recast as a challenge" to the underlying procedure, analysis, or methodology. *DCH Regional Medical Center v. Azar*, 925 F.3d 503, 506 (D.C. Cir. 2019).

Applying that whole-includes-the-parts principle, courts have held that the judicial-review bar on "'[a]ny estimate of the [HHS] Secretary'" used for certain purposes also precludes review of statutory claims challenging "the *methodology* used to make the estimates." *Id.* at 505–06

15

(quoting 42 U.S.C. § 1395ww(r)(3)(A)); *see id.* at 505–08. Likewise, a judicial-review bar providing that "'[t]he decision of the Secretary shall be final and shall not be subject to judicial review'" also bars challenges to the agency's "procedure[s]" and "methods" for reaching that final decision. *Skagit County Pub. Hosp. Dist. No. 2 v. Shalala*, 80 F.3d 379, 385–86 (9th Cir. 1996) (quoting 42 U.S.C. § 1395ww(d)(10)(C)(iii)(II)).

Even if the Court could entertain procedural or collateral challenges, Plaintiffs' claims would fail because they directly attack the Secretary's TPS determination. Plaintiffs do not challenge any guidance document, regulation, or policy distinct from the Secretary's termination of Yemen's TPS designation. Instead, they explicitly challenge the substance of her determinations —her findings, reasoning, evidentiary support, and conclusions. The truly substantive nature of Plaintiffs' claims is further evident because the "procedure is challenged only in order to reverse the [unreviewable] . . . individual . . . decision." *Skagit*, 80 F.3d at 386; Compl., Case No. 26 Civ. 2103, Dkt. No. 1 ("First Compl."), ¶ 186 (asking the Court to "vacate the termination of TPS for Yemen"); Compl., Case No. 26 Civ. 2280, Dkt. No. 1 ("Second Compl.") ¶ 181 (same); *see Ramos*, 975 F.3d at 893 (claims were not true collateral challenges partly because they "seek direct relief from the challenged decisions").

By arguing that § 1254a(b)(5)(A)'s bar on judicial review nominally prevents judicial review of the Secretary's ultimate decision to terminate a country's TPS designation but allows litigants to seek vacatur of that decision by challenging the evidence, analysis, and procedures underlying it, Plaintiffs would effectively nullify the statute's broad prohibition on judicial review. First Motion at 12–13. Real-world litigants do not challenge agency determinations in a vacuum; they inevitably attack the evidence, analysis, and procedures underlying them. Under Plaintiffs'

16

reasoning, those challenges may proceed, rendering Congress's sweeping bar on judicial review effectively meaningless.

### B.    Section 1252(f)(1) Precludes Plaintiffs' Requested Relief

Plaintiffs also cannot prevail because they seek to restrain the Secretary's operation of the TPS statute in violation of § 1252(f)(1). That provision strips "court[s] (other than the Supreme Court)" of "jurisdiction" to "enjoin or restrain the operation of the provisions of part IV of this subchapter," in any "action or claim" by any "party" (with an exception not relevant here). 8 U.S.C. § 1252(f)(1). This statute "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

Section 1254a is one of the statutory provisions that § 1252(f)(1) covers. In the U.S. Code, § 1254a (the TPS statute) appears in part V of the relevant subchapter. The public law enacted by Congress, however, strips lower courts of the authority to enjoin or restrain "the provisions of chapter 4 of title II," which contains the TPS statute (section 244 of the INA, as amended). Illegal Immigration Reform and Immigrant Responsibility Act of 1996, div. C, Pub. L. No. 104-208, §§ 306 (enacting § 1252(f)), 308 (specifying section 244 as part of chapter 4), 110 Stat. 3009. When the enacted text and the U.S. Code conflict, the enacted text prevails. *U.S. National Bank of Oregon v. Independent Insurance Agents of America, Inc.*, 508 U.S. 439, 448 (1993) ("United States Code is 'prima facie' evidence that the provision has the force of law, 1 U.S.C. § 204(a), [but] it is the Statutes at Large that provides the 'legal evidence of laws,' [1 U.S.C.] § 112 . . . ."); *United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) ("'the Code cannot prevail over the Statutes at Large when the two are inconsistent'" (quoting *Stephan v. United States*, 319 U.S. 423, 426 (1943))). Thus, the TPS statute is within the scope of § 1252(f)(1), as Judge Failla concluded in

17

adjudicating the Syria TPS case. *See Doe v. Noem*, Case No. 25 Civ. 8686, Dkt. No. 59 at 33; *accord NTPSA v. Noem*, 150 F.4th 1000, 1018 & n.8 (9th Cir. 2025).

