UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NOOR DOE, *et al.*,<br>        Plaintiffs,<br><br>                    v.<br><br>MARKWAYNE MULLIN, Secretary,<br>United States Department of Homeland<br>Security, in his official capacity, *et al.*,<br><br>        Defendants. | Case No. 26 Civ. 2103 (DEH) |
| NOOR DOE, *et al.*,<br>        Plaintiffs,<br><br>                    v.<br><br>MARKWAYNE MULLIN, Secretary,<br>United States Department of Homeland<br>Security, in his official capacity, *et al.*,<br><br>        Defendants. | Case No. 26 Civ. 2280 (DEH) |

## DECLARATION OF THREAT SCREENING CENTER DEPUTY DIRECTOR CHERYL MIMURA REGARDING LAW ENFORCEMENT SENSITIVE INFORMATION

I, Cheryl Mimura, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am a Supervisory Special Agent with the Federal Bureau of Investigation (FBI). I have served as Deputy Director of the Threat Screening Center[1] (TSC) since January 25, 2026. I have been with the FBI since November 1995 and have served in a variety of counterterrorism, counterintelligence, cyber, national security, crisis response, and management positions. In my capacity as the Deputy Director of the TSC, I supervise seven units and approximately 400 individuals

---

[1] Prior to March 2025, the Threat Screening Center was known as the Terrorist Screening Center.

1

(including both government employees and contractors) and am responsible for the overall operations of the TSC, including maintaining the Terrorist Screening Dataset (TSDS), which is the federal government's consolidated terrorist watchlist, and sharing TSDS information with domestic and foreign partners.

2. I am providing this declaration for submission to the Court in the above-referenced cases. I understand that, while TSC is not a party to this lawsuit, sensitive TSC information has been proposed for public filing. The purpose of this declaration is to provide the Court with an overview of the TSC and the TSDS, to explain why certain law enforcement sensitive information cannot be disclosed publicly or to plaintiffs or plaintiffs' counsel, and to assert and support a claim of law enforcement privilege over such law enforcement sensitive information.

3. The matters stated herein are based on my personal knowledge, background, training, and experience relating to terrorist watchlisting and counterterrorism investigations, and my review and consideration of information available to me in my official capacity, including information furnished to TSC personnel in the course of their official duties. My conclusions have been reached in accordance therewith.

2

## OVERVIEW OF THE CONSOLIDATED U.S. TERRORIST WATCHLIST

4. The TSDS was created by and is maintained by the TSC, a federal multi-agency center administered by the FBI.[2]

5. The TSDS, which is the federal government's consolidated terrorist watchlist, contains names and other identifying information (e.g., dates of birth, photographs, iris scans, and fingerprints) of individuals known or reasonably suspected to be engaged, to have been engaged, or to intend to engage in conduct constituting, in preparation for, or in aid or in furtherance of terrorism and/or terrorist activities.

6. Several federal agencies use information from the TSDS for a variety of national security and law enforcement screening and vetting purposes. For example, U.S. Customs and Border Protection receives information from the TSDS and may rely on that information when inspecting individuals at U.S. ports of entry. The Transportation Security Administration (TSA) also uses information in the TSDS in implementing aviation security procedures. It is my understanding that certain government agencies may use TSDS information, along with other information, in making certain immigration decisions.

---

[2] The Terrorist Screening Dataset was previously referred to as the Terrorist Screening Database (TSDB).

7. Because much of the information in the TSDS is derived from classified or other legally restricted information which originated from other U.S. Government agencies or foreign partners, disclosure of TSDS information for any purpose other than an authorized watchlisting function must be approved by the originator of the underlying information.

8. The "Overview of the U.S. Government's Watchlisting Process and Procedures," ("Overview Document"), attached hereto as Exhibit A, contains additional information about the process for nomination of individuals to the TSDS, use of the TSDS information by domestic agencies, quality assurance measures to ensure that information in the TSDS is thorough, accurate, and current, and the available process for redress requests.  It is the result of a lengthy interagency process to publicly disclose as much information about the U.S. government terrorism watchlisting process and procedures as the watchlisting community determined could be made public without compromising national security and law enforcement interests.  The Overview Document was prepared for the purpose of more fully and clearly informing the public of watchlisting processes, and it is publicly available on TSC's website: https://www.fbi.gov/file-repository/terrorist-watchlisting-transparency-document-april-2024-050224.pdf/view.

