**+IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

Abdo DOE, Hadeel DOE, Faiz DOE, Ebe DOE, Sam DOE, Ali DOE, and Fahad DOE, on their own behalf and on behalf of others similarly situated,

*Plaintiffs*,

– *versus* –

Markwayne MULLIN, Secretary, United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,

*Defendants*.

**Case No. 1:26-cv-2280-DEH**

**FIRST AMENDED COMPLAINT
CLASS ACTION**

**INTRODUCTION**

1.      A decade of civil war. One of the worst humanitarian crises on earth. A State Department warning that no American should set foot in Yemen for any reason. And yet: on March 3, 2026, the government terminated humanitarian protections for more than 3,200 Yemeni nationals, effective May 4, and told them to go back. It gave them sixty days to prepare. Only this Court's May 1, 2026, order postponing that effective date stands between them and that result.

2.      Since September 2015, the United States has granted Yemeni nationals Temporary Protected Status ("TPS"), a statutory form of humanitarian relief that shields people from removal when their country is deemed unsafe due to armed conflict, natural disaster, or other extraordinary circumstances, and allows them to live and work legally here in the interim. Administration after administration, across both parties, extended that protection because the facts demanded it. More than 3,200 Yemeni nationals now depend on TPS—approximately 2,810 who hold the status today, and another 425 with applications pending. They built lives here in reliance on that promise: families, homes, and careers. Now, after more than a decade of protection, the government has ripped it away and given them sixty days to dismantle everything.

3.      Plaintiffs are seven of those Yemeni nationals. Some have held TPS for nearly a decade. If the termination takes effect, they will face an impossible choice: abandon everything and search for refuge elsewhere; remain here without status, subject to arrest and deportation; or return to Yemen, a country the government's own travel advisory declares too dangerous for any American to visit. There is no fourth option. The administration has suspended asylum processing and benefit adjudications for Yemeni nationals. Every door is closing at once.

4.      This purported termination did not emerge from the deliberative process Congress required. Defendant Noem has announced the termination of thirteen TPS designations in a

1

row—every single one that came up for review.[1] Courts across the country have found that these decisions were made before the required interagency consultation was conducted, or even begun. Yemen followed the same pattern but what the government put in writing here is fatal to its own case. The March 3, 2026 Federal Register Notice ("Notice") does not engage with the State Department's contrary findings. It does not explain how a country at war became safe for return. It invokes "national interest," a rationale no prior administration had ever used to end TPS in the program's thirty-five-year history, and declares the matter closed. But the statute is clear: the Attorney General may terminate TPS only when a country "no longer continues to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3)(B). The Notice does not claim Yemen has ceased to meet those conditions. It says the opposite—that "extraordinary and temporary conditions continue to challenge Yemeni nationals' ability to safely return home."[2] The government's own document establishes that termination is statutorily barred. The Secretary terminated anyway invoking the "national interest." Among the thirteen terminations, only Yemen's notice contains a finding that the country's nationals cannot return safely.

5.    The record reveals what drove this decision. President Trump campaigned on ending TPS and described Yemeni immigrants as "known terrorists" who "want to blow up our country." Defendant Noem dismissed TPS as an "immigration scheme" and branded immigrants "foreign invaders" and "leeches." The administration has systematically dismantled humanitarian protection for nationals of non-white countries while fast-tracking refugee admissions for white South Africans.

---

[1] These are: Haiti, Afghanistan, Cameroon, Nepal, Nicaragua, Honduras, Venezuela, Syria, South Sudan, Burma, Ethiopia, Somalia, *see Miot v. Trump*, No. 25-cv-2471, 2026 WL 266413 at *23 (D.D.C. Feb. 2, 2026), and now Yemen.
[2] 91 Fed. Reg. 10404-05 (Mar. 3, 2026).

6.      The termination of TPS for Yemen is ultra vires and violates the Administrative Procedure Act and the Fifth Amendment of the United States Constitution.. This Court should set it aside. On May 1, 2026, this Court postponed the termination's effective date under 5 U.S.C. § 705 and expressly reserved Plaintiffs' equal protection claim. *Doe v. Noem,* No. 26 Civ. 2280 (DEH), 2026 WL 1192079. at *15 n.14 (S.D.N.Y. May 1, 2026). On June 25, 2026, the Supreme Court held in *Mullin v. Doe*, No. 25-1083, 2026 WL 1825840 (U.S. June 25, 2026), that 8 U.S.C. § 1254a(b)(5)(A) bars review of the non-constitutional claims challenging TPS determinations in that case. *Mullin* did not disturb constitutional claims, and it did not address claims that the Secretary acted wholly without statutory authority. Plaintiffs file this Amended Complaint to conform the pleadings to that posture.

## THE PARTIES

### Plaintiffs

7.      **Plaintiff Abdo Doe** is a Yemeni national and TPS holder who has lived in the United States since 1999 and currently resides in the Bronx, New York. He has a cardiac condition for which he takes medication. He will lose his work authorization and protection from deportation if TPS is terminated. If TPS is terminated, he could be forced to return to Yemen, where he fears for his safety because the Houthi rebels control his hometown, Sana'a, where the health care infrastructure has been devastated, and where he has no immediate family remaining.

8.      **Plaintiff Hadeel Doe** is a Yemeni national and TPS holder who has lived in the United States since 2023 and currently resides in Detroit, Michigan. She is the mother of two U.S. citizen children, ages 9 years old and 2 years old. She is seven months pregnant with a child who has a heart condition that will require medical care unavailable in Yemen. She has no relatives remaining in Yemen: Her entire immediate family—father, mother, two brothers, and

four sisters—all reside in the United States, and all have either U.S. citizenship or green cards. She will lose her protection from deportation if TPS is terminated. Losing TPS will force her to relocate to Yemen, where she has no support system whatsoever and where her home region is controlled by the Houthi rebels.

9.      **Plaintiff Faiz Doe** is a Yemeni national and TPS holder who has lived in the United States since 2024 and currently resides in Brooklyn, New York. In Yemen, he was the president of an NGO working in the field of human rights and politics on behalf of internally displaced persons, providing legal protection and support for women and children. He will lose his work authorization and protection from deportation if TPS is terminated. Losing TPS would force him to return to Yemen, where he would be targeted by the Houthis who control his home region, as human rights workers are often suspected of being spies for the U.S. or Israel and typically end up jailed or disappeared.

10.     **Plaintiff Ebe Doe** is a Yemeni citizen with TPS who has lived in the United States since 2018 and resides in Houston, Texas. She has a medical degree and works as a clinical research specialist at Houston Methodist Hospital, supporting oncology trials and medical research to develop new treatments for cancer patients, while pursuing her dream of qualifying as a physician in the United States. She will lose her work authorization and protection from deportation if TPS is terminated. If TPS is terminated, she could be forced to return to Yemen. Her hometown, Ibb in northern Yemen, is under the control of the Houthi authorities. The environment in northern Yemen has become increasingly restrictive, particularly for women, who face growing limitations on freedom of movement, employment opportunities, and participation in public and professional life. Additionally, individuals who have lived in the

United States for several years can face heightened scrutiny or social pressure upon return because they are perceived as having different ideas, education, or lifestyles.

11.    **Plaintiff Sam Doe** is a Yemeni national with a pending TPS application who has lived in the United States since 2024 and currently resides in Indianapolis, Indiana. He is in the process of completing a B.S. degree in business and informatics remotely from the University of Debrecen, Hungary. If TPS is terminated and his pending asylum application is denied, he could be forced to return to Yemen. If returned to Yemen, he fears he would be recruited by force to join the Houthi fighters, as his hometown, Sana'a, is controlled by the Houthis.

12.    **Plaintiff Ali Doe** is a Yemeni national and TPS holder who has lived in the United States since 2021 and currently resides in Brooklyn, New York. His father is part of the officially-recognized Yemeni government, previously facilitated travel for soldiers with the Saudi-led coalition fighting the Houthis who control Ali's home city of Sana'a, and was the subject of a targeted assassination attempt. Because he had at times worked with his father, Ali is certain that he will be targeted himself if he returns. He will lose his work authorization and protection from deportation if TPS is terminated. If TPS is terminated, he could be forced to return to Yemen.

13.    **Plaintiff Fahad Doe** is a Yemeni national and TPS holder who has lived in the United States since 2017 and currently resides in Vero Beach, Florida. He currently works as a flight instructor and serves as an FAA-approved check airman. He has completed the requirements necessary to qualify for employment with an airline and is one step away from starting a career as an airline pilot. However, he will lose his work authorization, his current job, and his protection from deportation if TPS is terminated. Moreover, because he spent most of his life in Saudi Arabia and currently lives in the United States, he fears that he would be regarded

5

with suspicion and face potential harassment, detention, and mistreatment if forcibly returned to Yemen.

**Defendants**

14.     **Defendant Markwayne Mullin** is the Secretary of the Department of Homeland Security. As the highest-ranking officer for DHS, Defendant Mullin has asserted ultimate authority over all TPS extension, termination, and designation decisions assigned by statute to the Attorney General. He is sued in his official capacity. (He was preceded in office by Secretary Kristi Noem, who left the position on March 24, 2026, and was an original official-capacity defendant in this action. As such, she is referred to in her official capacity as DHS Secretary as "Defendant Noem" throughout this Amended Complaint.)

15.     **Defendant Department of Homeland Security** is a Cabinet-level department in the U.S. federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP"). DHS, together with its component agencies, is responsible for administering and enforcing the TPS program.

16.     **Defendant U.S. Citizenship and Immigration Services** is the sub-agency within DHS charged with adjudicating applications for immigration benefits, including TPS.

17.     **Defendant United States of America** includes all other government agencies and departments responsible for changes in TPS policies and the implementation and administration of those policies.

**JURISDICTION AND VENUE**

18.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and the case presents a justiciable case or controversy within the meaning of Article III of the U.S. Constitution. The Court also has jurisdiction over Plaintiffs' claims under the Fifth Amendment to the U.S. Constitution. The Court has additional remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the APA, 5 U.S.C. § 701 *et seq*.

19.     The federal government has waived its sovereign immunity and permitted judicial review of agency action under 5 U.S.C. § 702.[3] In addition, sovereign immunity does not bar claims against federal officials seeking to prevent violations of federal law, rather than monetary relief.[4]

20.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, and because at least one named Plaintiff, as well as unnamed members of the putative class, reside in this judicial district.

**THE STATUTORY SCHEME FOR TPS**

21.     Congress created TPS in response to unconstrained executive discretion in humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure" to confer blanket nationality-based humanitarian relief. *See* Lynda J. Oswald, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85

---

[3] *See Sharkey v. Quarantillo*, 541 F.3d 75, 91 (2d Cir. 2008).
[4] *See, e.g., id.*; *Lunney v. United States*, 319 F.3d 550, 557–58 (2d Cir. 2003); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 697–99 & nn.18–19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

Mich. L. Rev. 152, 157–60 (1986). Between 1960 and 1989, the Attorney General granted extended voluntary departure to approximately sixteen countries, with periods of protection ranging from eight months to 15 years.[5] This practice lacked "any specific … criteria." *Id.* at 178 n.153 (quoting Letter from William F. Smith, Att'y Gen., to Lawrence J. Smith, Rep. (July 19, 1983)). The arbitrary, overtly political decisions surrounding extended voluntary departure resulted in congressional pressure to reform the system, particularly in the wake of the Attorney General's refusal to grant extended voluntary departure for Salvadoran refugees at the time. *See Hotel & Rest. Emps. Union v. Smith*, 846 F.2d 1499, 1510–11 (D.C. Cir. 1988) (discussing termination of extended voluntary departure for El Salvador) (separate opinion of Mikva, J.).

22.     Congress designed TPS to ensure that future nationality-based protections would be based on "objective factors" and "identifiable conditions" rather than "the vagaries of our domestic politics." 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating the immediate precursor to the TPS statute). Congress also sought to replace the "ad hoc, haphazard . . . procedures" that existed before, and provide beneficiaries with certainty about "what [their] rights are, how the Justice Department determines what countries merit [protected] status," and "how long they will be able to stay." *Id.* at 25837 (statement of Rep. Bill Richardson). While establishing criteria to govern blanket humanitarian protection, Congress also overrode the executive branch and statutorily designated El Salvador for TPS. *See* Immigration Act of 1990, Pub. L. 101-649, Title III, §§ 302–303.

23.     Since 1990, the TPS statute has given the executive branch authority to provide nationality-based humanitarian relief to certain citizens of countries stricken by war, natural

---

[5] *See* Bill Frelick & Barbara Kohnen, *Filling the Gap: Temporary Protected Status*, 8 J. of Refugee Stud. 339, 362–63 (1995).

disaster or other catastrophe, who are already present in the United States. *See* 8 U.S.C. § 1254a. The statute provides that the Attorney General may designate a country for TPS where (1) "there is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; (2) "there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state" and it is "unable, temporarily, to handle adequately the return" of nationals; and (3) "there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(A)–(C).

24.    Under the statute, the "national interest" provision limits designation only under subsection (C)'s "extraordinary and temporary conditions" ground; it does not apply to designations under subsections (A) (armed conflict) or (B) (natural disasters).

25.    In keeping with its intent to free the process of designating countries for humanitarian protection from domestic politics, Congress established a statutory framework that governs the designations of countries for TPS. The statute first requires the Attorney General to consult with "appropriate agencies." 8 U.S.C. § 1254a(b)(1). After that, the Attorney General "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. *Id.* A designation lasts between six and eighteen months, effective either upon notice in the Federal Register or "such later date as the Attorney General may specify." *Id.* §1254a(b)(2).

26.    The Attorney General thus has substantial discretion over initial TPS designations. So long as she determines certain country conditions exist, she may choose whether and when to designate a country for TPS.

9

27.     By contrast, Congress limited, in important ways, the Attorney General's discretion to review TPS designations after the initial designation is made. *See* U.S. Gov't Accountability Off., GAO-20-134, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* (2020) ("GAO Report") at 15–18, 27 (differentiating between the discretion afforded before and after an initial designation). The statutory requirements are clear: "At least 60 days before [the] end of the . . . period of designation, . . . the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). The Secretary of Homeland Security has purported to assume this authority from the Attorney General since March 1, 2003.

28.     The review process typically begins months before the 60-day deadline. *See* GAO Report at 20–21. As part of the process, both USCIS and the State Department generally prepare country conditions memoranda and recommendations. *See id.* 15–16; *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023) (describing the TPS review process).[6] Generally, USCIS manages and coordinates the TPS review process for the Attorney General, soliciting a country conditions report from the Refugee, Asylum, and International Operations (RAIO) unit within USCIS and soliciting a country conditions report and recommendation from the State Department. *See* GAO Report at 15–

---

[6] The district court's decision was reversed on appeal in a 2-1 ruling on jurisdictional grounds, but a majority of active judges voted to rehear the case en banc; so the panel decision was vacated. *See Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

21; *see also Saget v. Trump*, 375 F. Supp. 3d 280, 299–300 (E.D.N.Y. 2019). After considering the materials provided, USCIS prepares a detailed recommendation, based on country conditions. *Id.* USCIS's recommendation is called a "Director Memo." *Saget*, 375 F. Supp. 3d at 299–300.