An order postponing the Secretary's order under Section 705 would have the "practical effect" of an injunction and therefore "enjoin" the Secretary from implementing the TPS statute insofar as it would prevent the Secretary from implementing it. *See, e.g.*, *Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313, at *10 (D.C. Cir. Nov. 22, 2025) (holding that 705 postponement has the "practical effects" of an injunction for purposes of appellate jurisdiction); *NTPSA v. Noem*, 150 F.4th 1000, 1014 (9th Cir. 2025) ("705 postponement has the practical effect of a preliminary injunction because it 'pauses the [ ]implementation of' agency action"); *Alliance for Hippocratic Medicine v. FDA*, No. 23-10362, 2023 WL 2913725, at *3 n.3 (5th Cir. Apr. 12, 2023) (stay under § 705 stay order had the "practical effect of an injunction").

Moreover, § 1252(f)(1) is not limited to injunctions; it prohibits any orders that "enjoin or *restrain*" the operation of a covered statute "[r]egardless of the nature of the action or claim." 8 U.S.C. § 1252(f)(1) (emphasis added). As the Supreme Court has explained, "restrain" in § 1252(f)(1) means to "check, hold back, or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action. *Aleman Gonzalez*, 596 U.S. at 549 (quotation marks omitted). When interpreting analogous language, the Supreme Court held that the Tax Injunction Act, 28 U.S.C. § 1341, which barred orders that "suspend or restrain" tax collection, stripped courts of jurisdiction to enter not just injunctive relief, but also declaratory relief. *California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982).

The relief issued here undoubtedly "restrain[s]" the "operation of" § 1254a by preventing the Secretary from terminating Yemen's TPS designation after she exercised her authority under

18

that statute and concluded that termination was appropriate. 8 U.S.C. § 1252(f)(1). And, again, such an order would effectively be an injunction, as it has the same "practical effect[]" as one. *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 983–84 (9th Cir. 2025).

## II. PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS, EVEN IF THE COURT COULD DECIDE THEM

Because judicial review of Plaintiffs' claims is barred, the government has necessarily shown it is likely to succeed in this action. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) ("a likelihood of success encompass[es] not only substantive theories but also establishment of jurisdiction" (quotation marks omitted)). Regardless, the government is likely to succeed because Plaintiffs' claims lack merit.

### A. Plaintiffs' APA Claims Fail on the Merits

#### 1. The Secretary Lawfully Terminated Yemen's TPS Designation After Considering the Relevant Factors

Plaintiffs cannot demonstrate a likelihood of success on their APA claims because the Secretary reasonably terminated Yemen's TPS status after considering relevant factors. "Under the APA, courts review agency action to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Animals v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)). This "'narrow'" standard does not allow a court "'to substitute its judgment for that of the agency.'" *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1554 (2d Cir. 1992) (citation omitted).

Here, the Notice sets out a reasoned review of the relevant facts and statutory considerations. The Secretary explained that Yemen's conflict conditions had "improved notably" since the April 2022 U.N.-brokered truce; that violence "significantly declined" during implementation of the truce, including a cessation of Saudi-led coalition airstrikes and major

19

ground offensives; that, although sporadic events continued along frontlines, the peace resulting from the truce remained in effect; that diplomatic developments in 2025, including renewed peace efforts by the U.N. Special Envoy, reflected that "relative calm and stability" continued to hold on the frontlines; and that, in December 2025, the Southern Transitional Council took over two of Yemen's eight provinces without apparent accompanying violence. *See supra* Section II. The Secretary also considered additional facts bearing on safe return, including parole travel to Yemen and the fact that ICE is currently removing aliens to Yemen. *See id.* And the Secretary separately explained why, even assuming extraordinary and temporary conditions remained, continued TPS was contrary to the national interest, based on document-verification problems, the lack of a competent or cooperative central authority for issuing passports and civil documents, the closure of the U.S. Embassy in Sana'a, competing authorities issuing passports, Yemen's lack of territorial control, active U.S. military operations, the Houthis' control over areas encompassing 70 percent of Yemen's population, the designation of Ansar Allah (commonly known as the Houthis) as a Foreign Terrorist Organization, the threat posed by Al-Qaeda in the Arabian Peninsula, investigations relating to national security and public safety involving some TPS applicants or beneficiaries, and high Yemeni visa-overstay rates. *See id.* Though Plaintiffs may disagree with the Secretary's determination, it is reasonable, adequately explained in the Notice, and accords with the APA. *See New Jersey v. Bessent*, 149 F.4th 127, 152 (2d Cir. 2025) (agency need only have "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'").