## PRIVILEGE ASSERTIONS

9. I understand the government has asserted the law enforcement privilege over information pertaining to the number of "KST or Non-KST National Security Record" numbers within the relevant population of Yemeni TPS recipients. I further understand that such numbers relate directly to the number of individuals within this population that are listed in the TSDS, either as known or suspected terrorists (KSTs) or watchlist exceptions.[3] This is TSC information provided by TSC to other agencies within the watchlisting community exclusively for screening and vetting purposes and subject to restrictions upon further dissemination without the express permission of the TSC.

10. Based upon my review of this matter, and for the reasons explained below, I hereby formally assert the law enforcement privilege over the above-described information in paragraph 9. I do so because public disclosure of this information could reasonably be expected to risk circumvention of the law and to cause harm to law enforcement and counterterrorism investigations and intelligence efforts.

---

[3] In addition to KSTs, the TSDS includes identifying information of some individuals who are not KSTs and do not meet the reasonable suspicion standard, also known as watchlist exceptions. The identifiers for these individuals are within the TSDS for the limited purpose of supporting specific screening functions of the U.S. Department of Homeland Security and the State Department, and information from such records is exported to those agencies only for these purposes. In other words, watchlist exceptions are not considered KSTs and are not screened as such.

5

## TSDS STATUS INFORMATION

11. It is the policy of the U.S. Government not to publicly disclose any individual's status in the TSDS or any subset of the TSDS, beyond certain limited disclosures contemplated by the DHS Travel Redress Inquiry Program procedures for U.S. Persons who are denied boarding because of their presence on the No Fly list (Overview Document at Pages 7 and 8).  This policy protects the national security of the United States.  In general, if the U.S. Government were required to reveal TSDS status outside of the above-described narrow exception, terrorists would be better able to circumvent counterterrorism efforts and more effectively and intelligently plan and carry out terrorist attacks.  For example, public disclosure that an individual has a TSDS status that the TSA relies upon to require enhanced security screening would arm terrorists with the knowledge of who would be required to undergo additional screening and who would not.  Terrorists could use this information to attempt to evade enhanced security screening and other security measures to gain access to the commercial aviation system and perpetrate an attack.  Public disclosure of an individual's TSDS status (outside the narrow exception noted above) would also compromise ongoing counterterrorism investigations and intelligence efforts by giving members of terrorist groups the opportunity to gauge whether a particular individual is of investigative interest or is the subject of counterterrorism, intelligence, or national security investigation.

6

Such disclosure could cause that person to alter his behavior, destroy evidence, take new precautions against surveillance, or change the level of any terrorism-related activity in which she is engaged.  Terrorists would then be able to leverage the information to ensure their activities go undetected.

12. For these reasons, information pertaining to an individual's TSDS status is properly subject to the law enforcement privilege and must not be disclosed publicly or to petitioner or petitioner's counsel.

## NUMBER OF TSDS RECORDS WITHIN AN IDENTIFIABLE POPULATION

13. While disclosure of the total number of "KST or Non-KST National Security Records" within the population of Yemeni TPS recipients might not directly disclose the status of any specific individual, disclosing such information for such an identifiable population would provide valuable information to U.S. adversaries regarding the effectiveness of the U.S. government's TSDS-related screening procedures and/or countermeasures employed by U.S. adversaries.

14. For example, a terrorist organization with operatives within the subject population could benefit from comparing disclosed "KST" and "Non-KST" numbers to the number of its operatives within the population.  If such an organization were to have "X" number of operatives within the relevant population and the disclosed numbers were substantially lower than X, the terrorist organization could infer a large percentage of its operatives have been able to go

undetected (thereby minimizing the deterrent effect of the TSDS). Conversely, to the extent the disclosed numbers were revealed to be higher than X, the terrorist organization might perceive a need to become more cautious and develop and employ additional countermeasures to evade detection.