29.    Once the decision has been made, the statute requires that "[t]he Attorney General shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. § 1254a(b)(3)(A).

30.    Unless the Attorney General timely determines and publishes notice of her decision that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for six months or "in [her] discretion . . . a period of 12 or 18 months." 8 U.S.C. § 1254a(b)(3)(C). The statute thus "essentially provides extension as a default." *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 851 (N.D. Cal.), *aff'd*, 150 F.4th 1000 (9th Cir. 2025) ("*NTPSA I* PI Decision").

31.    In contrast, if the Attorney General timely "determine[s]" that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal register." 8 U.S.C. § 1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* The statute provides no grounds for the termination of TPS other than a determination that a country no longer meets the conditions for designation.

32.     The Attorney General has discretion to further postpone the effective date of a termination "in order to provide for an orderly transition." 8 U.S.C. § 1254a(d)(3). For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office, the agency provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period. Before the current administration, only four TPS designations had been terminated without any such period, and each of those terminations occurred more than twenty years ago and involved a designation that had been in place for three years or less.

33.     Once a country has been designated for TPS, individuals from that country (and persons without nationality who last habitually resided in that country) may apply for immigration status under the program. To be eligible for TPS, individuals from a designated country must meet stringent requirements. These requirements include, among other things, (1) continuous physical presence in the United States from the most recent date of designation; (2) continuous residence in the United States from a (potentially earlier) date designated by the Secretary; (3) satisfaction of the criteria for admissibility as an immigrant or, for certain grounds of inadmissibility, a waiver of those grounds; (4) a lack of disqualifying criminal history such as convictions for a single felony or multiple misdemeanors; and (5) the submission of an application, extensive documentation, and fees. *See* 8 U.S.C. § 1254a(c)(1); *see also* 8 C.F.R. §§ 244.2, 244.4, 244.9. Further, an individual is not eligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the security of the United States." *See* 8 U.S.C. § 1254a(c)(2)(B)(ii) (incorporating 8 U.S.C. § 1158(b)(2)(A)).

34.     Congress ensured that people who are ultimately granted TPS would enjoy the freedom to live and work in the United States without fear of deportation. Under the statute's clear directives, anyone who receives and maintains TPS "shall [be] authorize[d]" to work in the

12

United States; "shall not be detained" by the Secretary of Homeland Security on the basis of immigration status; and "shall not [be] remove[d]" from the United States. 8 U.S.C. §§ 1254a(a)(1), (d)(4). The statute affords protections to qualifying individuals, regardless of whether they meet the requirements for asylum or other immigration relief. *See id*. § 1254a(b)(1).

35.    Individuals who apply for TPS and who are *prima facie* eligible for TPS may receive work authorization and are protected from deportation while the application is pending. *See* 8 U.S.C. § 1254a(a)(4)(B); 8 C.F.R. § 244.10(a), (e).

**YEMEN'S PRIOR TPS DESIGNATIONS AND CURRENT COUNTRY CONDITIONS**

36.    Yemen is a Muslim-majority country on the Arabian Peninsula. Its modern history is characterized by conflict between the traditionalist North and socialist South, as well as Shia-Sunni sectarian tensions. North Yemen became a republic in 1962 after the overthrow of a monarchy that had become independent from the Ottoman Empire in 1918. South Yemen gained independence from the British Empire in 1967 and became a socialist client state of the Soviet Union. Following the end of the Cold War, the two nations merged on May 22, 1990, with Ali Abdullah Saleh as President.

37.    Protests over corruption and economic hardship during the "Arab Spring" forced Saleh to step down in 2012. After two years of transitional government under Saleh's Vice President Abderabbu Mansour al-Hadi, the Shiite Houthi movement (Ansar Allah) seized the capital, Sana'a, in 2014, prompting a Saudi-led coalition intervention in 2015. The country is now fractured, with the internationally recognized government, Houthi rebels, and southern separatists (the Southern Transitional Council) controlling different regions. According to the BBC, "[t]he continuing civil war in Yemen has reportedly left more than 150,000 people dead

13

and triggered one of the world's worst humanitarian crises, with more than 23 million people—three quarters of the population—in need of some form of aid."[7]

38.     The Secretary of DHS first designated Yemen for TPS on September 3, 2015, in recognition of the country's escalating civil war, widespread civilian casualties, and mass displacement caused by government and non-state armed forces.[8] The Federal Register notice of designation stated that "there is an ongoing armed conflict within Yemen and, due to such conflict, requiring the return of Yemeni nationals to Yemen would pose a serious threat to their personal safety. … The conflict has caused an acute and rapidly deteriorating humanitarian crisis. The airstrikes and ground fighting have killed, wounded, and displaced noncombatants and destroyed and damaged hospitals, schools, roads, airports, the electric power grid, the water supply, and other critical infrastructure. The humanitarian situation is compounded by access constraints. Relief efforts and supplies have been hindered by the limited capacity of airports, seaports, and roadblocks. … Because Yemen relies on imports for 90 percent of its food, the combination of severely reduced imports, low food stocks, and a shortage of fuel has increased the number of people experiencing food insecurity to 12.9 million, nearly half of the total population of Yemen, including 5 million who are classified as severely food insecure."[9] The designation was extended for eighteen months on January 4, 2017.[10]

---

[7] *See* Yemen Country Profile, available at https://www.bbc.com/news/world-middle-east-14704852.

[8] *See* Designation of the Republic of Yemen for Temporary Protected States, 80 Fed. Reg. 53319 (Sep. 3, 2015).

[9] *Id.*

[10] 82 Fed. Reg. 859 (Jan. 4, 2017).

39.     DHS extended this designation during President Trump's first administration on September 14, 2018.[11] DHS repeatedly extended and redesignated Yemen for TPS, each time citing ongoing armed conflict, human rights abuses, and humanitarian catastrophe and underscoring the impossibility of safe return for Yemeni nationals.[12]

40.     DHS last renewed Yemen's TPS on July 10, 2024, redesignating TPS for Yemen through March 3, 2026. It did so upon two bases: (1) an "ongoing armed conflict" and (2) the continuation of "extraordinary and temporary conditions."[13] DHS found that the ongoing armed conflict continued to "directly affect[] the physical security of the civilian population throughout the country," including through political repression in Houthi-controlled areas behind the front lines of the conflict and violence by Al-Qaeda in the Arabian Peninsula, as well as a vast crisis of landmine and unexploded ordnance contamination.[14] DHS also found that "Yemen continues to experience one of the worst humanitarian crises in the world, suffering from a widespread lack of basic public services including electricity, healthcare, water, and sanitation services" with 4.5 million people internally displaced, "80% of the population in Yemen liv[ing] below the poverty line as the fragile economy remains on the brink of collapse," and "approximately 17 million people considered food insecure and 3.5 million reported to be acutely malnourished."[15]

41.     These conditions are well-documented. For example, the Congressional Research Service reported on February 20, 2026 that, after the October 7 attacks from Gaza, "the Houthis began targeting Israeli territory as well as commercial ships transiting the Bab al Mandab Strait,"

---

[11] 83 Fed. Reg. 40307 (Sep. 14, 2018).
[12] *See, e.g.*, 85 FR 12313 (Mar. 2, 2020); 86 Fed. Reg. 36295 (Jul. 9, 2021); 88 Fed. Reg. 94 (Jan. 3, 2023); 89 Fed. Reg. 56765 (Jul. 10, 2024).
[13] 89 Fed. Reg. 56765 (Jul. 10, 2024).
[14] *Id.*
[15] *Id.*

15

as a consequence of which, "[o]n March 15, 2025, U.S. forces began a military campaign ... intended to compel the Houthis to end their attacks and eliminate their capability to threaten maritime transit. The Houthis resisted, attacked U.S. Navy ships, and shot down U.S. unmanned aircraft." Some two to three thousand Al Qaeda members operate in country, in "alliance with the Somalia-based Al Shabaab."[16]

42.     The State Department's *2024 Country Report on Human Rights Practices: Yemen* notes that continuing "[s]ignificant human rights issues included credible reports of: arbitrary or unlawful killings; disappearances; torture or cruel, inhuman, or degrading treatment or punishment; arbitrary arrest or detention; serious abuses in a conflict; unlawful recruitment or use of children in armed conflict" and human trafficking, and that "[n]ongovernmental actors, including tribal militias, the Houthi terrorist militia, and other terrorist groups (including al-Qa'ida in the Arabian Peninsula and a local branch of ISIS), committed significant abuses with impunity."[17]

43.     The State Department's *Country Reports on Terrorism 2023: Yemen* stated that "Al-Qa'ida in the Arabian Peninsula (AQAP), ISIS-Yemen, the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF), and Iranian-backed terrorist groups such as Hizballah continued to exploit the political and security vacuum in Yemen created by the ongoing civil conflict between the internationally recognized Republic of Yemen government (ROYG) and Iranian-backed Houthi rebels. …[B]etween 60 percent and 70 percent of the country's population lived

---

[16] Congressional Research Service, *Yemen: Conflict, Red Sea Security, and U.S. Policy* (Feb. 20, 2026), available at https://www.congress.gov/crs-product/IF12581

[17] Department of State, *2024 Country Report on Human Rights Practices: Yemen*, available at https://www.state.gov/reports/2024-country-reports-on-human-rights-practices/yemen; see also Department of State, *2025 Trafficking in Persons Report: Yemen*, available at https://www.state.gov/reports/2025-trafficking-in-persons-report/yemen/ (citing various risks to men, women and children)

16

in Houthi-controlled areas. Tensions between the government and the Southern Transitional Council (STC) persisted in the South, where AQAP and ISIS-Yemen continued to maintain areas of influence and conduct operations." The Report noted that the officially recognized government "could not fully enforce [counterterrorism] measures or consistently lead multilateral efforts because of instability, violence, and degraded capabilities.  A security vacuum persisted, which provided AQAP and ISIS-Yemen room to operate."[18]

44.    In January 2025, Hans Grundberg, Special Envoy of the United Nations Secretary-General for Yemen, noted that "[t]he conflict in Yemen has become increasingly internationalized, with the escalating cycle of strikes and counter-strikes hindering the prospects of peace."[19] The U.N. World Food Program shut down operations in the northern, rebel-held part of Yemen in January 2026, following restrictions imposed by the Houthis.[20] President Trump's dissolution of USAID had already effectively cut off the largest source of humanitarian food aid in Yemen.[21] On January 8, 2026, Stéphane Dujarric, Spokesperson for United Nations Secretary-General António Guterres, cautioned that the situation in Yemen remains "extremely dire," with

---

[18] Department of State, *Country Reports on Terrorism 2023: Yemen*, available at https://2021-2025.state.gov/reports/country-reports-on-terrorism-2023/yemen/.

[19] *Houthis Undermining Regional, International Peace Efforts in Yemen, Says Delegate, Calling on Security Council to Pave Way towards Political Solution*, U.N. Security Council Meetings Coverage (Jan. 15, 2025), *available at* https://press.un.org/en/2025/sc15964.doc.htm

[20] *UN food agency is shutting down operations in rebel-held northern Yemen, officials say*, Associated Press (Jan. 29, 2026),  *available at* https://apnews.com/article/yemen-houthis-wfp-yemen-war-4bd5125a75b0af92fe57a8643fb15cdf

[21] Mohammed Ali Kalfood, *What Trump's 'Cruel' Halt to Foreign Aid Means for Yemen*, DAWNmena.org (Feb. 14, 2025), *available at* https://dawnmena.org/what-trumps-cruel-halt-to-foreign-aid-means-for-yemen/ ("In 2024, when USAID provided Yemen with roughly $620 million in total aid, half of that ($323 million) was disbursed to the World Food Program. In 2023, when USAID's budget in Yemen totaled $811 million, 60 percent of that aid, roughly $541 million, went to the U.N. food agency.").

millions of civilians facing acute food insecurity and a collapse of essential services."[22] According to the International Committee of the Red Cross, the humanitarian situation is worsening, with 70% of the population reliant on humanitarian aid to survive and more than 80% of Yemenis living below the poverty line.[23]

45.      The Houthis were twice designated by President Trump's administrations as a Foreign Terrorist Organization, first in January 2021, and then again in March 2025. *See Foreign Terrorist Organization Designation of Ansarallah*, 90 Fed. Reg. 11352 (Mar. 5, 2025). Such a designation potentially creates insuperable difficulties in delivering humanitarian aid to parts of the country controlled by the Houthis.[24]

46.      The U.S. Department of State continues to maintain a Level 4 "Do Not Travel" advisory for Yemen, which warns that "U.S. citizens should not travel to Yemen for any reason," "due to risk of terrorism, unrest, crime, health risks, kidnapping, and landmines." The advisory states that "[a] civil war continues in Yemen," which "conflict has destroyed basic infrastructure like housing, medical facilities, schools, and utilities. This makes it hard to get electricity, clean water, and medical care. Humanitarian groups face obstacles in delivering food, medicine, and water." "Al-Qa'ida in the Arabian Peninsula (AQAP) and Islamic State affiliates" "plan and carry out attacks in Yemen," and along with the Foreign Terrorist Organization-designated Houthis may attack public sites, places of worship, transportation hubs, markets, and government buildings and facilities. Moreover, "[h]ealth services in Yemen are poor. There is a re-emergence

---

[22] *UN Warns of Worsening Humanitarian Crisis in Yemen, Renews Call for Political Solution*, YemenOnline (Jan. 8, 2026), *available at* www.yemenonline.info/special-reports/11338.
[23] International Committee of the Red Cross, Yemen, *available at* www.icrc.org/en/where-we-work/yemen.
[24] Mohammed Ali Kalfood, *What Trump's 'Cruel' Halt to Foreign Aid Means for Yemen*, DAWNmena.org (Feb. 14, 2025), *available at* https://dawnmena.org/what-trumps-cruel-halt-to-foreign-aid-means-for-yemen/

of diseases like cholera, polio, and measles. They are spreading in Houthi-controlled areas.

Medicine and medical supplies are hard to find. Adequate medical treatment for routine and

emergency procedures is often not available." U.S. citizens—such as the citizen children of

Plaintiffs—"especially dual U.S.-Yemeni citizens, are at high risk of kidnapping and detention in

Yemen." Americans still planning to travel to Yemen are advised to "[d]raft a will."[25]

### THE SEQUENCE OF EVENTS TARGETING YEMENI NATIONALS

47.     Yemen's termination followed a sequence of official actions that reached Yemeni

nationals as members of a nationality-defined group. On June 4, 2025, President Trump issued

Proclamation 10949, suspending entry by nationals of a twelve countries, including Yemen. 90

Fed. Reg. 24497 (June 4, 2025). The Proclamation fixed the boundary group of the targeted

group: it names the covered countries and excludes others.