   Plaintiffs advance several arguments that ultimately ask the Court to reweigh the evidence and substitute Plaintiffs' judgment for that of the Secretary. For instance, Plaintiffs contend that

20

the Secretary failed to consider important aspects of the national-interest analysis, and that certain factors the Secretary did consider do not actually support termination. *See* Second Motion at 8–12. But that challenge fails. Nothing in the TPS statute limits what the Secretary may consider in determining the national interest.[7] Rather, the question of what serves the national interest offers "no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993); *see Trump v. Hawaii*, 585 U.S. 667, 684–86 (2018) (where President has discretion to determine if alien's entry "would be detrimental to the interests of the United States," courts should not inquire "into the persuasiveness of the President's justifications"); *Webster v. Doe*, 486 U.S. 592, 600 (1988) (the phrase "in the interests of the United States . . . exudes deference" and lacks "any meaningful judicial standard of review").

Plaintiffs likewise argue that the Secretary did not "meaningfully confront" the extraordinary and temporary conditions that continue to prevent safe return to Yemen, or that the "factual change in Yemen sufficient to justify termination" was not, in Plaintiffs' view, "bona fide." First Motion at 15–16. These are all variations of the same basic argument: that Plaintiffs disagree with the Secretary's analysis and ask the Court to reassess the evidence and reach a different conclusion. That is not the role of APA review because the weighing of the relevant evidence falls within the Secretary's discretion, and "[a] reviewing court may not itself weigh the evidence or

---

[7]   While the statute directs the Secretary to consider "the conditions in the foreign state" when deciding to extend TPS status, it does not limit the Secretary's review to those conditions; she instead must "determine whether the conditions for [TPS] designation . . . continue to be met," which requires her to examine whether the TPS designation is still in the national interest. 8 U.S.C. § 1254a(b)(3)(A).

21

substitute its judgment for that of the agency." *Const. Pipeline Co., LLC v. N.Y. State Dep't of Envtl. Conservation*, 868 F.3d 87, 102 (2d Cir. 2017) (quotation marks omitted).[8]

Ignoring the Secretary's analysis altogether, Plaintiffs contend that the Yemen termination was preordained because the Administration has criticized past TPS designations, because it has terminated other TPS designations, and because, in their view, the agency did not adequately consult with other federal agencies. First Motion at 13–16. Plaintiffs likewise claim that the Secretary's determination was not "objective" or "fact grounded" and instead it was "result-oriented." First Motion at 14. Legally, claims of preordained decisionmaking require "a strong showing of bad faith or improper behavior." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). But Plaintiffs identify nothing of the sort here. Instead, as the Notice explains, the Secretary reviewed Yemen-specific country conditions, applied the governing statutory standards, and determined that Yemen no longer met the criteria for TPS and that continued TPS was contrary to the national interest, even assuming extraordinary and temporary conditions remained. *See supra* Section II.

Plaintiffs' objections to the agency's internal process, including how it consulted with other agencies, fare no better. First Motion at 13–14. The statute requires the Secretary, "after consultation with appropriate agencies of the Government," to "review the conditions in the foreign state" and determine whether the conditions for designation continue to be met. 8 U.S.C.

---

[8]    For the same reasons, Plaintiffs' argument that the Notice fails to "engage seriously" with Yemeni TPS holders' reliance interests lacks merit. First Motion at 21. As noted above, the weighing of the relevant evidence falls within the Secretary's discretion. And in any event, Plaintiffs do not have a legitimate reliance interest in TPS. *See FDA v. Wages and White Lion Invs., L.L.C.*, 604 U.S. 542, 585 (2025) (litigant's "belief about how an agency is likely to exercise its enforcement discretion is not a serious reliance interes[t]" (citation and internal quotation marks omitted)).

§ 1254a(b)(3)(A). It does not codify any particular workflow, including the one described in a Government Accountability Office report cited by Plaintiffs, First Motion at 14, as a prerequisite to issuing a TPS determination.