## RELEASE SUBJECT TO PROTECTIVE ORDER

15. Given the sensitivities of the information and national security and law enforcement harms at stake, release of the law enforcement sensitive information described in this declaration, in any form, even under an attorney's eyes-only protective order, poses far too great a risk to national security. Regardless of the terms of any protective order, it is frequently impossible to detect whether there has been unauthorized disclosure (whether intentional or inadvertent). And, once sensitive law enforcement or national security information has been disclosed, the resulting harms to sources, methods, and ongoing investigations cannot be remedied.

## CONCLUSION

16. Accordingly, based upon my personal consideration of the matter, I have concluded that disclosure of the law enforcement sensitive information described in this declaration could be expected to risk circumvention of the law and cause harm to national security. This information is thus properly protected from disclosure by the law enforcement privilege.

8

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of April 2026.

Cheryl Mimura
Deputy Director
Terrorist Screening Center

# <u>Exhibit A</u>

UNCLASSIFIED

**OVERVIEW OF THE U.S. GOVERNMENT'S TERRORIST WATCHLISTING
PROCESS AND PROCEDURES**
*as of April 2024*

## BACKGROUND

The U.S. Government (USG) is committed to protecting the United States from terrorist threats
and attacks while safeguarding the freedoms, privacy, civil rights, and civil liberties of U.S.
persons and other individuals with rights under U.S. law.[1] Following the attacks of September
11, 2001, to further protect the Homeland, the President issued Homeland Security Presidential
Directive-6 (HSPD-6), which directed the USG to consolidate its approach to terrorism screening
and watchlisting, and facilitate information sharing.[2] Thereafter, Congress likewise mandated
greater sharing of terrorist information among federal departments and agencies, while still
protecting privacy, civil rights, and civil liberties.[3]

As part of this effort to facilitate information sharing, the Terrorist Screening Center (TSC) was
created by the Attorney General, Secretaries of Homeland Security and State, and the Director of
Central Intelligence concurrent with the issuance of HSPD-6.[4] The TSC was established to
manage the USG's consolidated terrorist watchlist, hereinafter referred to as the Terrorist
Screening Dataset (TSDS).[5] The TSDS contains the USG's integrated terrorism screening
information from federal departments and agencies within a single dataset for use by various
government entities in support of their screening and vetting activities.

The TSC is a federal multi-agency center that maintains the TSDS and provides terrorism
screening information to USG screening and vetting agencies for appropriate and lawful use in
accordance with their authorities.[6] The TSC is administered by the Federal Bureau of
Investigation (FBI) in coordination with the following USG partners:

- Department of Homeland Security (DHS)
- Department of State (State)
- Department of Justice (DOJ)
- Office of the Director of National Intelligence (ODNI)

The USG's terrorism watchlisting processes and procedures are subject to continual internal
review by participating agency officials. Agencies' policy, legal, privacy, civil rights, and civil
liberties offices participate in such reviews. In addition to these internal agency reviews,
terrorism watchlisting processes and procedures are regularly evaluated by external authorities,

---

[1] Unless otherwise noted, a U.S. person is defined in Section 3.5 of Executive Order 12333.
[2] *See* Homeland Security Presidential Directive/HSPD-6, Integration and Use of Screening Information (September
16, 2003).
[3] Intelligence Reform and Terrorism Prevention Act, Pub. L. No. 108-458 § 1016 (2004) (codified at 6 U.S.C. §
485).
[4] *See* Footnote 2. Note that under the Intelligence Reform and Terrorism Prevention Act the position of "Director of
Central Intelligence" was eliminated and replaced by the Director of the Central Intelligence Agency."
[5] In 2021, the TSDS replaced the Terrorist Screening Database (TSDB). As a result, most historical documents and
all cases with references to the TSDB remain valid and should be understood to refer to the TSDS.
[6] Prior to the creation of the TSC in 2003, the USG maintained 12 different terrorist watchlists.

1

UNCLASSIFIED

including Offices of Inspector General, the Government Accountability Office, Congress, and the Privacy and Civil Liberties Oversight Board.