48.     On December 1, 2025, the Secretary publicly vilified the nationals of travel-ban

countries, Yemeni nationals among them, as "killers, leeches, and entitlement junkies" and

"foreign invaders," declaring: "WE DON'T WANT THEM. NOT ONE." ECF No. 23-5. To

know whom that statement condemns, one needs a single fact about a person: their nationality.

49.     The next day, December 2, 2025, USCIS directed officers to hold pending benefit

requests from nationals of the travel-ban countries and to re-review already-approved benefits,

freezing Yemeni applications by nationality. USCIS Memorandum, Hold and Review of all

---

[25] Dept. of State, Travel Advisory—Republic of Yemen, *available at*
https://travel.state.gov/en/international-travel/travel-advisories/yemen.html (Dec. 19, 2025). The
State Department recently advised Americans to "DEPART NOW" from Yemen and a number
of other countries in the Middle East due to the conflict in Iran. See Ass't Sec'y Mora Namdar
(@AsstSecStateCA), x.com (Mar. 2, 2026, 4:49pm),
https://x.com/AsstSecStateCA/status/2028588420403241021?s=20

Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries, PM 602-0192 (Dec. 2, 2025).

50.     Seventeen days after her December 1 statement, on December 18, 2025, the Secretary signed the decisional memorandum terminating Yemen's TPS designation. ECF No. 48, at 19. She did so despite the finding, published in the Notice itself, that "Yemen still experiences extraordinary and temporary conditions" that "continue to challenge Yemeni nationals' ability to safely return home." 91 Fed. Reg. at 10404-05. No other termination notice contains such a finding. Each notice's treatment of return safety is documented at ECF No. 24, at 4-5. The Notice then invoked Proclamation 10949, which covers the very nationalities the December 1 statement vilified, as part of its national-interest rationale.

51.     The Secretary identified the source of these decisions. Nine days after the President was inaugurated, discussing TPS on CNN, the Secretary stated that DHS was "getting direction on how this works from the direction of the president of the United States." ECF No. 5, Ex. 30. The October 2024 campaign statement describing people "coming out of Yemen" as "known terrorists," alleged *infra*, preceded the sequence and supplies its background.

## DEFENDANTS' UNLAWFUL TERMINATION OF YEMEN'S TPS DESIGNATION

52.     On February 13, 2026, Defendant Noem announced her intent to terminate Yemen's TPS designation. *See* USCIS, *DHS Terminates Temporary Protected Status for Yemen* (Feb. 13, 2026), available at https://www.uscis.gov/newsroom/news-releases/dhs-terminates-temporary-protected-status-for-yemen. In her press announcement, she stated: "Allowing TPS Yemen beneficiaries to remain temporarily in the United States is contrary to our national interest. TPS was designed to be temporary, and this administration is returning TPS to its original temporary intent. We are prioritizing our national security interests and putting America

20

first." The press announcement offered a "complimentary plane ticket" and "$2,600 exit bonus"

payment for any Yemeni TPS beneficiaries willing to voluntarily self-deport.

53.    DHS formally announced the purported termination of Yemen's Temporary

Protected Status via a notice published under Secretary Noem's name in the Federal Register on

March 3, 2026. 91 Fed. Reg. 10402 (Mar. 3, 2026). The stated effective date of the termination

was May 4, 2026—a mere 60 days later and the minimum required by statute. *See* Termination

of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10402 (Mar. 3,

2026).

54.    The Secretary determined that "Yemen no longer meets the criteria for an ongoing

armed conflict that poses a serious threat to the personal safety of returning Yemeni nationals,"

describing the armed conflict as "sporadic" and "truncated." 91 Fed. Reg. at 10403. (In the very

next paragraph, the notice refers to the "prolonged *and still unresolved* violent conflict" created

by the Houthi insurgency. *Id*. (emphasis added).) The notice cites to the fact that ICE "is

currently removing aliens to Yemen" and that "a number of Yemeni nationals have requested

advance parole documents for travel back to Yemen" as evidence for the lack of armed conflict

throughout the country. *Id*. at 10404. The Notice counts 142 such applications from 2018

through 2025. *Id.*

55.    In the notice, Defendant Noem conceded that "Yemen still experiences

extraordinary and temporary conditions" "that prevent Yemeni nationals from returning in

safety," *id*. at 10404, 10405, but determined that "it is contrary to the national interest" to allow

Yemenis to remain here, *id*. at 10404. Nearly all of the conditions the notice subsequently cited

in support of the conclusion that extension of TPS was "contrary to national interest" relate to

dangerous country conditions in Yemen.  The notice stated that the Yemeni government "lacks a

21

competent or cooperative central authority for issuing passports or civil documents," "'does not have physical control over its own territory' and, since January 20, 2025, 'has been the site of active United States military operations.'" *Id*. at 10406 (quoting Presidential proclamation suspending entry of Yemenis, 90 Fed. Reg. 24498-99). The notice stated that after seizing control of "most Yemeni population centers," the Houthis have "fired at U.S. Navy warships dozens of times since 2023," "have launched numerous attacks on civilian infrastructure" (including in Saudi Arabia, the U.A.E., and Israel), and have carried out over 100 attacks on civilian shipping vessels. *Id*. "President Trump accordingly concluded that 'the Houthis' activities threaten the security of American civilians and personnel in the Middle East, the safety of our closest regional partners and the stability of global maritime trade.'" *Id*. Moreover, the notice stated that Al-Qaeda in the Arabian Peninsula continues to collaborate with the Houthis. *Id*. at 10407. The notice acknowledged that the Houthis "continue to hold areas encompassing more than 70% of Yemen's population," and are "supported by Iran's Islamic Revolutionary Guard Quds Force (IRGC-QF), another Foreign Terrorist Organization." *Id*. at 10406.

56.    These factors, ironically, were cited as evidence that it is against the national interest to allow Yemeni TPS holders to remain in the United States. The notice openly stated the obvious: "DHS acknowledges that there may appear to be some tension between its determination … that requiring the return of Yemeni nationals (and aliens having no nationality who last resided in Yemen) does not pose a serious threat to their personal safety due to an armed conflict; and its separate determination … that extraordinary and temporary conditions in Yemen that prevent Yemeni nationals from returning in safety may remain." *Id*. at 10405.

57.    The Notice also cited (as further support for the "national interest" assertion) to a purported increase in visa overstays by Yemeni nationals since 2018, and stated that continuing

22

the TPS program might serve as a "pull factor attracting migration" of other Yemenis due to the program's "generosity" and an attendant "perceptions of leniency in enforcement" of immigration laws. 91 Fed. Reg. 10407.

58.     Defendant Noem did not point to any situation in which any Yemeni TPS holder had ever been convicted of a serious crime, implicated in the violence in Yemen, or charged with supporting a terrorist organization.

59.     On May 7, 2025, President Trump renewed Yemen's "national emergency" designation pursuant to the International Emergency Economic Powers Act, finding that the "The actions and policies of Ansar Allah, also known as the Houthis, in threatening Yemen's peace, security, and stability continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States. For this reason, the national emergency declared … must continue in effect .... Therefore, …I am continuing for 1 year the national emergency … with respect to Yemen." Continuation of the National Emergency with Respect to Yemen, 90 Fed. Reg. 20081 (May 7, 2025). That declaration of national emergency continues in effect despite Secretary Noem's purported termination of Yemen's TPS designation.

60.     Defendant Noem failed to consult with other federal agencies about the presence of armed conflict in Yemen, or other country conditions in Yemen, before making her decision to terminate TPS for that country. There is no indication beyond boilerplate assertions in the March 3, 2026 Federal Register announcement that any other agencies were consulted.[26] This Court has so found. *Doe v. Noem*, 2026 WL 1192079, at *12-15. Defendant Noem's decision

---

[26] In contrast, the Federal Register Notice highlights that the President's decision to suspend entry of Yemeni nationals was made only "after the President consulted with the Secretary of State, the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, appropriate Assistants to the President, the Director of National Intelligence, and the Director of the Central Intelligence Agency." 91 Fed. Reg. 10406.

also was not based on an objective review of Yemen's country conditions. Rather, the decision to terminate TPS for Yemen was preordained: the Secretary terminated even upon her own finding that Yemen "still experiences extraordinary and temporary conditions" that "continue to challenge Yemeni nationals' ability to safely return home." 91 Fed. Reg. at 10404-05.

**Departure from Reasoned Analysis Evident in Prior Decisions**

61.     The record shows both an ongoing armed conflict and chronic extraordinary conditions rendering it unsafe to return to Yemen. The 2015, 2017, 2018, 2020, 2021, 2023 and 2024 extensions and redesignations all found that an armed conflict was occurring in Yemen. Unlike prior notices regarding TPS for Yemen, the termination notice does not meaningfully grapple with the record evidence or explain why enduring conditions that previously justified TPS no longer do so. The July 2024 redesignation stated that "the ongoing armed conflict and extraordinary and temporary conditions supporting Yemen's TPS designation remain." 89 Fed. Reg. 56765, 56767 (July10, 2024). Yet Secretary Noem's Notice purportedly terminating TPS status stated "[n]otable improvements with respect to the armed conflict in Yemen have been observed since April 2022," and that "the peace resulting from the April 2022 truce remains in effect." 91 Fed. Reg. 10404 (Mar. 3, 2026). The remainder of the discussion emphasizes continuing diplomatic efforts and cryptically notes "areas in Yemen remain under control of the recognized government and its allies." *Id*. (Two pages later the announcement quotes the President's determination in Proclamation 10949 that "the government of Yemen 'does not have physical control over its own territory.'" *Id*. at 10406.) There is no explanation for why conditions that existed prior to the previous redesignation's determination of ongoing armed conflict do not support such a conclusion now. The termination purports to conclude that conditions have improved, but does so with vague, unexplained assertions that fail to identify the

24

facts or sources reviewed or to provide a reasoned analysis. And examination of the sources cited in the termination notice reveals that the notice selectively cites cherry-picked facts from sources that do not support the Secretary's conclusions, but rather depict an unsafe country that continues in crisis.

62.    As to the ongoing humanitarian crisis in Yemen, the termination notice does not deny that dire conditions persist, but instead claims that allowing Yemeni TPS recipients to remain here is now against the "national interest." In support, the notice cites to the President's June 4, 2025 entry ban on Yemenis, itself based on "conflicts and high levels of insecurity within Yemen," the fact that the government "does not have physical control over its own territory," and the presence of the Houthis, Al Qaeda in the Arabian Peninsula, and the Islamic Revolutionary Guards Corps Quds Force in country, *id*. at 10406—all factors that were present during previous redesignations. The notice also cites to alleged elevated visa-overstay rates, and instances of benefits fraud, *id*. at 10407, with no indication that these alleged issues postdate the previous redesignation.

## THE FIRST TRUMP ADMINISTRATION'S EFFORTS TO ELIMINATE TPS PROTECTIONS

63.    The first Trump Administration attempted to end TPS designations for six non-white, non-European countries. Between 2017 and 2018, DHS announced terminations of TPS designations for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. *See Ramos v. Nielsen*, 709 F. Supp. 3d 871, 877–78 (N.D. Cal. 2023). If the terminations had taken effect, they would have ended TPS protection for approximately 400,000 people, comprising approximately

25

98 percent of all TPS holders at the time.[27] In each case, the Secretary announced either a 12- or 18-month orderly transition period, which would have delayed the effective date of termination.

64.     Litigation and congressional investigations subsequently revealed that the termination decisions were not based on an objective review of country conditions as required by statute—and as had been the past practice over multiple administrations, both Democratic and Republican—but rather were part of a "predetermined presidential agenda to end TPS." *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1094–99 (N.D. Cal. 2018) (vacated and remanded on different grounds; quoting then-DHS Secretary Duke's assurance to the White House that terminating Nicaragua's TPS would "send a clear signal that TPS in general is coming to a close").[28]

65.     Moreover, every district court to consider the question of whether animus was a motivating factor for the agency action found that the terminations were part of a policy "to decrease the presence of non-white immigrants in the United States." *Saget*, 375 F. Supp. 3d at 368–72 (also finding that "evidence of White House . . . animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti); *see also Ramos*, 336 F. Supp. 3d at 1100 (noting "evidence that President Trump harbors an animus against non-white, non-European [noncitizens] which influenced his (and thereby the Secretary's) decision to end . . . TPS designation[s]"); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 415 (D. Mass.

---

[27] Marcela Valdes, *Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call*, N.Y. TIMES (Apr. 7, 2021), https://www.nytimes.com/2021/04/07/magazine/immigration-el-salvador.html.

[28] *See also* Minority Staff of S. Comm. on Foreign Rels., 116th Cong., *Playing Politics with Humanitarian Protections: How Political Aims Trumped U.S. National Security and the Safety of TPS Recipients* 41 (U.S. Gov't Publ'g Off. Wash. 2019) (finding that termination decision was influenced by considerations related to upcoming elections and disregarded risks to national security and safety of returnees).

26

2018) ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador and Honduras).

66.     DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pre-textual terminations of TPS designations for nearly everyone who held the status. *Ramos*, 336 F. Supp. 3d at 1101. For example, in terminating TPS for Nepal, career officials were instructed not to devote research to crises not directly related to the earthquake, and when drafts did not adequately support the proposal to terminate, career officials omitted or deemphasized ongoing problems in Nepal.

67.     The courts considering challenges to these decisions consistently found that DHS had radically changed the way it approached TPS decisions, justifying the terminations by considering a much narrower range of country conditions than had been considered in the past. *See Saget v. Trump*, 375 F. Supp. 3d 280, 346 (E.D.N.Y. 2019); *Ramos*, 336 F. Supp. 3d at 1097–98; *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 412–14 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 321 (D. Md. 2018).

68.     To justify the termination of designations, and undermine the TPS program, political appointees during the first Trump Administration sought to paint TPS holders as criminals and manufactured evidence to support this implausible claim. A court in the Eastern District of New York found that Acting Secretary Duke decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions under the TPS statute. *Saget*, 375 F. Supp. 3d at 343, 347–

27

48, 359–62. Acting Secretary Duke specifically sought out a rationale to "[s]eparate out Haiti." *Id.* at 348. Additionally, subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed crimes and relied on public assistance, despite the fact that virtually any criminal record is disqualifying for TPS. *Id.* at 307-09. Secretary Kelly and other DHS and USCIS personnel tried to use these data to demonstrate that extending TPS to Haitians would not be in the "national interest."  *See id.* at 352; *cf.* 8 U.S.C. § 1254a (b)(1)(C), (c)(2)(B). Another federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes – *i.e.*, that non-whites commit crimes and are on the public dole." *Ramos*, 336 F. Supp. 3d at 1105.