And courts are "generally not free to impose additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel." *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021) (citation and internal quotation marks omitted). Congress, by contrast, knows how to impose more specific consultation requirements. *See, e.g.*, 8 U.S.C. § 1157(e) (defining "appropriate consultation" to require "discussions in person" involving particular information); 16 U.S.C. § 1536(b)(3)(A) (Secretary of the Interior, when consulted, must provide a "written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based"); 33 U.S.C. § 2321a(b) (Secretary of Army must "provide affected State, tribal, and Federal agencies with a copy of the proposed determinations" and "respond in writing to any objections" raised). Where, as here, Congress does not impose such requirements, courts cannot impose their own. *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978).[9]

---

[9]  Plaintiffs argue that the Secretary's characterization of the conditions in Yemen are "irreconcilable with the government's own record"—namely, a State Department travel advisory cautioning travel there. First Motion at 15. But such advisories describe "the risks and recommended precautions for U.S. citizens—not foreign nationals" and they are an "assessment of threats *only* insofar as they may impact U.S. citizens, nationals, and legal residents." *Travel Advisories*, https://travel.state.gov/en/international-travel/travel-advisories.html (last visited Apr. 2, 2026) (emphasis added). Thus, State Department Travel Advisories are written for American travelers visiting foreign countries—not for nationals of those countries. The Notice's finding of "[n]otable improvements with respect to the armed conflict in Yemen" is not inconsistent with the continuation of safety concerns that would make it inadvisable for Americans to travel there. 91 Fed. Reg. at 10,404.

Plaintiffs' broader theory, that termination reflects "the latest implementation of a preexisting policy commitment," is equally unpersuasive. First Motion at 13. "[A] court may not set aside an agency's policymaking decision solely because it might have been . . . prompted by an Administration's priorities." *Department of Commerce* v. *New York*, 588 U.S. 752, 781 (2019). The President and the Secretary "c[a]me into office with policy preferences and ideas," but the Secretary adhered to the statutory process and "substantiate[d] the legal basis for a preferred policy." *Id.* at 783. That is "hardly improper." *Id.* For those reasons, contrary to Plaintiffs' assertions, a pattern of consistent policy preferences is not an APA violation. First Motion at 14 (discussing the Secretary's "conduct in other TPS termination decisions"). "[T]he fact that the agency appears to be exercising its . . . discretion consistently is a virtue, not a vice." *Bouarfa v. Mayorkas*, 604 U.S. 6, 17 (2024). Facing a series of "temporary" designations that have lasted many years or even decades, it is unremarkable that the Secretary found them to have outstripped the TPS statute's criteria.[10]

In the end, Plaintiffs offer no basis to overcome the presumption of regularity that attaches to the Secretary's decisionmaking. The Notice reflects a substantive, Yemen-specific review of country conditions, the statutory standards, and the national interest. *See supra* Section II. Plaintiffs' disagreement with the Secretary's conclusions does not make the decision pretextual or predetermined. And an argument that a decision "was pretextual is no different from arguing that it was wrong" because "[b]oth arguments challenge the validity of the grounds for" the decision.

---

[10]  Plaintiffs' reliance on internal agency emails produced in other litigation to show that "this was not a neutral review process," *see* First Motion at 14, is misplaced because those emails do not even mention Yemen. And the Notice itself shows that the Secretary considered country conditions in connection with the decision to terminate TPS for Yemen.

24

*Nouritajer v. Jaddou*, 18 F.4th 85, 89 (2d Cir. 2021) (cleaned up). Allowing a court to infer preordination on this record would circumvent the limits on inquiring "into the mental processes of administrative decisionmakers," which "is usually to be avoided." *Citizens*, 401 U.S. at 420.

**2.    The Secretary Terminated Yemen's TPS Designation After Appropriately Considering Whether the Designation Continued to be in the "National Interest"**

Plaintiffs also argue that the Secretary's consideration of the "national interest" in terminating Yemen's designation was contrary to the statute. First Motion at 16–19; Second Motion at 7–8. Plaintiffs further contend that the statute requires consideration of the national interest only when designating a country based on extraordinary and temporary circumstances, not when terminating that designation. *See id.* Those arguments are incorrect.