The USG recognizes the importance of transparency and the need for a general understanding of its approach to terrorism screening and watchlisting. This document provides a general description of the processes for nominating a person to the TSDS, how the TSC ensures records are thorough, accurate, and current, how departments and agencies use the TSDS for screening and vetting, and how potentially erroneous information is identified and corrected through multiple processes to include internal reviews and encounter identity resolution. This document also describes the travel-related redress mechanisms in place which ensure watchlisting concerns are handled in a timely and fair manner and serve as another mechanism to correct potentially erroneous information.

## THE TSDS OVERVIEW

The TSDS contains biographic and biometric identifying information (e.g., names, dates of birth, photographs, iris scans, and fingerprints) of known or suspected terrorists.[7] The TSDS *does not* contain classified national security information. Identity information maintained in the TSDS is considered Law Enforcement Sensitive/Sensitive Security Information and is for screening purposes only. As such, the information is protected from public disclosure and provided only to persons who have a need to know, such as federal law enforcement officials, for their authorized screening and vetting functions.

The TSDS includes subsets of known or suspected terrorists who may be subject to additional security screening before being permitted to board an aircraft or who are prohibited from boarding flights on U.S. carriers or any flights into, out of, over, or within U.S. airspace.[8] The Transportation Security Administration (TSA) uses these subsets to secure commercial air travel against the threat of terrorism. However, individuals may be subjected to additional security screening for reasons other than a match to a record in the TSDS. For example, passengers may be randomly selected for additional security screening. Random selection is an important unpredictable security measure that is a layer in TSA's risk-based security approach to countering potential threats to transportation.

As a result of the dynamic threat environment, continuous internal reviews, and the redress process, the TSDS is constantly changing. Identities are added, have their statuses changed, or are removed. Therefore, the USG does not regularly release the number of identities within the

---

[7] A known or suspected terrorist is a person who is known or reasonably suspected to be engaged in, has been engaged, or intends to engage in conduct constituting, in preparation for, or in aid or in furtherance of terrorism and/or terrorist activities. The TSDS also includes identifying information of some individuals who are connected to or associated with known or suspected terrorists but who may not themselves meet the reasonable suspicion standard. These records are exported to State and DHS for the limited purpose of supporting screening functions, and may only be provided for other purposes, or to other departments and agencies, as approved through established interagency processes.

[8] The TSDS is the USG's comprehensive and singular consolidated terrorist watchlist. As it relates to this document, the term "subset" is defined as a portion of the greater TSDS; it is not used to reference separate standalone lists, which do not exist.

2

UNCLASSIFIED

TSDS. There are no quotas or numerical goals. Most of the identities in the TSDS are foreign nationals who are not located in the United States.

## WATCHLISTING AND SCREENING

### Nominations to the TSDS

USG departments and agencies nominate an individual for inclusion in the National Counterterrorism Center (NCTC)'s Terrorist Identities Datamart Environment (TIDE)[9] and/or the TSDS. The nominator reviews available intelligence and information that indicates the individual meets the criteria to be watchlisted. Nominations with a nexus to international terrorism are provided to the NCTC for inclusion in TIDE, and, if eligible, are passed from the NCTC to the TSC for potential inclusion in the TSDS. The FBI is the sole agency responsible for nominating identities with a nexus to purely domestic terrorism information and provides domestic terrorism nominations directly to the TSC for potential inclusion in the TSDS. Upon receipt, the TSC reviews the provided information to ensure each nomination satisfies the criteria for inclusion in the TSDS.

The USG continuously evaluates its standards for inclusion in the TSDS and its subsets. In order for a known or suspected terrorist to be accepted in the TSDS, the nomination must include sufficient information to satisfy the reasonable suspicion standard. The reasonable suspicion standard has been met when, based on the totality of the circumstances, there is reasonable suspicion that the person is engaged, has been engaged, or intends to engage in conduct constituting, in preparation for, or in aid or in furtherance of terrorism and/or terrorist activities. This includes taking into consideration any aggravating or mitigating factors that may contextualize or attenuate an individual's association to terrorism.

This assessment must be based upon articulable intelligence or information, taken together with rational inferences drawn from that intelligence or information. Mere guesses or hunches, or the reporting of suspicious activity alone, are not sufficient to establish reasonable suspicion.