69.     After analyzing "a wealth of record evidence" regarding the terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan, a federal district court found that "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad . . . The evidence . . . suggests this change may have been made in order to implement and justify a pre-ordained result." *Id.* at 1092, 1097–98; *see also Centro Presente v. DHS*, 332 F. Supp. 3d at 416 (denying motion to dismiss and explaining "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees"). A court in the Eastern District of New York came to the same conclusion after a four-day bench trial regarding Haiti's TPS termination, finding that the termination "was preordained and pretextual" and "was made in part due to political influence," violating the TPS statute's requirement that decisions be based on country conditions. *Saget*, 375 F. Supp. 3d at 346.

70.    Indeed, then-Acting Secretary Duke's writings revealed that "she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS." *Ramos*, 336 F. Supp. 3d at 1099. Specifically, she expressed that her TPS decision-making was based on "an America first view," a term that invoked President Trump's preference for immigration from majority-white European countries. *Id.* at 1099–1100, 1104. Notably, Defendant Noem expressly included the same "America First" objectives in the published Federal Register Notice terminating TPS for Syria and other countries in 2025.

71.    As a result of injunctions issued in these cases and subsequent stipulated orders, the terminations sought by the first Trump Administration did not go into effect. *See, e.g.*, *Ramos*, 709 F. Supp. 3d at 878–79. And in 2023, DHS rescinded the TPS terminations for Honduras, Nicaragua, Nepal, and El Salvador and extended TPS designations for those countries instead. *See id.* DHS issued new extensions for Haiti and Sudan on May 21, 2021, and April 19, 2022, respectively, effectively overturning their TPS terminations.[29] *See id.* In doing so, DHS extensively criticized the flawed country-conditions analyses in the termination decisions issued under the first Trump Administration.[30]

---

[29] *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863 (Aug. 3, 2021); Designation of Sudan for Temporary Protected Status, 87 Fed. Reg. 23,202 (Apr. 19, 2022).
[30]  *See* Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304, 40,307 (June 21, 2023) ("[T]he conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day."); Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40294, 40,297 (June 21, 2013) (same for Nicaragua); Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023) (same for Nepal).

## THE SECOND TRUMP ADMINISTRATION'S PROMISE TO END TPS

**Secretary Noem, President Trump, and Vice President Vance Publicly Commit to Terminating TPS**

72.    Even before she became Secretary of DHS, Defendant Noem publicly committed to ending TPS for reasons unrelated to the situation in Yemen, or any other country. During her confirmation hearing, she claimed that TPS "has been abused and manipulated by the Biden Administration," and suggested that the "extensions" of TPS were impermissible because "[t]he program was intended to be temporary."[31]

73.    Defendant Noem repeatedly insinuated that TPS was an illegal program. In announcing her decision to end TPS for Venezuela, for instance, she said she would not allow Venezuelan TPS holders to "stay here and violate our laws."[32] In her press statement announcing the partial vacatur of TPS for Haiti, Defendant Noem emphasized that "TPS is a type of immigration status available to nationals of certain designated countries that allows aliens, *even if they entered the country illegally*, the ability to reside *temporarily* in the U.S."[33] Defendant Noem further cited Haiti as an "example" of the "exploit[ation]" of the system because "Haiti

---

[31] *Homeland Security Secretary Nominee Gov. Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 15, 2025), https://www.c-span.org/program/senate-committee/homeland-security-secretary-nominee-governor-kristi-noem-testifies-at-confirmation-hearing/654484 (at approximately 1:50:54); *see also* NBC News (@NBCNews)*, Meet the Press full broadcast – Feb. 2*, YouTube (Feb. 2, 2025), https://www.youtube.com/watch?v=FpeMXrvxHco (at approximately 16:25).

[32] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox & Friends (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad6860 37 (at approximately 1:00).

[33] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphasis in original).

has been designated for TPS since 2010"; and because "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension."[34]

74.    President Trump, Vice President Vance, and Trump surrogates have likewise expressed their disagreement with TPS, characterizing designations as illegal, or, in the Vice President Vance's words, "a magic amnesty wand."[35]

75.    Both the President and the Vice-President made clear their intent to target TPS and TPS designations for termination before taking office.[36] President Trump, while campaigning, said that he would "[a]bsolutely … revoke" TPS from Haitians, saying, "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal."[37] He decried TPS as a "little trick," asserting that Haitian migrants "are illegal immigrants" who were "destroying the town"[38] and that he would "do large deportations" of Haitian TPS holders.[39]

---

[34] *Id.* (Here, Defendant Noem presumably meant each "redesignation," because an extension does not allow additional Haitian nationals to benefit from TPS).

[35] Gabe Whisnant, *JD Vance Confronted on Putting Constituents 'at Risk' With Haitian Claims*, NEWSWEEK (Sept. 16, 2024), https://www.newsweek.com/jd-vance-cnn-confronted-ohio-haitian-immigrant-claims-1954036.

[36] *See* Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), *https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html*; Miriam Jordan & Hamed Aleaziz, *Trump Immigration Targets: Ukrainians, Venezuelans, Haitians*, N.Y. Times (Nov. 15, 2024), https://www.nytimes.com/2024/11/15/us/trump-immigrants-temporary-protected-status.html.

[37] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,* NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (starting at approximately 12:00); *see also* Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. Times (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

[38] Charisma Madarang, *Trump Says Legal Haitian Migrants Are Illegal 'As Far As I'm Concernced'*, ROLLINGSTONE (Oct. 9, 2024), https://www.rollingstone.com/politics/politics-news/trump-claims-legal-haitian-migrants-illegal-1235129621/.

76.     For his part, Vice-President Vance, said that "[w]e're going to stop doing mass grants of Temporary Protected Status. Of course, you're going to have people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."[40] Given that TPS is, by statute, designed by Congress to be a mass grant for all eligible individuals (unlike asylum and other forms of fear-based immigration relief grounded in individualized assessments), this statement can only be understood as an attack on TPS itself. Vice President Vance expressed this view repeatedly while campaigning.[41]

77.     According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the revocation of TPS as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.[42]

---

[39] Soo Rin Kim et al., *Trump calls US 'garbage can for the world' in latest anti-immigrant rhetoric*, ABC NEWS (Oct. 24, 2024), https://abcnews.go.com/Politics/trump-calls-us-garbage-world-latest-anti-immigrant/story?id=115149893; Alexandra Ulmer et al., *Trump Pledges to Deport Haitians in Ohio City if Elected*, REUTERS, (Sept. 14, 2024), https://www.reuters.com/world/us/biden-says-attacks-haitian-immigrants-have-stop-2024-09-13/.

[40] Timothy Nerozzi, *Trump ends Temporary Protected Status for more than 300,000 Venezuelans in US*, WASH. EXAM'R (Feb. 3, 2025), https://www.washingtonexaminer.com/policy/immigration/3308462/trump-ends-temporary-protected-status-venezuelans/.

[41] *See, e.g.*, CNN-News 18 (@cnnnews18), *CNN's Dana Bash And JD Vance Clash Over Claims About Haitian Immigrants*, YouTube (Sept. 16, 2024), http://youtube.com/watch?v=djpTr5r0zMQ (at approximately 5:10, disputing anchor's characterization of TPS holders as being in the United States legally and calling TPS designations a "magic amnesty wand."); *Senator JD Vance Campaigns in Raleigh, North Carolina*, C-SPAN (Sept. 18, 2024), https://www.c-span.org/program/campaign-2024/senator-jd-vance-campaigns-in-raleigh-north-carolina/649012 (at approximately 41:00, "The media loves to say that the Haitian migrants, hundreds of thousands of them, by the way . . . they are here legally . . . . if Kamala Harris waves the wand illegally and says these people are now here legally. I'm still going to call them an illegal alien.").

[42] *See* Charlie Savage et al., *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. TIMES (Nov. 11, 2023),

78.     Project 2025, "the 2025 Presidential Transition Project," a product of current and former Trump political appointees, also called for the "[r]epeal [of] TPS designations" without elaboration as to any consideration of individual country conditions or any other statutory requirements.[43]

## DEFENDANTS' RENEWED EFFORTS TO END TPS

79.     Neither the adverse decisions of federal courts nor DHS's 2023 analysis have deterred the second Trump Administration from reinstating its plan to effectively end TPS consistent with campaign promises. To date, the Administration has attempted to terminate all thirteen TPS designations that have come up for review. The termination decisions—including the termination of TPS for Yemen—reflect preordained outcomes driven by the very sort of partisan politics the statute is intended to forestall.

80.     On his first day in office, President Trump issued an executive order titled "Protecting the American People against Invasion." Exec. Order No. 14159 § 16(b), 90 Fed. Reg. 8,443, 8,446 (Jan. 20, 2025) ("Invasion EO"). The supposed "invasion" at issue involved purportedly "unprecedented" levels of irregular entry into the United States. *Id.* § 1. The executive order describes immigrants, including lawfully present TPS holders, as invaders committing "vile and heinous acts against innocent Americans." *Id.* "Invasion" is a "code word" often used to "express[] that Racial/Ethnic Minorities spread something harmful within

https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.").

[43] *Mandate for Leadership: The Conservative Promise* 150 (Paul Dans & Steven Groves eds., 2025) (chapter written by Ken Cuccinelli), https://static.project2025.org/2025_MandateForLeadership_FULL.pdf.

communities, institutions, or other societal domains." Deirdre Pfeiffer & Xiaoqian Hu,

*Deconstructing Racial Code Words*, 58 L. & Soc'y Rev. 294, 310 (2024).

81.     The Executive Order directs the DHS Secretary to "promptly take all appropriate

action, consistent with law, to rescind the policy decisions of the previous administration that led

to the increased or continued presence of illegal aliens in the United States," including by

reviewing "designations of Temporary Protected Status." Invasion EO § 16(b). Although TPS

holders are, by definition, lawfully present in the United States, the Executive Order demanded

that TPS designations be "appropriately limited in scope" to restrict the "continued presence of

illegal aliens[44] in the United States." *Id.*

82.     Immediately after Defendant Noem was confirmed as Secretary of DHS,

Defendants began to implement the Executive Order's mandate and several of Defendant

Noem's termination orders rely explicitly on this order. In fact, when publicizing the Venezuela

TPS vacatur described below, Defendant Noem explained that the vacatur reflected President

Trump's "desire" to make sure TPS was "used properly," adding that "when the President gives

a directive, the Department of Homeland Security will follow it."[45]

---

[44] "Illegal alien" is widely recognized as a derogatory term used to vilify and dehumanize non-white immigrants without lawful status (or people perceived as such). *See, e.g.*, Kai Wei, et al., *The Role of Language in Anti-Immigrant Prejudice: What Can We Learn from Immigrants' Historical Experiences?*, 8(3) Soc. Scis. J. 1, 10–11 (2019), https://www.mdpi.com/2076-0760/8/3/93#B63-socsci-08-00093.
The administration's use of this term "conveys a message of rejection and exclusion" and further evinces its animus against non-white immigrants. *See also infra* ¶¶ 91-113.
[45] Secretary Kristi Noem (@Sec_Noem), X (Jan. 29, 2025, 6:57 PM), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s (statement appears in posted video clip from CNN interview).

**Venezuela**

83.    Within days of taking office, Defendant Noem made the unprecedented decision to *reverse* the prior Administration's extension of Venezuela's 2023 TPS designation.[46] The termination of Venezuelan TPS followed soon after. A federal court later found that Defendant Noem's official justification for her unprecedented vacatur was a pretext to cover "the desire to totally undo" the redesignation signed by then-Secretary Alejandro Mayorkas.[47]

84.    Secretary Noem's decision was not based on the statutorily required country conditions review. Rather, the limited review the agency conducted was designed to find support for a termination decision that had already been made. The hasty process Defendants' undertook for Venezuela illustrates the decision's pretextual nature; "just two days after a draft of the vacatur decision was prepared and/or circulated . . . a draft of the termination decision was prepared and/or circulation," indeed the termination notice was prepared "even *before* the vacatur decision was finalized," and "DHS staff was asked to 'focus on any improvements in Venezuela,' implicitly to advance and support termination of Venezuela's TPS."[48]

85.    A comparison of Venezuela's two competing decision memos—dated only three weeks apart—is illustrative. USCIS's earlier decision memo, dated January 9, 2025,

---

[46] *See NTPSA I* PI Decision at 819–20.

[47] *Id.* at 855. This decision issuing preliminary relief was stayed by the Supreme Court in a non-precedential decision with no analysis. *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (2025). The Ninth Circuit later upheld the district court's preliminary relief decision in a detailed opinion, *Nat'l TPS All. v. Noem*, 150 F.4th 1000 (9th Cir. 2025), terminating the Supreme Court's stay, 145 S. Ct. at 2729. Meanwhile, the district court issued a decision on summary judgment in the same case, holding that plaintiffs had established that the agency's vacatur and termination decisions were unlawful and/or arbitrary and capricious. *Nat'l TPS All. v. Noem,* No. 25-CV-01766-EMC, 2025 WL 2578045 (N.D. Cal. Sep. 5, 2025) ("*NTPSA I* SJ Decision"). That merits decision was then stayed as to the vacatur by the Supreme Court in another non-precedential decision with no analysis. *Noem v. Nat'l TPS All.,* No. 25A326, 2025 WL 2812732, at *1 (U.S. Oct. 3, 2025).

[48] *NTPSA I* SJ Decision at *29 (emphasis added).

35

recommended extension, describing Venezuela's country conditions as a "complex, serious and multidimensional humanitarian crisis." In sharp contrast, USCIS's January 31, 2025 memo recommended termination and was terse. In justifying its recommendation, it focused on insignificant positive changes, including a "permit for [a U.S. corporation] to operate in Venezuela," while ignoring relevant country conditions the January 9th memo assessed, including food insecurity, political repression and human rights abuses, and restricted access to certain basic services.

86.     Defendants could not even agree on a justification for terminating Venezuelan TPS. USCIS suggested—despite the absence of supporting evidence—that conditions in Venezuela had improved. Defendant Noem, however, based her decision primarily on national interest grounds, asserting that—because Venezuela was designated for TPS on the grounds of extraordinary and temporary conditions (rather than natural disaster or war)—she did not need to find improved conditions in order to terminate its TPS. Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042 ("[E]ven assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States."). The Venezuela termination was the first termination in the history of the TPS program based on national-interest grounds.