The TPS statute plainly requires the Secretary's decision regarding termination to consider the same factors that govern designation. Specifically, section 1254a(b)(3)(B) provides that the Secretary "shall terminate" a designation if she determines that the country "no longer continues to meet the conditions for designation under paragraph (1)." 8 U.S.C. § 1254a(b)(3)(B). Paragraph (1), in turn, sets out the relevant "conditions for designation," including, under subparagraph (C), whether "there exist extraordinary and temporary conditions in the foreign state," unless the Secretary "finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(C) (emphasis added). When the Secretary assesses whether a country "no longer continues to meet the conditions for designation under paragraph (1)," that inquiry necessarily includes the national-interest proviso contained in paragraph (1)(C).

25

That is so here. Yemen's TPS designation was extended on the basis of both armed conflict and "extraordinary and temporary conditions." 91 Fed. Reg. 10,403. When the Secretary later determined that Yemen "no longer continues to meet the conditions for designation," 8 U.S.C. § 1254a(b)(3)(B), that determination necessarily encompassed both the "extraordinary and temporary conditions" inquiry and the "national interest" component of Section 1254a(b)(1)(C). And when the Secretary found that continuing to permit Yemeni nationals to remain in the United States under TPS was "contrary to the U.S. national interest," 91 Fed. Reg. 10,405, the Secretary necessarily determined that one of the relevant "conditions for designation" was no longer met. 8 U.S.C. § 1254a(b)(1)(C), (3)(B).

Plaintiffs' contrary reading would improperly sever the national-interest proviso from the rest of Section 1254a(b)(1)(C). In their view, the Secretary may consider national interest at the moment of designation but must ignore it when deciding whether the country continues to satisfy the same "conditions for designation under paragraph (1)." 8 U.S.C. § 1254a(b)(3)(B). Nothing in the statutory text supports that asymmetrical approach.

### 3. The Secretary's Selection of a Sixty-Day Wind-Down Is Consistent with the Statute

Finally, Plaintiffs' argument that the Secretary's determinations departed *sub silentio* from past practice is without merit. First Motion at 19–22. Though Plaintiffs argue that 60 days' notice of the TPS cancellation is arbitrary and capricious, this timeline is expressly permitted by statute. 8 U.S.C. § 1254a(b)(3)(B) (termination "shall not be effective earlier than 60 days after the date the notice is published"). Indeed, the relevant regulations make clear that TPS protections typically end "upon the sixtieth (60th) day after the date notice of termination is published in the Federal Register." 8 C.F.R. § 244.19; *see also* 8 C.F.R. § 244.13(b). The Secretary "may" provide for a

26

longer transition period in the exercise of discretion. 8 U.S.C. § 1254a(d)(2). But the government has never made a "hard-and-fast commitment" to offer longer periods—let alone taken an "earlier [agency] position" that could have conferred a legitimate reliance interest on a TPS recipient. *FDA v. Wages and White Lion Invs., L.L.C.*, 604 U.S. 542, 573–85 (2025) (litigant's "belief about how an agency is likely to exercise its enforcement discretion is not a 'serious reliance interes[t]'"). Even if the agency's past choices of wind-down periods for other countries could create a "hard-and-fast commitment," those past choices reflect *variation*, not consistency, on the length of wind-down periods. There is no basis to find that the Secretary "deviated 'from a prior policy *sub silentio* or simply disregard[ed]' what it had previously said." *Id.* at 575. And even if the Secretary had somehow done so, that would not support indefinitely postponing the termination. Plaintiffs should not obtain an indefinite wind-down period through a Section 705 stay that is longer than the wind-down period they claim an entitlement to under a supposed past practice.

### B.    Plaintiffs' Animus Claim Fails on the Merits

Plaintiffs are unlikely to succeed on their Fifth Amendment claim, which is subject to rational-basis review. Under *Trump v. Hawaii*, 585 U.S. 667 (2018), rational basis review governs constitutional challenges to executive branch immigration policies and such policies pass constitutional muster so long as they are "plausibly related" to the government's policy objective. *Id.* at 704. That deferential review reflects that "decisions in these matters may implicate relations with foreign powers, or involve classifications . . . defined in the light of changing political and economic circumstances," which are judgments "'frequently of a character more appropriate to either the Legislature or the Executive.'" *Id.* at 702 (citation and internal quotation marks omitted); *see Mathews v. Diaz*, 426 U.S. 67, 82 (1976) ("narrow standard of review" applies to "decisions made by the Congress or the President in the area of immigration"); *Kleindienst v. Mandel*, 408

27

U.S. 753, 766–70 (1972) (judicial review of "[p]olicies pertaining to the entry of aliens and their right to remain here" is limited to whether the executive gave a "facially legitimate and bona fide" reason for its action). That reasoning applies to TPS-related actions, which involve unique country-specific determinations that both "implicate relations with foreign powers" and "involve classifications . . . defined in the light of changing political and economic circumstances." *Hawaii*, 585 U.S. at 702 (cleaned up). As the Supreme Court has explained, "the upshot of [its] cases in this context is clear: Any rule of constitutional law that would inhibit the flexibility of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and our inquiry into matters of entry and national security is highly constrained." *Id.* at 704 (citation and internal quotation marks omitted).