Nominations to the TSDS are made based on information from:

- law enforcement,
- homeland security, defense, and intelligence communities, and
- U.S. embassies and consulates abroad.

In addition, certain foreign partners with which the USG has arrangements to share terrorist screening information may provide information to the USG that can be used to create nominations to the TSDS or enhance a TSDS record.

---

[9] The NCTC maintains classified national security information concerning international terrorists within its TIDE. Pursuant to Section 119 of the National Security Act of 1947, the NCTC serves as the primary organization in the USG for analyzing and integrating all intelligence possessed or acquired by the USG pertaining to terrorism and counterterrorism, excluding intelligence pertaining exclusively to domestic terrorists and domestic counterterrorism.

UNCLASSIFIED

Engaging in constitutionally protected activity alone will not meet the reasonable suspicion standard for inclusion in the TSDS. Protected constitutional activities include freedom of speech, free exercise of religion, freedom of the press, freedom of peaceful assembly, and the freedom to petition the government for redress of grievances.[10] Additionally, nominations to the TSDS shall not be based solely on race, ethnicity, national origin, or religious affiliation.

In addition to satisfying the reasonable suspicion standard, nominations must also include sufficient identifying information to enable screeners to determine whether the individual they are screening is a match to a record in the TSDS.

The TSC reviews each nomination it receives from the NCTC and the FBI to ensure compliance with the criteria for inclusion. At the conclusion of the TSC's review, the TSC will either accept or reject the nomination for inclusion into the TSDS.

**Nominations to the No Fly List or Selectee List**

Nominations to the No Fly List or Selectee List, subsets of the TSDS, must satisfy additional criteria beyond that required for inclusion in the TSDS as a known or suspected terrorist. The TSC is responsible for determining that all required criteria are satisfied.

Any individual, regardless of citizenship, may be included on the No Fly List when the TSC determines the individual meets at least one of the following criteria:

(1) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft (including a threat of piracy, or a threat to airline, passenger, or civil aviation security);

(2) a threat of committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the Homeland;

(3) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any USG facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations (as defined by 10 U.S.C. § 2801(c)(4)), U.S. ships, U.S. aircraft, or other auxiliary craft owned or leased by the U.S. Government; or,

(4) a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

Individuals who are on the No Fly List are prohibited from boarding an aircraft, whereas individuals on the Selectee List undergo enhanced screening before boarding an aircraft.

The TSA may designate individuals for additional security screening before they are permitted to enter the sterile area of an airport or to board an aircraft for reasons unrelated to the TSDS. TSA uses enhanced screening measures to ensure the safety and security of the traveling public. The vast majority of individuals designated for additional security screening are designated for reasons unrelated to the TSDS or any subset. For example, an individual may be designated for

---

[10] The same constitutional protections apply whether the First Amendment activities are conducted online or offline.

4

UNCLASSIFIED

additional screening in order to resolve a walk-through metal detector alarm, because of random selection, or for other reasons.

**Use of the TSDS**

Pursuant to HSPD-6, departments and agencies that are authorized or required to conduct terrorist screening or to use information to support diplomatic, military, intelligence, law enforcement, immigration, transportation security, visa, passport, and protective processes receive access to terrorism screening information to facilitate their respective missions.[11]

The following USG partners use the TSDS to support their respective missions:[12]

- State: Visa adjudication and passport issuance
- DHS
  - U.S. Customs and Border Protection (CBP): Vetting and inspection of travelers seeking entry to the United States, at preclearance facilities abroad, during the processing of trusted traveler applications, and those encountered between ports of entry
  - TSA: Air passenger screening and transportation security credential vetting
  - U.S. Citizenship and Immigration Services (USCIS): Immigration benefits screening
  - U.S. Immigration and Customs Enforcement (ICE): Investigations
- Department of Defense (DOD): Base access screening
- FBI: Investigations

## ENCOUNTERS

An encounter is an event in which an individual is identified during a screening process to be a potential match to an individual in the TSDS. An encounter can be a face-to-face interaction (e.g., inspection at a U.S. port of entry, visa interview, or traffic stop by local law enforcement), electronic (e.g., Electronic System for Travel Authorization (ESTA) application or a visa application), or paper-based (e.g., review of a visa petition). When an encounter occurs, the department, agency, or encountering officer contacts the TSC to confirm whether the individual matches the record in the TSDS. If the individual is confirmed to match the record in the TSDS, each encountering agency will take appropriate action, according to its internal procedures and policies and consistent with the application of its expertise and regulatory and statutory requirements, to serve its mission.