**Haiti**

87.     Defendants targeted Haiti next. DHS partially vacated an existing TPS extension for Haiti and purported to retroactively shorten the expiration dates of all documents issued under the prior Secretary's extension by six months. Defendants' hasty and limited review

process for Haiti mirrored that of Venezuela and, as a district court has found, similarly reflects Defendants' preordained plan to terminate TPS designations.[49]

88.    Defendant Noem's press statement on Haiti's partial vacatur also underscores the pretextual nature of her decision. The release announced that Secretary Noem "vacated a decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law."[50] The press statement also referenced the recission of Venezuela's TPS extension, explicitly linking the two vacaturs as part of the same project to change "the TPS system."[51]

89.    The justifications provided by Defendant Noem in the Federal Register for the partial vacatur of TPS for Haiti had no basis in the TPS statute and were inconsistent with the history of TPS decision-making. For example, Defendant Noem substantially based the vacatur decision on a critique of former DHS Secretary Mayorkas for purportedly failing to explain why he chose an 18-month extension period or why extension and redesignation for Haiti's TPS were not contrary to the national interest. Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511, 10,513–14 (Feb. 24, 2025). But as a federal district court found, "the absence of a specific justification for the length of a [TPS] extension" once that decision has been made, is neither "unusual or impermissible."[52] Similarly, "DHS Secretaries typically have not given explanations as to why allowing TPS holders to remain in the United

---

[49] *NTPSA I* SJ Decision at *34.

[50] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status [hereinafter "Haiti Termination Press Release"].

[51] *Id.*

[52] *NTPSA I* SJ Decision at *33.

States is not contrary to the national interest." *Id.* at \*34. The court held that Defendants' decision "was preordained" and made without "any meaning[ful] analysis and review [of country conditions]." *Id.*

90. On June 27, 2025, Defendants terminated Haiti's TPS designation. Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760 (July 1, 2025). Because Haiti, like Venezuela, was designated for TPS on the grounds of extraordinary and temporary conditions, the Secretary believed she could justify termination based solely on a finding that extension is not in the national interest. And that is what she did—claiming that crisis-level conditions actually *required* termination because continuing TPS for a country facing total societal collapse is contrary to the U.S. national interest. *Id.* at 28,763(terminating Haitian TPS despite acknowledging "[w]idespread gang violence … sustained by the country's lack of functional governmental authority" has "destabilized Haiti," and that "'Haiti in the grip of severe humanitarian and human rights crisis'"). Defendant Noem also identified the actions of one individual convicted of numerous violent crimes as "underscor[ing] the broader risk posed by rising Haitian migration." DHS' press release, however, proclaimed that "country conditions have improved to the point where Haitians can return home in safety."[53]

91. On July 1, 2025, the Eastern District of New York held that the partial vacatur exceeded the Secretary's authority and set it aside, with the effect that no termination could take place before February 3, 2026, the expiration of the most recent extension. *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp 3d 255, 267, 272-73 (E.D.N.Y. 2025). In view of that ruling, the Secretary made "a new, superseding determination," announced November 28, 2025, resting

---

[53] *See DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful Status*, U.S. Citizenship & Immigr. Serv., https://www.uscis.gov/newsroom/news-releases/dhs-terminates-haiti-tps-encourages-haitians-to-obtain-lawful-status.

on an assertion that no extraordinary and temporary conditions prevent safe return and on the same national-interest ground. 90 Fed. Reg. 54,733, 54,734-35.

**Afghanistan**

92.     On May 12, 2025, DHS announced the termination of TPS for Afghanistan. Despite an ongoing State Department warning against any travel to the country "due to civil unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities,"[54] Defendant Noem claimed that conditions had "notabl[y] improve[d]." She cited the fact that only 23.7 million (rather than 29 million) Afghan nationals relied on humanitarian assistance to support the conclusion that "the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. 20,309, 20,310 (May 13, 2025). She also failed to address entire categories of conditions previously identified as bases for Afghanistan's TPS designation and prior extensions, including human rights abuses and the welfare of women and girls. *Compare* Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65,728, 65,730–33 (Sept. 25, 2023), *with* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,310.

93.     Defendant Noem also asserted that extending TPS would be contrary to the national interest. Her sole explanation for this conclusion was that "DHS records indicate that there are Afghan nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,311.

---

[54] *Travel Advisory*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Afghanistan.html.

**Cameroon**

94.     Defendants terminated TPS for Cameroon on June 4, 2025. Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697 (June 4, 2025). Cameroon had been designated for TPS because of the existence of armed conflict and extraordinary and temporary conditions. Defendant Noem issued the termination despite acknowledging that "Cameroon is experiencing two major conflicts" that "remain active." *Id*. at 23,698. Defendant Noem again failed to address conditions previously cited as a basis for TPS, including human rights abuses, food insecurity, a cholera epidemic, and ongoing mass displacement. *Compare* Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945 (Oct. 10, 2023), *with* Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,697. Documents produced as part of litigation demonstrated that Defendant Noem's decision to terminate TPS for Cameroon was made without any recommendation or input from the Department of State. *See CASA, Inc. v. Noem*, 792 F. Supp.3d 576 (D. Md. 2025).

95.     As with the other terminations, she insisted that continuing TPS would be "contrary to the national interest." Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,698. In this instance, Defendant Noem reached her conclusion based solely on the executive order directing her to limit TPS and President's Trump's broader "policy imperatives" related to immigration. *Id*.

**Nepal**

96.     On June 6, 2025, Defendants terminated TPS for Nepal. Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24,151 (June 6, 2025). Repeating the pattern developed in the prior terminations, Defendant Noem claimed that

40

"notable improvements" justified ending Nepal's designation while ignoring entire categories of conditions—such as widespread food insecurity and lack of access to sanitation—that DHS had previously considered. *Compare* Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023), *with* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,151.

**Honduras and Nicaragua**

97.     On July 8, 2025, Defendants announced the termination of TPS for Honduras and Nicaragua. Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30,089 (July 8, 2025) ("Honduras Termination Notice"); Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30,087 (July, 8, 2025) ("Nicaragua Termination Notice"). These notices came two days after the expiration of the most recent previous extension for each country and were thus untimely. *See* 8 U.S.C. § 1254a(b)(3)(B).

98.     The Honduras Termination Notice cites to the Invasion E.O., noting that "the Secretary should … ensur[e] that designations of Temporary Protected Status . . . are appropriately limited in scope and made for only so long as may be necessarily to fulfill the textual requirements of that statute."[55]

99.     Repeating the pattern developed in the prior terminations, Secretary Noem identified certain positive indicators—such as increasing tourism and real estate investment—while ignoring major categories of conditions that had previously been considered, including "political violence" and "staggering levels of crime" with "[g]angs that originated in the United States . . . la[ying] siege to communities and . . . plung[ing] the country into a state of crisis." Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304

---

[55] Honduras Termination Notice, n.10.

(June 21, 2023) (internal quotation marks and citations omitted); *see* Honduras Termination Notice (not addressing political violence or crime). The Nicaragua Termination Notice similarly relies on the Invasion E.O.[56] It recognizes that "certain conditions for the TPS designation of Nicaragua may continue," but nonetheless terminates Nicaragua's designation on the ground that "notable improvements … allow Nicaragua to adequately handle the return of its nationals." Nicaragua Termination Notice, at 30,088. The Termination Notice fails to acknowledge or consider numerous categories of conditions that formed the basis of prior extensions, including "political instability," a "deteriorat[ing]" "human rights situation," and a related "humanitarian crisis."[57]

100.    In finding that Honduras and Nicaragua can "handle adequately the return" of their nationals, *see* 8 U.S.C. § 1254a(b)(1)(B), Secretary Noem adopted a new definition of "adequate," defining the term to mean "[s]atisfactory, but worthy of no stronger praise or recommendation; barely reaching an acceptable standard; just good enough."[58]

101.    Discovery produced in litigation challenging Defendants' termination of TPS for Nepal, Honduras and Nicaragua[59] confirms that USCIS drafted decision memoranda recommending termination for Honduras and Nicaragua *before* drafters had reviewed USCIS country conditions reports—and for Nepal and Nicaragua, without ever receiving any recommendation or contemporaneous conditions report from the State Department. This process

---

[56] Nicaragua Termination Notice, n.4.

[57] Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40,294, 40,300. *See* Nicaragua Termination Notice (failing to address the political or humanitarian situation).

[58] *See* Honduras Termination Notice at n. 23; Nicaraguan Termination Notice at n.14.

[59] *See Nat'l TPS All. v. Noem*, No. 25-cv-05687-TLT (N.D. Cal. Aug. 21, 2025) ("*NTPSA II*").

violated the statutory directives to engage in interagency consultation and further evidences Defendants' ends-oriented approach.

**Syria**

102.    On September 19, 2025, Defendants announced the termination of Syria's TPS designation. The termination was published in the Federal Register on September 22, 2025, with a termination date of November 21, 2025—a mere 60 days later and the minimum required by statute.[60]

103.    Noem acknowledged that "the civil war in Syria displaced over half of the country's population, resulted in the deaths of more than 500,000 people, destroyed critical infrastructure, and significantly weakened the Syrian economy."[61] However, she stated that, in large part due to the fall of the Assad regime in December 2024, "the situation [in Syria] no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Syrian nationals."[62]

104.    With respect to Syria's designation due to "extraordinary and temporary conditions," Defendant Noem dismissed the dire security and humanitarian situation, acknowledging that "most Syrians require some form of humanitarian assistance" but nonetheless concluding that "this does not prevent nationals from returning in safety."[63]

105.    Remarkably, the Trump Administration took a contradictory position regarding Syria's country conditions on September 30, 2025, days after DHS announced the termination of TPS for Syria. On that date, President Trump renewed Syria's "national emergency" designation

---

[60] *See* Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. 45,398 (Sep. 22, 2025).

[61] Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. at 45,400.

[62] *Id.*

[63] *Id.*

pursuant to the International Emergency Economic Powers Act, finding that the "situation in and in relation to Syria undermines the campaign to defeat . . . ISIS, endangers civilians, and further threatens to undermine the peace, security, and stability in the region."[64]

**South Sudan**

106.    On November 5, 2025, Defendants published a Federal Register notice terminating TPS for South Sudan.[65] Defendants attempt to justify the termination based on an end to the civil war, "diplomatic developments between the U.S. Department of State and South Sudan's transitional government," and "improvements in displacement trends, infrastructure, and governance."[66] While the termination notice says there is ongoing "inter/intra-communal violence linked to border disputes, cross-border violence, cyclical and retaliatory attacks, and ethnic polarization," it does not cite any sources regarding those threats nor does it address the potential impact on TPS holders.[67] Instead, it focuses more on the U.S. government's national interest in ensuring South Sudan accepts people who are deported from the U.S. and the termination notes the government of South Sudan's willingness to facilitate deportations, including deportations of people from third-countries.[68] While pointing generally to webpages for the UN Mission to South Sudan, the termination notice ignores findings of "escalating conflict" in South Sudan, and also reports of continued widespread conflict and forced displacement, impacting at least 300,000 people in 2025 alone.[69]

**Burma**

107.    On November 25, 2025, DHS published a notice in the Federal Register terminating Burma's TPS designation, effective January 26, 2026.[70] Secretary Noem described

---

[64] Continuation of the National Emergency With Respect to the Situation in and in Relation to Syria, 90 Fed. Reg. 47,967 (Oct. 2, 2025).

the termination as another success in the administration's ongoing efforts to "restor[e] TPS to its original status as temporary."[71]

108.    In DHS's notice of termination, the Secretary acknowledged the persistence of "certain extraordinary and temporary conditions" and humanitarian challenges in Burma, including ongoing military operation and the need for humanitarian assistance.[72] Nonetheless, she concluded that such conditions no longer hinder the safe return of Burmese nationals to the country, citing the official end of Burma's state of emergency in July 2025. This conclusion directly contradicts the President's February 4, 2025 renewal of Burma's "national emergency" under the International Emergency Economic Powers Act, which found that the emergency created by the 2021 coup—during which the military arbitrarily arrested civilians and government leaders and undermined democracy and the rule of law—continued.[73]

109.    Defendant Noem's assessment also fails to mention or consider other U.S. government agencies' concerning assessments of human rights abuses and humanitarian crisis in

---

[65][65] Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484 (Nov. 6, 2025)

[66] *Id*. at 50,485.

[67] *Id*.

[68] *Id*. at 50,485-86.

[69] Press Release, Comm'n on Hum. Rts. in S. Sudan, Hum. Rts. Council, South Sudan: UN Commission urges AU and UN Security Council to act decisively as crisis deepens, demanding urgent action and renewed commitment to peace, accountability and a credible transition, U.N. Press Release (Oct. 13, 2025), https://www.ohchr.org/en/press-releases/2025/10/south-sudan-un-commission-urges-au-and-unsecurity-council-act-decisively.

[70] *See* Termination of the Designation of Burma (Myanmar) for Temporary Protected Status, 90 Fed. Reg. 53,378 (Nov. 25, 2025).

[71] News Release, U.S. Citizenship & Immigr. Servs., DHS Terminating Temporary Protected Status for Burma (Nov. 24, 2025), https://www.uscis.gov/newsroom/news-releases/dhs-terminating-temporaryprotected-status-for-burma

[72] Termination of the Designation of Burma (Myanmar) for Temporary Protected Status, 90 Fed. Reg. at 53,380.

[73] *See* Continuation of the National Emergency with Respect to the Situation in and in Relation to Burma, 90 Fed. Reg. 9,111 (Feb. 4, 2025).

Burma. The termination notice wholly ignored key factors considered in the most recent extension and redesignation of Burma's TPS, including pervasive human trafficking, targeted violence towards certain ethnic minorities (with 3.4 million people internally displaced), widespread food insecurity (with 15.2 million people in need of food aid), and an eviscerated economy (particularly in the wake of a 7.7 magnitude earthquake that struck on March 28, 2025).[74] References to input or reports from the Department of State or other federal agencies— aside from boilerplate language that the Secretary "consult[ed] with appropriate U.S. Government agencies"—were also conspicuously missing.

**Ethiopia**

110.   On December 15, 2025, Defendants announced the termination of TPS for Ethiopia. Similarly to the South Sudan termination, the termination focuses on some improvements in armed conflict between government forces and other militia groups, while simultaneously noting reports show attacks on civilians in some regions have increased.[75] The termination also points to changes in conditions regarding healthcare and displacement.[76] It cites the Invasion EO as well to justify national interest in ending TPS, and points to vague national security, public safety, and fraud focused administrative investigations of some Ethiopian TPS holders, including a footnote that leads to no citation or additional information.

---

[74] *Compare* 90 Fed. Reg. 53378 with 89 Fed. Reg. 20682 (asserting input received from the Department of State on country conditions and citing to Department of State sources on Burma) and 87 Fed. Reg. 58515 (same); Vibhu Mishra, *'Still reeling': Myanmar Quakes Worsen Humanitarian Crisis in Fractured Country*, U.N. News (June 24, 2025), https://news.un.org/en/story/2025/06/1164881;.

[75] Termination of the Designation of Ethiopia for Temporary Protected Status, 90 Fed. Reg. 58,028 (Dec. 15, 2025).