Though Plaintiffs argue otherwise (Second Motion at 12), it makes no difference that *Hawaii* involved policies directed at aliens seeking entry into the country, whereas TPS concerns aliens who are already in the United States. Indeed, the Second Circuit has applied rational basis review for an equal protection challenge brought by aliens within the United States. *See Rajah v. Mukasey*, 544 F.3d 427, 433 (2d Cir. 2008). The Supreme Court cited *Rajah* approvingly and further reasoned that rational-basis review applies in the context of immigration decisions "across different contexts and constitutional claims." *Hawaii*, 585 U.S. at 703–04.

In enacting the TPS statute, Congress provided for the availability of a temporary status to aliens who cannot safely return to their home countries because of, among other things, extraordinary and temporary conditions or ongoing armed conflicts. The Notice relied on various considerations that supported the Secretary's conclusion that permitting Yemeni nationals to remain temporarily in the United States is contrary to the national interest, including national-

28

security, public-safety, and fraud-related concerns. 91 Fed. Reg. at 10,407; *see, e.g.*, *Hawaii*, 585 U.S. at 706 ("The Proclamation is expressly premised on legitimate purposes: preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices."). The Secretary appropriately consulted with other governmental agencies, and after doing so determined that the conditions that prompted the TPS designation for Yemen were no longer present. 91 Fed. Reg. at 10,408. Those are facially legitimate policy considerations, not evidence of unconstitutional discrimination. *Hawaii*, 585 U.S. at 704–05; *see also United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980) ("Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end.").

Thus, under the rational-basis test, Plaintiffs' constitutional claim fails. Even under the heightened standard in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), which Plaintiffs incorrectly invoke (First Motion at 22; Second Motion at 12), Plaintiffs' animus claim is likely to fail, as they cannot establish racially discriminatory intent—because there was none. Under *Arlington Heights*, to establish an equal protection claim under the Fifth Amendment's due process clause, Plaintiffs must prove that a racially "discriminatory purpose has been a motivating factor in the [government's] decision." 429 U.S. at 265–66. Plaintiffs cannot show discriminatory animus through statements taken out of context and without direct links to the Secretary's determinations. *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 34–35 (2020) (explaining that disparate impact, unusual rescission history, and pre- and post-election statements failed "to raise a plausible inference that the rescission was motivated by animus"); *see also Ramos*, 975 F.3d at 897 (rejecting similar constitutional claim "due to the glaring lack of evidence tying the President's alleged discriminatory intent to the specific TPS

29

terminations—such as evidence that the President personally sought to influence the TPS terminations, or that any administration officials involved in the TPS decision-making process were themselves motivated by animus against 'non-white, non-European' countries").

Here, the Secretary provided reasoned, non-discriminatory explanations for her determinations, and Plaintiffs have not plausibly connected any discriminatory purpose to those determinations. Rather than focusing on the neutral, statutorily-based justifications laid out in the Notice, Plaintiffs instead cherry-pick statements from the President and Secretary Noem in other contexts to suggest discriminatory motives for the TPS determinations. First Motion at 22–23; Second Motion at 13–15. But none of these allegations reflect animus based on race or national origin.