## QUALITY ASSURANCE REVIEWS AND REMOVAL PROCESS

**Quality Assurance Reviews**

To maintain thorough, accurate, and current terrorism screening information, the TSDS is subjected to ongoing quality control measures to ensure nominations continue to satisfy the

---

[11] *See* Footnote 2.
[12] This is not inclusive of *all* users.

5

UNCLASSIFIED

criteria for inclusion, and that information offered in support of the nomination is reliable and current.

Quality control measures include reviews and evaluations by the nominating agency, the NCTC or the FBI, and the TSC to verify each nomination meets the appropriate criteria for inclusion in the TSDS, and any appropriate subset list. These reviews and evaluations provide a means to identify any changes to the information over time that could affect eligibility for continued inclusion.

For example, each nominating agency must have internal procedures to correct or update its information. These procedures include reviewing and issuing retractions or corrections of information that may have been used to support a nomination.

Special handling is warranted for U.S. persons who are nominated to the watchlist. A formal process has been implemented to facilitate compliance with guidance and accommodate proper interagency coordination.

The TSC regularly reviews data in the TSDS to ensure the underlying information supports continued inclusion and performs audits to confirm the data in the TSDS is thorough, accurate, and current. For each record in the TSDS, all available information is reviewed to evaluate whether the record still meets the standard for inclusion. Additionally, a TSDS review occurs following each screening encounter resulting in a potential match to a TSDS record.

Departments and agencies involved in watchlisting and screening review the USG's terrorist watchlisting policies and procedures approximately every three years, or as needed.

**Removal Process**

When a record is determined to no longer meet the criteria for inclusion in the TSDS, it is removed. This often occurs when new information refutes or discredits the original nomination, or when updates to watchlisting policies affect eligibility for inclusion in the TSDS. Removing ineligible records from the TSDS is an integral part of the watchlisting process and helps to ensure quality control and maintain the integrity of the watchlisting process.

**Oversight**

Relevant USG departments' and agencies' Inspectors General and the U.S. Government Accountability Office regularly review terrorist watchlisting, screening, and redress processes. The Privacy and Civil Liberties Oversight Board and the U.S. Congress also provide oversight. The U.S. Congress conducts oversight through its committees including, but not limited to, the House and Senate Intelligence Committees, the House and Senate Homeland Security Committees, the House and Senate Appropriations Committees, and the House and Senate Judiciary Committees. The TSC also has an embedded legal unit and a dedicated privacy attorney to provide advice and counsel.

UNCLASSIFIED

## REDRESS PROCESS

The DHS Traveler Redress Inquiry Program (DHS TRIP) is a resource for individuals who believe they have been unfairly or incorrectly delayed, denied boarding, or identified for additional screening or inspection at airports or U.S. ports of entry. TSA administers DHS TRIP.[13]

The DHS TRIP website (https://trip.dhs.gov) provides a single point of contact for travelers to seek resolution of travel-related screening difficulties. The website provides travelers with detailed information about the redress process and what to expect regarding their inquiry. As part of the redress process, DHS TRIP provides travelers with a mechanism to submit any information that they consider relevant for consideration by the USG.