[76] *Id*. at 58,031.

**Somalia**

111.    On January 14, 2026, Defendants issued a notice in the Federal Register, terminating Somalia's TPS designation, effective 11:59 p.m. on March 17, 2026. 91 Fed. Reg. 1,547. Despite the fact that Congress tasked the DHS Secretary with reviewing TPS designations, President Trump posted on social media that he was terminating TPS for Somalis "effective immediately."[77] The termination announcement declines to provide country conditions, does not specify by name any other agency consulted during the process, and does not mention that on April 8, 2025 President Trump himself renewed recognition of Somalia's "national emergency" status under the International Emergency Economic Powers Act, citing to the deterioration of the security situation and the "persistence of violence" that is "committed against civilians" and attributable to al-Shabaab. Nor does the notice mention the Level 4 State Department travel advisory for Somalia or explain why such conditions are consistent with safe return for Somali nationals.

**Defendants' Departure from Past Practice Regarding Timing and Transition**

112.    In another break with past practice, Secretary Noem provided that, for every country whose TPS designation she terminated (Venezuela, Haiti, Cameroon, Afghanistan, Nepal, Nicaragua, Honduras, Syria, South Sudan, Burma, Ethiopia, Somalia, and Yemen), the TPS termination would take effect in 60 days—the minimum period permitted under the TPS statute. 8 U.S.C. § 1254a(b)(3)(B).

---

[77] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 21, 2025, at 8:37 PM), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464

113.    With the exception of Venezuela, Cameroon, Afghanistan, Burma and Ethiopia,[78] each terminated country had been designated since at least 2015. Rather than demonstrating awareness of DHS's longstanding practice of providing at least a six-month orderly transition period when ending a TPS designation of substantial length, the Secretary denied that there was any such practice. *See* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,153–54 n.24. While acknowledging "that certain previous TPS terminations allowed for an extended transition," she noted that "certain other TPS designations were terminated without allowing for an extended transition period," indicating her view that the agency had no particular practice. *Id.* That is incorrect. DHS maintained a clear practice over the past twenty years of providing at least a six-month orderly transition period for any TPS termination, and even before that had provided at least a six-month transition for any country designated for TPS for more than three years.

## SECRETARY NOEM AND PRESIDENT TRUMP EXPRESSED DISCRIMINATORY ANIMUS BASED ON NATIONAL ORIGIN, RACE, ETHNICITY, AND RELIGION

114.    President Trump, Secretary Noem, and other members of the Trump Administration have built their political platforms and public-facing personas on unabashed animus toward non-white people, particularly immigrants from certain countries or of certain religious backgrounds. This animus significantly motivated the Trump Administration's plan to end TPS designations and is evidenced by numerous statements made by Defendant Noem, President Trump, and other Administration officials. A limited number of those statements are described herein.

---

[78] Afghanistan and Cameroon were initially designated in 2022 and Venezuela was initially designated in 2021.

115.    Members of the Trump Administration have publicly expressed strong biases against Yemenis, communities in the Middle East that encompass Yemen, and other Muslim-majority countries.

116.    At a campaign event in Iowa in October 2023, President Trump boasted of his successes at excluding non-white migrants, defending his Administration's travel ban for Muslim-majority countries as:

> [T]otally constitutional because we want to keep bad people out that want to destroy our country. . . . I banned refugees from Syria. I banned refugees from Somalia, very dangerous places, and from all of the most dangerous places all over the world . . .[I]n my second term, we're going to expand each and every one of those bans because we have no choice. Some very rough people, some very, very rough people come out of these areas. They want to blow up our country. We aren't bringing in anyone from Gaza, Syria, Somalia, Yemen, or Libya or anywhere else that threatens our security.[79]

Throughout his campaign, President Trump repeated similar statements, depicting people from Muslim-majority countries as "dangerous terrorists."[80]

117.    In April 2024, at a speech to law enforcement officials in Grand Rapids, Michigan, President Trump claimed that immigrants have "wrecked our country," claiming that other countries were "sending prisoners, murderers, drug dealers, mental patients, and terrorists. .

---

[79] *Speech: Donald Trump Holds a Campaign Event in Clive, Iowa - October 16, 2023*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-iowa-october-16-2023/#101.

[80] *See also Speech: Donald Trump Holds a Political Rally in Robstown, Texas - October 22, 2022*, ROLL CALL, ("They include Syria, Somalia, Yemen, Russia, China, Iran, all of Africa. They're storming our country. They're storming our borders. We have no idea who they are, where they come from.") https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-robstown-texas-october-22-2022/#20.

. this isn't just in South America. They're coming from Congo, from Yemen, from Somalia, from Syria."[81]

118.    At an April 2024 fundraiser to an audience of multimillionaire donors, President Trump reiterated comparisons between "nice countries, you know like Denmark, Switzerland" and "Norway," and "unbelievable places and countries, countries that are a disaster," when speaking about immigrants.[82] He added that people were coming into the United States from Yemen, "where they're blowing each other up all over the place."[83]

119.    At a campaign event in May 2024, President Trump said of immigrants: "They come from Africa. They come from Asia. They come from all over the world. They come from the Middle East, Yemen ... Large numbers of people are coming in from China. … And if you look at these people, did you see them? They are physically fit. They're 19 to 25. Almost everyone is a male, and they look like fighting age. … I think they're building an army ... they want to get us from within."[84]

120.    In his Republican Convention speech in July 2024, President Trump, repeating the invasion talking point, stated: "The greatest invasion in history is taking place right here in our country. They are coming in from every corner of the earth, not just from South America, but

[81] *Speech: Donald Trump Addresses Law Enforcement Officials in Grand Rapids - April 2, 2024*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-law-enforcement-officials-grand-rapids-michigan-april-2-2024/.

[82] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

[83] *Id.*

[84] Alexandra Hutzler, *Trump continues to demonize migrants, falsely claims they're "building an army,"* ABC News (May 24, 2024), *available at* https://abcnews.com/Politics/trump-continues-demonize-migrants-falsely-claims-building-army/story?id=110535732

from Africa, Asia, Middle East. . . . They're coming at levels that we've never seen before. . . . and [the Biden] administration does absolutely nothing to stop them."[85]

121.    At a rally in Arizona in August of 2024, President Trump described immigrants as "mak[ing] our criminals look like the nicest people on earth. That's how tough they are. They come from the Middle East. They come from areas that we're fighting. They come from enemy terrain."[86]

122.    At a campaign event in Pennsylvania in October 2024, President Trump stated: "They're coming out from the Congo, … from Asia, from the Middle East, they're coming out of Yemen... A lot of people coming out of Yemen. And they're known terrorists... and they are released into our country."[87]

123.    Stephen Miller has long expressed support for white nationalism, has "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[88] As an undergrad student at Duke, Miller was the national coordinator for a "Terrorism Awareness Project" whose mission was to "make our fellow students aware of the Islamic jihad and the terrorist threat, and to mobilize support for the defense of America and the civilization of the

---

[85] *Read the Transcript of Donald J. Trump's Convention Speech*, N.Y. TIMES (July 19, 2024), https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html.
[86] *Speech: Donald Trump Holds a Political Rally in Glendale, Arizona - August 23, 2024*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-glendale-arizona-august-23-2024/#90.
[87] *Trump directs serious accusations against Yemeni immigrants in America*, Yemen Press Agency (Oct. 6, 2024) https://en.ypagency.net/337276
[88] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, SOTHERN POVERTY LAW CENTER (Nov. 12, 2019). https://www.splcenter.org/hatewatch/2019/11/12/stephen-millers-affinity-white-nationalism-revealed-leaked-emails.

West."[89] Miller also lauded historical immigration laws that imposed quotas based on racist assumptions.[90]

124.    Consistent with the support of Miller and other Administration officials for white nationalism, the so-called "replacement theory" is a unifying theme of the Trump Administration's racist statements and immigration policies. This conspiracy theory turns on the idea that non-white immigrants will "replace" the white race, and in doing so undermine the country's perceived white foundation, history, and culture.[91] Secretary Noem has endorsed this core premise, describing irregular immigration across the U.S.-Mexico border as an "invasion happening on purpose … to remake the foundation of this country."[92]

125.    DHS recently posted a one-word tweet: "Remigrate."[93] This word "refer[s] to the mass deportation of non-white immigrants," "has ties to white nationalism and has been seen as a

---

[89] Andrew Kaczynski & Chris Massie, *In college, Trump aide Stephen Miller led controversial 'Terrorism Awareness Project' warning of 'Islamofascism'*, CNN (Feb. 15, 2017, 3:40 PM), https://edition.cnn.com/2017/02/15/politics/kfile-stephen-miller-terrorism-awareness; *see also* Nicole Narea, *Stephen Miller Sought to Link Immigrants to Crime and Terrorism in Private Emails to Breitbart,* VOX (Nov. 25, 2019), https://www.vox.com/policy-and-politics/2019/11/12/20961458/stephen-miller-white-supremacist-anti-immigrant-emails-breitbart-southern-poverty-law-center.

[90] Adam Serwer, *Trump's White-Nationalist Vanguard*, THE ATLANTIC (Nov. 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . show Miller praising racist immigration reactions from a century ago, while bitterly lamenting the law that repealed them.").

[91] *See The 'Great Replacement' Theory, Explained*, National Immigration Forum, https://immigrationforum.org/wp-content/uploads/2021/12/Replacement-Theory-Explainer-1122.pdf.

[92] *South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race*, CBS NEWS (Mar. 5, 2024), https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/ (at approximately 4:57).

[93] Homeland Security (@DHSgov), X (Oct. 14, 2025, 3:06 PM), https://x.com/DHSgov/status/1978175527329358094.

euphemism for ethnic cleansing."[94] Consistent with the so-called "replacement" theory, President

Trump and members of his Administrations have long expressed animus against non-white

immigrants in general and non-white TPS-holders in particular.

126.    On September 23, 2025, President Trump used his platform at the U.N. General

Assembly to critique the United Nations' humanitarian aid for migrants as "funding an assault on

Western countries and their borders," railing that "immigration and their suicidal energy ideas

will be the death of Western Europe."[95]

127.    Secretary Noem has repeatedly described non-white, non-European immigrants as

"dirt bags"[96] and TPS holders as criminals.

128.    In many comments between February 2024 through the present, Secretary Noem

has "equated Venezuelan immigrants and/or TPS holders with gang members, criminals,

mentally unstable persons, and the like." *NTPSA I* PI Decision at *39–45 (finding Plaintiffs

likely to succeed on their claim that the Secretary's decision to vacate and terminate Venezuela's

TPS designation was motivated by animus in violation of the Constitution); *see also*, Homeland

Security (@DHSgov), X (May 19, 2025, 5:18 PM),

https://x.com/DHSgov/status/1924575437344186612 (criticizing the TPS program for allegedly

---

[94] Connor Greene, *Trump's Department of Homeland Security Embraces a Word with Ties to White Nationalism*, TIME (Oct. 16, 2025), https://time.com/7326233/trump-remigrate-homeland-security/.

[95] *Trump Speaks at U.N.*, REV, https://www.rev.com/transcripts/trump-speaks-at-un.

[96] Secretary Kristi Noem (@Sec_Noem), X (Jan. 28, 2025, 7:35 AM), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); CBS Mornings (@CBSMornings), *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, YouTube (Jan. 29, 2025), https://www.youtube.com/watch?v=tODarHnNiNs ("These guys are dirtbags. They have come in and perpetuated violence in this country."). The CBS reporter who accompanied Secretary Noem on New York City raids she references reported that nearly half of those arrested had no criminal history.

facilitating the entrance of "half a million poorly vetted migrants into this country—from MS-13 gang members to known terrorists and murderers," even though TPS is available only to individuals who are already present in the United States and anyone with more than a single misdemeanor conviction is ineligible for protection). In December 2025, Secretary Noem referred to individuals from countries that are covered by the Trump Administration's travel ban, including Yemen and some other TPS countries, as "killers, leaches, and entitlement junkies" and declared "WE DON'T WANT THEM. NOT ONE."[97]

129. President Trump has repeatedly conflated immigrants with "criminals, gang members and terrorists."[98] At a rally one week before the 2024 election, President Trump described the country as "occupied," and as "invaded and conquered" by criminal immigrants.[99]

130. While campaigning in 2023, President Trump repeatedly said that non-white, non-European, and non-Christian immigrants are "poisoning the blood of our country."[100] Similar phrases pepper discussions of Jewish people in Adolf Hitler's infamous book *Mein Kampf*.[101]

---

[97] Secretary Kristi Noem (@Sec_Noem), X (Dec 1, 2025, 11:52 PM), https://x.com/EnvoyNoem/status/1995642101779124476?lang=en.

[98] *See, e.g.*, Donald Trump, *Donald Trump: This Is How I Will End Joe Biden's Border Disaster on Day One*, DES MOINES REGISTER (Jan. 3, 2024), https://www.desmoinesregister.com/story/opinion/columnists/caucus/2024/01/03/donald-trump-joe-biden-border-disaster/72093156007/; *Read the Full Transcripts of Donald Trump's Interviews with TIME*, TIME (Apr. 2024), https://time.com/6972022/donald-trump-transcript-2024-election/ ("This is an invasion of our country. An invasion like probably no country has ever seen before. They're coming in by the millions.").

[99] *FULL* LiveNOW from FOX (@kivenowfox), *SPEECH: Trump holds MSG rally in NYC*, YouTube(Oct. 27, 2024), https://www.youtube.com/watch?v=bzVT4YEYsuI (Speech by Donald Trump at Madison Square Garden presidential campaign rally, at approximately 16:13).

[100] *Donald Trump on Illegal Immigrants 'Poisoning the Blood of Our Country''*, C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 (at approximately 00:15); Raheem J. Kassam (@RaheemKassam), *Raheem Kassam Interviews Donald Trump*, YouTube (Sept. 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s (at approximately 1:34 to 1:45).

[101] *See* ADOLF HITLER, MEIN KEMPF (1943).

President Trump also has repeatedly "retweeted" avowed white nationalists, such as @WhiteGenocideTM, and publicly dined with prominent, self-declared white supremacists, thereby endorsing their racist views and amplifying their racist message.[102]

131.    In October 2024, during an interview with conservative radio host Hugh Hewitt, President Trump further emphasized his belief about the genetic inferiority of non-white, non-European immigrants. Speaking about "allowing people to come to an open border," he said, "many of them murdered far more than one person, and they're now happily living in the United States. You know now a murderer, I believe this, it's in their genes. And we got a lot of bad genes in our country right now."[103] By contrast, he told a predominately white crowd at a campaign rally in Minnesota that they have "good genes."[104]

132.    President Trump has used overtly dehumanizing rhetoric to described non-white, non-European immigrants, referring to them as "animals."[105] He has repeatedly recited "The Snake," a fable in which a woman takes in a freezing snake and is fatally bitten, deploying it first, during the 2016 campaign, as a warning against admitting Syrian refugees.[106] When

---

[102] Benjy Sarlin, *Donald Trump Retweets Apparent Neo-Nazi Supporter*, NBC NEWS (Jan. 22, 2016), https://www.nbcnews.com/politics/2016-election/donald-trump-tweets-apparent-neo-nazi-supporter-n502136; Eric Lichtblau, *OPINION: Trump amplifies racist lies, giving neo-Nazis 'real power.' Where are GOP leaders?* USA TODAY (Sept. 23, 2024), https://www.usatoday.com/story/opinion/2024/09/23/trump-far-right-haitian-immigrants-springfield/75301951007/.