Lacking any Yemen-specific discriminatory statement by the President or then-Secretary Noem that is tied to this determination, Plaintiffs cite statements from the President about restricting immigration from various countries, including Yemen, as well as comments about immigration generally. Second Motion at 14–15; First Motion at 22–23. But these statements were "remote in time and made in unrelated contexts" and therefore "do not qualify as contemporary statements probative of the decision at issue." *Regents of the Univ. of Cal.*, 591 U.S. at 35 (citation and internal quotation marks omitted). Plaintiffs also broadly allege that the Administration is hostile to TPS, has used terms like "remigration" or "remigrate," and has pursued restrictive policies affecting non-white and Muslim-majority populations. First Motion at 22–23; Second Motion at 13–15. But charged rhetoric of that kind, even taken as Plaintiffs characterize it, does not establish that the Yemen-specific TPS determination was motivated by discriminatory animus rather than by the policy judgments reflected in the Notice. The same is true of Plaintiffs' reliance

30

on other allegedly coded language—such as references to "invasion," an "immigration scheme," or immigrants "contaminating" the Nation. First Motion at 22–23. Those statements were not made in the Yemen termination notice, were not contemporaneous explanations by the then-Secretary for this determination, and do not bridge the gap between generalized political rhetoric and a showing that discriminatory purpose motivated this agency action.

More generally, Plaintiffs' reliance on the President's statements to evaluate a determination by the *Secretary* is not probative of discrimination by the *Secretary* in connection with the TPS termination decision. *See, e.g.*, *Ramos*, 975 F.3d at 897 ("We doubt that the 'cat's paw' doctrine of employer liability in discrimination cases can be transposed to th[e] particular context" of TPS terminations). Such an approach would invite judicial second-guessing of an agency official's actions based on mere allegations that a different government official harbored some discriminatory motive. Such second-guessing would in turn open the door to impermissible intrusion on privileged executive branch deliberations, *see United States v. Nixon*, 418 U.S. 683, 708 (1974), and potential litigant-driven discovery that would disrupt the President's execution of the laws, *see Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982).

Nor do Plaintiffs' pattern, historical-background, and comparator allegations carry their burden. Plaintiffs point to the termination of TPS for other majority non-white or Muslim-majority countries, the continued existence of Ukrainian parole, and admissions for white Christian Afrikaners, and they argue that the Yemen termination is the latest in a series of decisions that other courts have found infected with discriminatory animus. Second Motion at 23–24. But those allegations do not tie any alleged bias to this Yemen TPS determination. At most, they reflect Plaintiffs' disagreement with a broader immigration policy agenda. Different humanitarian and

31

immigration programs arise under different statutory authorities, concern different countries and conditions, and involve different foreign-policy and national-security judgments. Those cross-program comparisons therefore do not support a plausible inference that the Secretary terminated Yemen TPS because Yemenis are Arab, non-white, or Muslim. Nor does Plaintiffs' invocation of other TPS cases change that result. *Id.* at 23. Those cases did not involve this record or this Yemen-specific determination, and they do not relieve Plaintiffs of the obligation to show that discriminatory purpose motivated the action challenged here.

Plaintiffs' disparate-impact and procedure-based allegations fare no better. Plaintiffs emphasize that Yemeni nationals are overwhelmingly Arab and from a Muslim-majority country and argue that the agency departed from ordinary practice and followed a suspicious sequence of events. First Motion at 22–23. But this alone does not establish discriminatory purpose. *See, e.g.*, *Regents of the Univ. of California*, 591 U.S. at 34 (allegation that animus was evidenced by "the disparate impact of the rescission on Latinos from Mexico, who represent 78% of DACA recipients" did not establish a plausible equal protection claim). Indeed, where a particular race "make[s] up a large share of the" relevant alien population, "one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program." *Id*. That certainly holds for TPS, where "virtually every country that has been designated for TPS since its inception has been 'non-European' . . . and most have majority 'non-white' populations." *Ramos*, 975 F.3d at 898. Were that fact "sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Regents*, 591 U.S. at 34.

And the procedural and sequencing allegations on which Plaintiffs rely are, at most, equally consistent with a policy decision to construe TPS more narrowly and to terminate designations on

32

a shorter timetable. These sorts of allegations also do not suffice to raise a plausible inference that the challenged action was motivated by unconstitutional animus, particularly where the Secretary has also articulated facially neutral reasons for its action.

In sum, none of the evidence cited by Plaintiffs is sufficient to support a claim that the Secretary's TPS determinations were motivated by racial animus. Even if the *Arlington Heights* test were applied, Plaintiffs would still fail to state a Fifth Amendment claim because the Secretary's determinations were consistent with the TPS statute, including its emphasis on the temporariness of the protection afforded and its assignment of responsibility for determining whether, in the Secretary's informed judgment, continuing to permit the TPS recipients to remain temporarily in the United States is in the national interest. *See* 8 U.S.C. § 1254a(b)(1)(C). Accordingly, Plaintiffs have failed to plausibly allege a Fifth Amendment equal protection violation.