Travelers may apply for redress at the DHS TRIP website or by submitting a completed DHS TRIP Traveler Inquiry Form and copies of required documents by U.S. mail to:

> U.S. Department of Homeland Security
> Traveler Redress Inquiry Program (DHS TRIP)
> 6595 Springfield Center Drive, TSA-901
> Springfield, VA 20598-6901

To resolve redress inquires, DHS TRIP works with the following DHS component agencies and other USG agencies:

- CBP
- TSA
- USCIS
- DHS Management Directorate's Office of Biometric Identity Management
- ICE
- State
- DOJ, including the FBI and TSC

The TSC supports DHS TRIP on inquiries related to data in the TSDS. Approximately 98 percent of travelers who make redress inquiries to DHS TRIP are not a positive match to a TSDS record. In those rare cases where a traveler's inquiry does appear to relate to the TSDS, the TSC determines whether the traveler is a positive match to a record in the TSDS. If so, the TSC reviews the DHS TRIP inquiry related to the traveler, available information about the traveler, and documentation provided by the traveler. Additionally, the TSC requests from the nominating agency any new or exculpatory information relating to the traveler, which is also reviewed.

After reviewing the available information, the TSC determines whether the traveler's record should remain in the TSDS, be modified, or be removed, unless the legal authority to make such

---

[13] Congress directed the TSA to "establish a timely and fair process for individuals identified [under TSA's passenger prescreening function] to appeal to the Transportation Security Administration * * * and correct any erroneous information." 49 U.S.C. § 44903(j)(2)(G)(i). See also 49 U.S.C. § 44903(j)(2)(C)(iii)(I); 49 U.S.C. § 44926(a).

7

UNCLASSIFIED

a determination resides, in whole or in part, with another government agency.[14]  In such cases, the TSC prepares a recommendation for the decision-making agency and implements the decision-maker's determination.

When a change to a record's status is warranted, the TSC ensures such changes are made and verifies that any modifications or removals are carried over to the various screening systems that receive terrorism screening information from the TSDS. DHS TRIP then sends a determination letter advising the traveler of the results of the adjudication of the redress inquiry.

Because of security concerns, the USG's general policy is neither to confirm nor deny a person's watchlist status. In certain instances, however, a U.S. citizen or lawful permanent resident denied boarding because of their presence on the No Fly List may be apprised of their status through the DHS TRIP process. These applicants will be provided an opportunity to request and receive additional information regarding their status. Such additional information shall include as much unclassified information as possible supporting the applicant's No Fly status, and be reasonably calculated to permit the individual to respond, considering the national security and law enforcement interests at stake. The amount and type of information provided may vary depending on the facts and circumstances of each case. Applicants are then provided an opportunity to submit any information they consider relevant to their status on the No Fly List. The TSC reviews all submissions and takes appropriate action.

Where the TSC determines an individual seeking redress should remain on the No Fly List, the TSC provides a recommendation to the TSA Administrator. The TSA Administrator will review the available information, including the recommendation from the TSC and the traveler's submission, and either issue a final order maintaining the person on the No Fly List or removing the person from the No Fly List, or remand the case back to the TSC with a request for additional information or clarification. If a final order maintaining the individual on the No Fly List is issued, it will state the basis for the TSA Administrator's decision (to the extent feasible in light of national security and law enforcement interests) and will notify the person of the ability to seek judicial review pursuant to 49 U.S.C. § 46110.

DHS TRIP encourages all aviation travelers to include their Redress Control Number, provided in DHS TRIP response letters, in all future travel reservations.

It is important to note that the USG cannot ensure future travel will be delay-free. Individuals may also receive additional inspection, screening, or inquiry for a variety of reasons unrelated to the TSDS, including but not limited to:

- the particular circumstances of the individual's travel;
- grounds for possible inadmissibility to the United States;
- enforcement of the Immigration and Nationality Act;
- random selection; or
- airline selection.

---

[14] For example, as described in further detail below, the TSA Administrator makes final determinations concerning placement on the No Fly List pursuant to 49 U.S.C. § 46110.

UNCLASSIFIED

The USG is committed to ensuring the redress process is fair and responsive, as part of its commitment to protect the American public from terrorist threats while safeguarding privacy, civil rights, and civil liberties.

**CONCLUSION**

This document explains the robust processes and procedures of many agencies working in concert to provide for the appropriate and lawful use of terrorism screening information to protect the United States while, at the same time, safeguarding privacy, civil rights, and civil liberties.

The USG is committed to ensuring that the terrorist watchlisting process is implemented consistent with federal law, is subject to numerous routine reviews, oversight, and provides the opportunity to seek redress.