[103] Jack Traylor et al., *Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants*, NBC NEWS (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271.

[104] *Id.*

[105] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals,'* POLITIFACT (May 17, 2018), https://www.politifact.com/truth-o-meter/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").

[106] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, VOX (Feb. 23, 2018), www.vox.com/policy-and-

discussing undocumented immigrants during a March 2024 rally, he stated, "I don't know if you call them people. In some cases they're not people, in my opinion, but I'm not allowed to say that[.]"[107] When he has named the people this rhetoric describes, he has named them by nationality, race, and religion.

133.    In the wake of the November 26, 2025 shooting of two National Guard members in Washington, D.C., in which the suspect is an Afghan national who had been granted asylum by the Trump Administration, President Trump posted on social media that he would "permanently pause migration from all Third World Countries," remove noncitizens deemed not to be a "net asset" to the United States, terminate federal benefits for noncitizens, "denaturalize migrants who undermine domestic tranquility," and deport noncitizens he described as incompatible with "Western Civilization," concluding that "[o]nly REVERSE MIGRATION can fully cure this situation."[108]

134.    He has also specifically targeted non-white TPS holders. For months, he repeated and amplified the false claim that Haitian TPS holders were "eating the dogs," "eating the cats,"

politics/2018/2/23/17044744/trump-snake-speech-cpac; Kylie Atwood, *Donald Trump Compares Syrian Refugees to Snakes*, CBS News (Jan. 13, 2026), https://www.cbsnews.com/news/donald-trump-compares-syrian-refugees-to-biting-snakes/; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. TIMES (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John Bennett, *"Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon*, ROLL CALL (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border. . . .  And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. . . . The whole country is being turned into an absolute dumping ground[.]").
[107] Ariana Figueroa, *Trump Promises Mass Deportations of Undocumented People. How Would That Work?*, MISSOURI INDEPENDENT (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/.
[108] https://www.theguardian.com/us-news/2025/dec/07/trump-immigration-ice

and "eating the pets of the people that live" in Springfield, Ohio.[109] President Trump called

Haitians in Springfield with lawful TPS "illegal migrant[s]" who "descended upon a town of

58,000 people, destroying their way of life."[110] Following these statements, there were several

bomb threats against hospitals, government buildings, and schools in Springfield.[111]

135.    Vice President Vance has unapologetically repeated these knowing unfounded

rumors, stating that if he "ha[s] to create stories" about Haitian migrants "so that the American

media actually pays attention to the suffering of the American people, then that's what I'm going

to do."[112] Additionally, Vice President Vance disparaged Haitian TPS holders with longstanding

stereotypes[113] of immigrants as dangerous criminals and spreaders of disease. He accused

Haitians in Springfield of triggering "a massive rise in communicable diseases, rent prices, car

---

[109] *See, e.g.*, *Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024), https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 (at approximately 29:26).

[110] Sam Levine, *'They've Destroyed the Place': Trump Repeats Racist, Anti-immigrant Lies*, THE GUARDIAN (Sept. 13, 2024), https://www.theguardian.com/us-news/2024/sep/13/trump-repeats-lies-haitian-immigrants; *see also* Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,'* NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (at approximately 12:45, "Springfield is such a beautiful place. Have you seen what's happened to it? It's been overrun. You can't do that to people. . . . I'd revoke [TPS], and I'd bring [the migrants] back to their country.").

[111] Edward Helmore, *More bomb threats hit Springfield, Ohio, after Trump elevates false claims about Haitians*, THE GUARDIAN (Sept. 14, 2024), https://www.theguardian.com/us-news/2024/sep/14/more-bomb-threats-hit-springfield-ohio-after-trump-elevates-false-claims-about-haitians.

[112] Kit Maher & Chris Boyette, *JD Vance Defends Baseless Rumor About Haitian Immigrants Eating Pets*, CNN (Sept. 15, 2024), https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv/index.html; *see also* Rachel Leingang, *Republicans spread baseless slurs about 'cat-eating migrants' in Ohio city*, THE GUARDIAN (Sept. 9, 2024), https://www.theguardian.com/us-news/article/2024/sep/09/republicans-haitian-migrants-pets-wildlife-ohio.

[113] Expert Declaration of Elliott Young in Support of Plaintiff's Motion to Postpone Effective Date of Agency Action ¶¶ 20, 22, 23, 25, *NTPSA I*, 2025 WL 2578045 (No. 25-CV-01766-EMC) (expert declaration of Professor Elliott Young tracing the historical use of these tropes).

insurance rates, and crime," stating "[t]his is what happens when you drop 20,000 people into a small community."[114] He specifically stated that Haitians caused "TB and HIV" to be "on the rise."[115]

136.   During his First Administration, President Trump repeatedly denigrated immigrants from countries designated for TPS. Most infamously, he referred to countries designated for TPS as "shithole" countries in a conversation with legislators about TPS, saying "Why do we need more Haitians?" He asked officials to "take them out" of the immigration proposal. He expressed a preference, instead, for immigrants from countries "such as Norway."[116]

137.   Secretary Noem's termination orders for Burma, Somalia, and Yemen explicitly rely on Presidential Proclamation 10949, titled "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats," which imposes full or partial entry restrictions on nationals of nineteen countries—all non-white countries—including Yemen.

---

[114] JD Vance (@JDVance), X (Sept. 13, 2024, 9:25 AM), https://x.com/jdvance/status/1834584115825226087?s=46; *see also* WCNC (@WCNC), *JD Vance Has Heated Exchange Over Claims Migrants Are Eating Pets in Ohio*, YouTube (Sept. 11, 2024), https://www.youtube.com/watch?v=LqjLoSNkyDs ("That small migrant community has caused a lot of problems. It's led to higher rates of communicable diseases, that's a verifiable fact. It's led to animals disappearing, many of my constituents have said that has been happening.").

[115] JD Vance (@JDVance), X (Sept. 10, 2024, 9:58 AM), https://x.com/jdvance/status/1833505359513661762?s=46.

[116] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, WASH. POST (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

138.    President Trump has stated that Venezuelans have "destroyed the fabric of our country."[117] In 2024 he asserted that, "[e]very day, Americans . . . are living in fear all because [former Vice President] Kamala Harris decided to empty the slums and prison cells of Caracas [,Venezuela] and many other places . . . . And we have to live with these animals, but we're not going to live with them for long, you watch."[118] He also stated that he was "talking a lot about Venezuela because Aurora[,Colorado] is really *infected* by Venezuela."[119] One analysis by Axios of 109 of President Trump's speeches, debates, and interviews found that he called Venezuelan immigrants "criminals" at least seventy times between September 1, 2023 and October 2, 2024.[120]

---

[117] *See also Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024), https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 (at approximately 33:40, "They allowed people to come in, drug dealers, to come into our country, and they're now in the United States. And told by their countries like Venezuela don't ever come back or we're going to kill you. . . . There's never been anything done like this at all. They've destroyed the fabric of our country. Millions of people let in.").

[118] FOX 4 Dallas-Fort Worth (@fox4news), *Trump rally in Aurora, Colorado: FULL SPEECH*, YouTube (Oct. 12, 2024), https://www.youtube.com/watch?v=_xguaneoZ5A (at approximately 41:05); *see also* NBC News (@NBCNews), *Meet the Press full broadcast — Dec. 8*, YouTube (Dec. 8, 2024), https://www.youtube.com/watch?v=-UsHJWEAj_I (at approximately 8:52, "Did you know that Venezuela their prisons are . . . at the lowest point in terms of emptiness that they've ever been? They're taking their people out of those prisons by the thousands and they're drop—."); Fox News (@FoxNews), *Donald Trump delivers remarks at rally in Reading, PA*, YouTube (Oct. 9, 2024), https://www.youtube.com/live/QuoT6T3fbU0?t=1791s (at approximately 29:55, 30:07, similar).

[119] FOX 4 Dallas-Fort Worth (@fox4news), *Trump rally in Aurora, Colorado: FULL SPEECH*, YouTube (Oct. 12, 2024), https://www.youtube.com/watch?v=_xguaneoZ5A (emphasis added) (at approximately 43:15).

[120] Russell Contreras et al., *Trump keeps calling Venezuelan and Congolese migrants criminals*, Axios (Oct. 5, 2024), https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric.

139.    In March 2025, the Trump Administration dramatically escalated its rhetoric and actions against Venezuelans, relying on purported Tren de Aragua ("TdA")[121] membership as justification for deporting more than 200 Venezuelans to an infamous Salvadoran terrorist detention center, in apparent violation of a court order.[122] The Administration cited the Alien Enemies Act—a 1798 law that facilitates deportation during wartime—despite the lack of armed conflict between Venezuela and the United States. In a March 15, 2025 "Proclamation"— "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua"—President Trump asserted that TdA members "are conducting irregular warfare and undertaking hostile actions against the United States" and proclaimed them "Alien Enemies" subject to immediate and summary apprehension, detention, and removal if they are not U.S. citizens or lawful permanent residents.[123] President Trump applauded the deportations on social media, using dehumanizing language. He posted a video of deported Venezuelans being roughly

---

[121] Tren de Aragua reportedly is a criminal group with origins in a Venezuelan prison and whose operations extend past the country. *See* John Otis, *Tren de Aragua—all you need to know about the Venezuelan Gang*, NPR (Mar. 16, 2025), https://www.npr.org/2025/03/16/nx-s1-5329777/tren-de-aragua-all-you-need-to-know-about-the-venezuelan-gang.

[122] *President Trump Delivers Justice to Terrorists, Security for Americans*, THE WHITE HOUSE (Mar. 17, 2025), https://www.whitehouse.gov/articles/2025/03/president-trump-delivers-justice-for-terrorists-security-for-americans/#:~:text=America%20First%20Legal%3A%20%E2%80%9CPresident%20Trump,the%20country's%20maximum%2Dsecurity%20prison ("America First Legal: "President Trump has deported 238 criminals in the violent Venezuelan gang Tren de Aragua to El Salvador to be imprisoned in CECOT, the country's maximum-security prison."); Nicholas Riccardi & Regina Garcia Cano, *Trump administration deports hundreds of immigrants even as a judge orders their removals be stopped*, AP (Mar. 17, 2025), https://apnews.com/article/trump-venezuela-el-salvador-immigration-dd4f61999f85c4dd8bcaba7d4fc7c9af.

[123] Proclamation by the President, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/.

hustled off a plane in El Salvador in the dark of night, bent over, amid a massive security presence, describing the Venezuelans as "monsters."[124]

140.    In stark contrast, the Trump Administration has shown a strong bias in favor of immigrant populations perceived as white. On February 7, 2025, President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, which directs Secretary Noem (among others) to:

> [T]ake appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination.[125]

## HARMS CAUSED BY DEFENDANTS' TERMINATION OF TPS FOR YEMEN

**Harms to TPS Holders and Their Families**

141.    Defendants' decision to terminate TPS for Yemen would strip TPS status from some 2,810 Yemenis and prevent 425 Yemeni nationals with pending applications from securing protection. Many of these individuals have lived in the United States for close to or over a decade, have children or close relatives who are U.S. citizens or permanent residents, and are deeply embedded in their communities. Should Defendants' biased and unlawful termination stand, the harm caused by that action would be immediate, profound, and far-reaching.

142.    With the loss of their legal status, Yemeni TPS holders may face imminent detention and/or deportation and must make the impossible choice whether to relocate to a country in dire humanitarian crisis and at the peak of political transition, remain in the United

---

[124] Donald J. Trump (@realDonaldTrump), TRUTH (Mar. 16, 2025), https://truthsocial.com/@realDonaldTrump/posts/114173862724361939.
[125] Exec. Order No. 14204, 90 Fed. Reg. 9497, 9497 (Feb. 12, 2025).

States without lawful immigration status, or uproot themselves once again to find refuge in a third country.

143.   Some TPS holders may currently be seeking other legal avenues to remain in this country (such as asylum, adjustment of status, or employment-based nonimmigrant status). However, due to the years-long asylum backlog, affirmative asylum applications remain long pending and do not guarantee protection from either detention or deportation in the interim. Defendants' actions also threaten detention and deportation for TPS holders who do not presently have alternative paths to legal status, even though TPS was established expressly to serve this population—individuals who cannot safely return to Yemen but may not fit the specific legal requirements of asylum. The loss of TPS in some instances also limits the possibility of acquiring an alternative legal status for which an individual would otherwise be eligible, but for which present legal status is a prerequisite.[126] TPS holders who lose their status may also face a years-long statutory bar to re-entry whether they depart on their own or are deported.[127]

144.   As of December 2, 2025, the U.S. Citizenship and Immigration Services announced a pause on adjudication of all pending affirmative asylum applications for nationals of any country, as well as a pause on adjudication of all USCIS immigration benefit applications filed by individuals from Yemen and 18 other countries,[128] throwing into question when and how

---

[126] *See Temporary Protected Status: An Overview*, AMERICAN IMMIGRATION COUNCIL (June 2025), Temporary-Protected-Status-An-Overview-0925.pdf (noting some TPS recipients may be eligible to adjust status).

[127] 8 U.S.C. § 1182(a)(9)(A)(ii), (B)(i)(II).

[128] Policy Memorandum from U.S. Citizenship and Immigration Services, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Fild by Aliens from High-Risk Countries (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf; note that just days

TPS holders from Yemen who otherwise qualify for asylum will be able to obtain asylum, and when Yemeni TPS holders who have applied for other benefits will have those applications adjudicated. USCIS expressly identifies nationality in a country subject to the administration's re-entry ban—here, Yemen—as a "significant negative factor" when adjudicating discretionary benefits applications.[129] Accordingly, Yemeni TPS holders with pending discretionary applications, including applications for adjustment of status, face a substantially heightened risk that USCIS will deny those applications, although a recent decision in a separate lawsuit has set aside the USCIS adjudication pause policy.[130]

145.    TPS holders who may be entitled to a fear-based form of immigration relief—such as withholding of removal or protection pursuant to the Convention Against Torture—face the prospect of deportation to unsafe countries. The government has sought to remove people to third countries "without adequate notice and a 'meaningful opportunity' to present a claim under the Convention," even if they may be subject to a fear-based form of relief. *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153, 2155 (2025) (Sotomayor, J. dissenting). While this issue is being litigated, the Supreme Court has allowed such third-country removals to move forward, including to South Sudan. *Id*.