## III.   EQUITABLE FACTORS WEIGH AGAINST POSTPONEMENT

The Supreme Court has twice weighed the equities and the government's likelihood of success, and twice concluded that the government is entitled to a stay enabling the Secretary's TPS determinations to take effect. *NTPSA*, 145 S. Ct. at 2728; *NTPSA*, 146 S. Ct. at 24. Again, those interim orders "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). Because this case "does not . . . differ from" the case in which those orders were issued "in any pertinent respect," this Court's equitable analysis can begin and end there. *Id.* (stay orders "squarely control[ ]" like cases).

Further, the government suffers irreparable injury "[a]ny time" it is "enjoined by a court from effectuating statutes enacted by representatives of [the] people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). The harm here is pronounced because, after

33

considering the statutory factors, the Secretary determined that the termination of Yemen's TPS designation was needed to protect "the national interest" based on concerns grounded in part on national security concerns. 91 Fed. Reg. at 10,405–07. The Secretary cited a presidential proclamation noting that "Yemen lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures." *Id.* at 10,406 (quotation marks omitted). The lack of a U.S. embassy in Yemen further hinders the government's ability to confirm the validity of identity documents. *Id.* At the same time, most of the country's population is controlled by a foreign terrorist organization. *Id.* Finally, the government and the public share an interest in ensuring that the process established by Congress —under which the Secretary has unreviewable authority to weigh the statutory factors governing TPS designations—is followed.

Plaintiffs also allege injuries from the termination of TPS status—most of which relate to the loss of the right to live and work in the United States. First Motion at 23–27; Second Motion at 16–18. But loss of expressly temporary protection from removal and associated benefits (such as employment authorization) is inherent in the TPS statute. TPS was never designed to provide permanent protection, so the loss of temporary status is designed to occur eventually, regardless of whether a court issues preliminary relief. Plaintiffs' asserted harm thus flows from the statutory scheme itself; they cannot show their injuries "directly result from the action which [they] seek[] to enjoin." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Moreover, "removal alone cannot constitute the requisite irreparable injury" to justify a stay. *Nken*, 556 U.S. at 435.

Finally, any eligible Yemeni national may pursue other protections from removal, including asylum, withholding of removal, or protection under the Convention Against Torture.

*See* 8 U.S.C. §§ 1158, 1231(b)(3)(A), 1231 note; *CASA, Inc. v. Noem*, No. 25-1792, 2025 WL 2028397, at *1 (4th Cir. July 21, 2025) (noting those "affected by the termination of TPS designations . . . may be eligible for [those forms of] relief "). In particular, the time bar for asylum applications is tolled while the applicant maintains TPS status, 8 C.F.R. §§ 208.4(a)(5)(iv), 1208.4(a)(5)(iv), and such an applicant may also be able to obtain employment authorization if certain conditions are met, 8 U.S.C. § 1158(d)(2); 8 C.F.R. § 208.7. The availability of these remedies for eligible Yemeni nationals mitigates the harm asserted by Plaintiffs.

Again, in the face of materially identical equitable factors, the Supreme Court twice held that the equities favor the government. For the same reasons, the government should be allowed to implement the TPS termination while this case is litigated on the merits.[11]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions to delay agency action.

---

[11] Even if preliminary relief were warranted here, Plaintiffs have no basis to request universal relief benefiting non-parties. *See Trump v. CASA, Inc.*, 606 U.S. 831 (2025); *Gill v. Whitford*, 585 U.S. 48, 73 (2018). A court granting equitable relief "may administer complete relief between the parties," *CASA*, 606 U.S. at 851 (cleaned up), and nothing in section 705 rebuts the presumption that traditional equitable rules apply to relief ordered under section 705. To the contrary, section 705's language embraces principles of equity, authorizing "all necessary and appropriate process" and making clear that "irreparable injury," a traditional equitable inquiry, is a key consideration. 5 U.S.C. § 705; *see Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (interpreting similar statutory text to incorporate traditional equitable principles). In sum, there is no basis to read section 705 to depart from the "party-specific principles" that "permeate our understanding of equity." *CASA*, 606 U.S. at 844.

Dated: New York, New York
April 6, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney
Southern District of New York
*Attorney for Defendants*

By:    */s/ Mark Osmond*
MARK OSMOND
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2713
mark.osmond@usdoj.gov

36