146.    TPS holders also face the prospect of losing employment authorization. This may result in their summary dismissal from their jobs, jeopardizing their and their families' financial stability. Without stable employment, some TPS holders risk losing their homes or other material

---

later, the Trump administration added 20 additional countries to the Travel Ban, see supra XX/¶ 65.

[129] Policy Alert, U.S. Citizenship & Immigr. Servs., Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits, PA-2025-06 (Nov. 7, 2025),

[130] *Dorcas Int'l Inst. of Rhode Island v. U.S. Citizenship & Immigr. Servs.*, No. 26-CV-132-JJM-PAS, 2026 WL 1622708, at *57 (D.R.I. June 5, 2026), judgment entered, No. 26-CV-132-JJM-PAS, 2026 WL 1695954 (D.R.I. June 11, 2026).

assets, leading to further economic harm. Many TPS holders also face the imminent loss of their driver's licenses (or state identification cards) and, with them, their mobility and freedom of movement, because in many states driver's licenses and state-issued identification are limited to those with legal immigration status.[131] In addition, because the Secretary's termination goes into effect so quickly, TPS holders have been afforded almost no time to make alternative arrangements for themselves and their families, including by applying for other forms of immigration relief, employment authorization, or driver's licenses for which they may be eligible.

147.    Compounding the destabilizing harms of loss of legal status, employment authorization, and driver's licenses and state identification cards are the severe risks of family separation, loss of healthcare, psychological harm, and stigma.

148.    The loss of legal status renders TPS holders vulnerable to separation from U.S. citizen children and other loved ones. There are many Yemeni TPS holders in mixed-status families—with children, spouses, partners, elderly parents, and other family members who are U.S. citizens, lawful permanent residents, or who hold other forms of lawful status. These TPS holders face the risk of being forced to leave their family members behind or bringing their U.S. citizen children (or other family members) to a country that is unsafe and in dire straits, where the children have never lived and, in many cases, have never even visited.

149.    TPS holders and their families will be deprived of employer-sponsored health insurance and in some cases public health care. Despite having paid into Social Security for decades, in many cases, TPS holders also face the loss of this crucial benefit.

---

[131] *See, e.g.*, *REAL ID Checklist*, California DMV, https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/real-id/real-id-checklist/ (listing documents showing immigration status as requirements for REAL ID driver's licenses).

150. Meanwhile, the fear of deportation inflicts severe psychological harm on TPS holders and their loved ones. Yemeni TPS holders have been experiencing tremendous emotional and psychological harm since the challenged decision was announced, resulting in heightened anxiety, trauma, insomnia, and depression. The psychological harms resulting from Defendants' actions will only intensify as the effective date approaches.

151. TPS holders have also suffered the additional constitutional harm of being subject to an agency action motivated by racial, ethnic, religious and/or national-origin discrimination.

**Harms to the Named Plaintiffs**

152. Plaintiff **Abdo Doe** would be returned to Yemen without access to TPS. He has no immediate family there and is from an area controlled by the Houthis. Given the destruction of the health care infrastructure in country, he is concerned that he will face difficulties in obtaining ongoing treatment for his heart and spinal conditions.

153. Plaintiff **Hadeel Doe** is the mother of two U.S. citizen children, ages 9 years old and 2 years old. Revoking her TPS would directly impact their lives, stability, and wellbeing. She is currently pregnant, with a due date in mid-May 2026. Deportation or loss of status at this stage of her pregnancy would pose a serious risk to her health and the health of her unborn child. Medical records indicate that her unborn son has a heart condition that will require medical attention. Adequate medical care for this condition is not available in Yemen, and relocating there could be life-threatening for him. Hadeel has no relatives remaining in Yemen. Her entire immediate family—including her father, mother, brothers, and sisters—all reside in the United States. She would have no support system whatsoever if forced to return. The ongoing conflict and humanitarian crisis in Yemen make it unsafe for her U.S. citizen children to live there. Returning would put them in serious danger, particularly as the Houthis control her home region.

65

154.    Plaintiff **Faiz Doe** has been targeted in the past by the Houthi government, and, if returned to Yemen, will be subject to detention or disappearance due to his prior work in the field of human rights—both monitoring abuses and taking a public stance on human rights issues with the Danish Refugee Council, Yemen Red Crescent and others—as human rights workers are often suspected of being spies for the U.S. or Israel. His home region of Saadah is controlled by the Houthis.

155.    Plaintiff **Ebe Doe,** is from an area (Ibb) controlled by the Houthi authorities, where women face growing limitations on freedom of movement, employment opportunities, and participation in public and professional life, and she would face great difficulty progressing her medical and medical research careers. Without access to TPS, she would be returned to Yemen, and would lose the career in cancer research she has built at Houston Methodist Hospital.

156.    Due to Defendants' unlawful termination of Yemen's TPS designation, Plaintiff **Sam Doe**'s TPS application cannot be adjudicated. Without access to TPS, He is at risk of imminent confinement and deportation to a country where he fears he will be compelled to serve in the Houthi armed forces and viewed as a spy if he is sent back.

157.    Plaintiff **Ali Doe** would be returned to Yemen without access to TPS, where he has been specifically informed that he would be a target of the Houthis if returned to Yemen, due to his and his father's association with the officially recognized government, and his father's past work recruiting soldiers to fight against the Houthis.

158.    Plaintiff **Fahad Doe** would be returned to Yemen without access to TPS, and would lose the career as an airline pilot that is currently so close to his grasp. Because he spent most of his life in Saudi Arabia and currently lives in the United States, he fears that returning to

66

Yemen would cause him to be viewed with suspicion and accordingly be at risk of harassment, detention, or mistreatment.

159.    All Plaintiffs are potentially candidates for immigration detention here in the United States prior to future removal.

160.    All Plaintiffs have expressed fear and anxiety over forcibly returning to Yemen given the widespread shortages of food, fuel, electricity, and clean water in addition to the kidnappings, killings, and violence that have persisted across the country since the initial grant of TPS status.

161.    Yemeni TPS serves the purpose intended by Congress—providing nationality-based humanitarian relief regardless of whether individuals meet the more stringent eligibility requirements for other forms of humanitarian protection, such as asylum. Immigrants, including TPS holders, are integral to the social and economic fabric of the United States and, as the named Plaintiffs exemplify, contribute to their communities and this country in countless ways. The length of time TPS holders have lived in the United States and the deep ties they have built with families and communities make the loss of legal status especially devastating and, equally important, highlight the real human cost of Defendants' unlawful actions challenged here.

<strong><u>CLASS ACTION ALLEGATIONS</u></strong>

162.    This case is brought as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), or in the alternative 23(b)(1)(A), on behalf of Yemeni nationals (or individuals having no nationality who last habitually resided in Yemen) who had TPS status on March 3, 2026 (recipient class) and Yemeni nationals (or individuals having no nationality who last habitually resided in Yemen) with pending TPS applications (applicant class).

67

163.    The proposed classes are each sufficiently numerous so as to make joinder impracticable. Based on Defendants' own accounting in the Federal Register notice, the recipient class consists of 2,810 TPS holders and the applicant class consists of 425 people with pending applications.[132]

164.    There are common questions of law and fact affecting the members of both classes, including (a) whether Defendants' decision to terminate of Yemeni TPS was preordained, without regard to country conditions and prior to consulting with other appropriate agencies in violation of the TPS statute; (b) whether the TPS statute authorizes the Secretary to consider national interest as a sole justification to terminate TPS; (c) whether Defendants' decision to terminate TPS was impermissibly motivated by animus based on national origin, ethnicity, religion or race; (e) whether the termination caused a deprivation of a liberty and/or property interest without due process of law; and (f) whether the purported termination is *ultra vires* because the power over termination decisions continues to reside with the Attorney General rather than the DHS Secretary.

165.    The claims of Plaintiffs **Abdo Doe**, **Hadeel Doe**, **Faiz Doe**, **Ebe Doe**, **Ali Doe**, and **Fahad Doe** are typical of those of the recipient class with respect to the legality of Defendants' actions. Plaintiffs will fairly and adequately protect the interests of the class. None of the named Plaintiffs are aware of any conflicts that would preclude fair and adequate representation.

---

[132] 91 Fed. Reg. 10402, 10408 (Mar. 3, 2026) (citing DHS Office of Performance and Quality statistics as of December 8, 2025).

166.    Plaintiff **Sam Doe**'s claims are typical of those of the applicant class with respect to the legality of Defendants' actions. He will fairly and adequately protect the interests of the class. He is unaware of any conflicts that would preclude fair and adequate representation.

167.    Proposed class counsel has substantial experience litigating both cases involving challenges to federal immigration policies and class actions.

168.    Defendants' illegal termination of TPS for Yemen applies to the entire class, making class-wide relief appropriate.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### (Administrative Procedure Act)

169.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

170.    The Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, ensures that executive agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. 702.

171.    The APA provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). The right

of review under the APA includes a right to judicial review of actions that "fail[] to meet statutory, procedural, or constitutional requirements."[133]

172. Defendants' termination of the TPS designation for Yemen is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

173. Defendants' termination of the TPS designation for Yemen violates the APA because, among other things:

    a. Defendants' decision to terminate TPS for Yemen occurred prior to the requisite consultation with other appropriate agencies as required by 8 U.S.C. § 1254a(b)(3);

    b. Defendants' decision to terminate was not based on an objective review of country conditions, as required by 8 U.S.C. § 1254a(b)(3). Rather, as alleged above, the outcome was preordained, and the Secretary terminated notwithstanding her own finding that extraordinary and temporary conditions continue to challenge Yemeni nationals ability to safely return; the decision rested on extra-statutory factors; and it treated the dangers the Notice itself identified as grounds to exclude Yemeni nationals rather than as conditions bearing on their safe return;

    c. The research, consultation, and review process leading up to the termination of Yemen's TPS designation deviated dramatically from past practice without explanation;

---

[133] *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 56 (S.D.N.Y. 2025) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971); *accord FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

 d. To the extent Defendants engaged in any process, it was so deficient as to amount to no process at all, defeating the purpose of the TPS statute;

 e. Defendants relied on statutorily impermissible factors to justify their decision to terminate;

 f. Defendants' decision to terminate occurred under circumstances and a timeline that reflect that they were pretextual and animated by animus based on the national origin, race, ethnicity, and religion of Yemeni TPS holders;

174. Plaintiffs will suffer irreparable injury from the unlawful termination.

175. Defendants' decision to terminate Yemen's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

## SECOND CLAIM
### (Administrative Procedure Act)

176. All the foregoing allegations are repeated and realleged as though fully set forth herein.

177. To engage in appropriate decision-making, an agency must ordinarily "display awareness that it *is* changing position."[134] Agencies "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."[135] And the APA requires a "more detailed justification . . . for disregarding facts and circumstances that underlay . . . the prior policy."[136]

178. Defendants' termination of the TPS designation for Yemen with only 60-days' notice was arbitrary, capricious, and contrary to law in violation of the APA because it

---

[134] *Fox Television Stations, Inc.*, 556 U.S. at 515.
[135] *Id*.
[136] *Id*. at 515–16.

represented an unacknowledged and unexplained departure from decades of decision-making practices and ordinary procedures.

179.    Plaintiffs will suffer irreparable injury from the unlawful termination.

### THIRD CLAIM
### (Fifth Amendment of the U.S. Constitution—Equal Protection)

180.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

181.    The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that is motivated in part by a  discriminatory intent or purpose based on national origin, race, ethnicity, or religion. Classifications based on these characteristics receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than the protected characteristic.[137]

182.    Defendants terminated Yemen's TPS designation, motivated in part by animus based on Plaintiff's national origin. In the alternative, that animus motivating the termination extended to Plaintiffs' religion, race, or ethnicity.

183.    Plaintiffs will suffer irreparable injury resulting from the unlawful termination.

184.    Defendants' termination of Yemen's TPS designation must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment's guarantee of equal protection.

---

[137] *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

## FOURTH CLAIM
### (Fifth Amendment of the U.S. Constitution—Due Process)

185.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

186.    The Due Process Clause of the Fifth Amendment applies "to all 'persons' within the United States, including aliens,"[138] and "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests."[139]

187.    Plaintiffs have liberty and property interests in their TPS status and related benefits, including employment authorization and removal protection. Defendants' termination of TPS for Yemen without following the statutorily mandated requirements for termination deprives Plaintiffs of their liberty and property interests without due process of law.

188.    Plaintiffs will suffer irreparable injury resulting from the unlawful termination.

189.    Defendants' termination of Yemen's TPS designation must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment's guarantee of due process.

## FIFTH CLAIM
### (Ultra Vires / Administrative Procedure Act)

190.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

191.    The power to terminate TPS designations is assigned by statute to the Attorney General of the United States, *see* 8 U.S.C. § 1254a(b)(3)(B), who has not exercised it to terminate the designation of Yemen.

---

[138]  *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).
[139]  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

192.     That power was never transferred to the Secretary of Homeland Security, and therefore former Secretary Noem's purported March 3, 2026 termination of Yemen's TPS designation is void as statutorily *ultra vires*, and is contrary to law and in in excess of statutory jurisdiction, authority, or limitations in violation of the Administrative Procedure Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that Defendants' termination of TPS for Yemen was unlawful under the APA, ultra vires, and unconstitutional under the Due Process Clause of the Fifth Amendment;

2.     Set aside or otherwise vacate the termination of TPS for Yemen as beyond Defendants' authority and/or unlawful under the APA;

3.     Postpone or stay the termination of TPS for Yemen from taking effect or being put into effect;

4.     Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from enforcing the termination of TPS for Yemen;

5.     Order Defendants to take all steps necessary to ensure that the TPS designation for Yemen remains in full force and effect;

6.     Award Plaintiffs' attorneys' fees and costs under 28 U.S.C. § 2412 and any other applicable statute or regulation; and

7.     Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: July 13, 2026                                    Respectfully submitted,

                                                         /s/*Shayana Kadidal*

74

Shayana Kadidal [SK-1278]
Angelo Guisado
Baher Azmy [BA-8406]
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6438
Fax: (212) 614-6451
kadidal@ccrjustice.org
aguisado@ccrjustice.org
bazmy@ccrjustice.org

Razeen Zaman
Helen Anne Schutz Lo
Dinesh McCoy*
Phi Nguyen*
Niji Jain
ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY 10013
Tel: (212) 966-5932
rzaman@aaldef.org
alo@aaldef.org
dmccoy@aaldef.org
pnguyen@aaldef.org
njain@aaldef.org

*Counsel for Plaintiffs*

*\*Application for admission Pro Hac Vice
forthcoming*

75