**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Abdo DOE, Hadeel DOE, Faiz DOE, Ebe DOE, Sam DOE, Ali DOE, and Fahad DOE, on their own behalf and on behalf of others similarly situated,<br><br><br>*Plaintiffs*,<br><br>- *versus* -<br><br>Markwayne MULLIN, Secretary, United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br><br>*Defendants*. | **Case No. 1:26-cv-2280-DEH** |

**MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION TO POSTPONE
EFFECTIVE DATE OF AGENCY ACTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 3

LEGAL STANDARD ............................................................................................................ 4

ARGUMENT ......................................................................................................................... 5

    I.   Plaintiffs are likely to succeed because Congress vested TPS Termination Authority Exclusively in the Attorney General ........................................................................... 5

        A.    Congress has only ever authorized the Attorney General to terminate TPS ................. 5

        B.    Authorities DHS has invoked did not actually transfer authority to the Secretary ...... 7

        C.    Plaintiffs' *Ultra Vires* Claim Presents a Question *Mullin* Did Not Decide ................. 12

    II.    The Due Process Clause Requires Invalidation of the Termination ............................. 12

        A.    The Termination of TPS Implicates Significant Liberty and Property Interests ........ 13

        B.    The Government's Process Was Not Constitutionally Sufficient .............................. 16

        C.    Plaintiffs' Procedural Due Process Claim Is Reviewable ........................................... 18

    III.    The Remaining Factors Continue to Favor a Stay ......................................................... 18

CONCLUSION ..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) ........................................................ 13

*Bell v. Burson*, 402 U.S. 535 (1971) ....................................................................................... 13, 14

*Bellin v. McDonald*, 177 F.4th 167 (2d Cir. 2026) ................................................................. 13, 14

*Bridges v. Wixon*, 326 U.S. 135 (1945) .......................................................................................... 15

*Cervantes v. Holder*, 597 F.3d 229 (4th Cir. 2010) ...................................................................... 10

*City of Arlington, Tex. v. FCC*, 569 U.S. 290, (2013) ..................................................................... 6

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ............................................. 14, 15, 17

*Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004) .................................................... 10

*Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603 (1st Cir. 1989) ................................ 12

*Dep't of State v. Munoz*, 602 U.S. 899 (2024) ............................................................................... 16

*DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020) ...............................................................11

*DHS v. Thuraissigiam*, 591 U.S. 103 (2020) ................................................................................ 16

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ....................................................................................... 14

*Kapps v. Wing*, 404 F.3d 105 (2d Cir. 2005) ................................................................................ 13

*Lackey v. Stinnie*, 604 U.S. 192 (2025) ......................................................................................... 12

*Landon v. Plasencia*, 459 U.S. 21 (1982) .................................................................................... 15

*Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) .................................................... 2, 6

*Mansor v. USCIS*, 685 F. Supp. 3d 1000 (W.D. Wash. 2023) ....................................................... 15

*Mathews v. Diaz*, 426 U.S. 67 (1976) ........................................................................................... 13

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................................................ 13, 16

*Mejia Rodriguez v. DHS.*, 562 F.3d 1137 (11th Cir. 2009) .......................................................... 10

*Mullin v. Doe*, Nos. 25-1083 & 25-1084, 2026 WL 1825840 (U.S. June 25, 2026) ............ passim

*Najera v. United States*, 926 F.3d 140 (5th Cir. 2019) ................................................................. 10

*Nat'l Ass'n of Broadcasters v. FCC*, 39 F.4th 817 (D.C. Cir. 2022) .............................................. 6

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
    595 U.S. 109 (2022) ................................................................................................................. 6

*Nat'l TPS Alliance v. Noem*, 166 F.4th 739 (9th Cir. 2026) ........................................................... 6

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................................... 5, 20

*Perry v. Sindermann*, 408 U.S. 593 (1972) ..............................................................................11, 14

*Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018) .......................................................... 15

*Rodas v. Chertoff*, 399 F. Supp. 2d 697 (E.D. Va. 2005) ................................................. 15

*Rust v. Sullivan*, 500 U.S. 173 (1991) ................................................................. 14

*Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) ................................................ 15

*Webster v. Doe*, 486 U.S. 592 (1988) .................................................................. 18

*Webster v. Fall*, 266 U.S. 507 (1925) ............................................................... 3, 10

*Whitman v. United States*, 135 S. Ct. 352 (2014) ......................................................... 10

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008) .................................................. 4

*Withrow v. Larkin*, 421 U.S. 35 (1975) ............................................................... 17

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ............................................................ 13, 15

**Statutes**

5 U.S.C. § 705 ................................................................................ 1, 5

5 U.S.C. § 706(2) ........................................................................ 2, 6, 7, 18

6 U.S.C. § 271 .............................................................................. 1, 8

6 U.S.C. § 542(a) ............................................................................. 9

6 U.S.C. § 552(d) ............................................................................ 10

6 U.S.C. § 557 ............................................................................... 10

8 U.S.C. § 1103(a) ......................................................................... 1, 7

8 U.S.C. § 1103(g) ............................................................................ 8

8 U.S.C. § 1252(b)(9) ........................................................................ 18

8 U.S.C. § 1254a ......................................................................... passim

8 U.S.C. § 1255(c)(2) ........................................................................ 19

**Other Authorities**

Department of Homeland Security Reorganization Plan, H.R. Doc. No. 108-16 (2002) ............... 9

Designation of the Republic of Yemen for Temporary Protected Status,
80 Fed. Reg. 53,319 (Sept. 3, 2015) ................................................................. 3

Extension and Redesignation of Yemen for Temporary Protected Status,
89 Fed. Reg. 56,765 (July 10, 2024) ................................................................ 4

Extension of the Designation of Honduras under Temporary Protected Status Program,
68 Fed. Reg. 23,744 (May 5, 2003) ................................................................. 7

Extension of the Designation of Somalia Under the Temporary Protected Status Program,
67 Fed. Reg. 48,950 (July 26, 2002) ................................................................ 9

Extension of the Designation of Somalia under the Temporary Protected Status Program,
67 Fed. Reg. 48,950 (July 26, 2002) ................................................................ 8

Proclamation No. 10998, 90 Fed. Reg. 59,717 (Dec. 19, 2025) ................................... 19

Temporary Protected Status, 56 Fed. Reg. 618 (Jan. 7, 1991)....................................................... 8

Termination of Bosnia-Herzegovina Under the Temporary Protected Status Program,
    65 Fed. Reg. 52,789 (Aug. 30, 2000) ....................................................................................... 9

Termination of Designation of Kuwait Under Temporary Protected Status Program,
    57 Fed. Reg. 2,930 (Jan. 24, 1992) .......................................................................................... 9

Termination of Designation of Lebanon Under Temporary Protected Status Program,
    58 Fed. Reg. 7,582 (Feb. 8, 1993) ............................................................................................ 9

Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-
    Month Extension, Reg. 15,437 (Mar. 31, 1998) ........................................................................ 9

Termination of the Designation of Yemen for Temporary Protected Status,
    91 Fed. Reg. 10,402 (Mar. 3, 2026) ........................................................................ 4, 9, 17, 19

## INTRODUCTION

Plaintiffs renew their motion for an emergency postponement of the effective date of the termination of Yemen's Temporary Protected Status ("TPS") designation (the "Termination"). *See* 5 U.S.C. § 705. The Court should grant the request because Plaintiffs are likely to succeed on the merits of two newly added claims that have never been presented to the Supreme Court, and because the equitable factors continue overwhelmingly to favor relief.

First, the Termination is *ultra vires* because the Secretary of Homeland Security lacked the authority to terminate Yemen's TPS designation. When Congress established TPS in 1990, it made clear that only the "Attorney General" possesses the authority to terminate a TPS designation. *See* 8 U.S.C. § 1254a(b)(3)(B), (d)(3). For more than a decade, the TPS statute was administered consistent with that statutory delegation, with the Attorney General alone terminating TPS designations. But in 2003, that changed, and the Department of Homeland Security ("DHS") Secretary began to make TPS designations and terminations. That shift was based on a fundamental misreading of the statutory scheme.

The Homeland Security Act of 2002 ("the Act") tasked the DHS Secretary with "the administration and enforcement of" immigration-related laws "except insofar as ... such laws relate to the powers, functions, and duties conferred upon the ... Attorney General" and a few other officials. 8 U.S.C. § 1103(a). In other words, the Act expressly reserved to the Attorney General immigration-related powers that were vested in the Attorney General prior to the Act's passage. The Act did separately transfer many immigration-related and even some TPS-related authorities to DHS, including those that had formerly been exercised by the Immigration and Naturalization Service ("INS") within the Department of Justice ("DOJ"). *See* 6 U.S.C. § 271. But the Attorney General—not INS—had consistently exercised the authority to terminate a TPS designation prior

to the Act's passage. So TPS termination authority did not pass from DOJ to DHS by the same mechanism, contrary to DHS's understanding. Because "an agency literally has no power to act ... unless and until Congress confers power upon it," *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986), the DHS Secretary's Termination of Yemen's TPS designation is *ultra vires*, is not shielded by the jurisdiction-stripping provision of § 1254a(b)(5)(A) (which only applies to determinations "of the Attorney General"), and must be "set aside," 5 U.S.C. § 706(2).

Second, the Termination deprives Plaintiffs of protected liberty and property interests without constitutionally adequate procedures, in violation of the Due Process Clause. TPS confers mandatory work authorization and removal protections upon TPS holders and TPS applicants who are prima facie eligible for TPS. Such benefits are liberty and property interests that trigger mandatory procedural safeguards under the Constitution. Congress understood this. That is why the TPS statute channels the decisionmaker's discretion and mandates extension unless the required termination determination is made. 8 U.S.C. § 1254a(b)(3)(A)-(C). Yet Plaintiffs received no advance notice of the proposed factual basis, no opportunity to answer it before the decision became final, and no administrative review. The Court's findings that the consultation contained no discussion of Yemen's conditions and that termination appeared to be predetermined confirm the value of those missing safeguards. Op. and Order at 23-31, ECF No. 54 ("Postponement Order").

The Supreme Court's decision in *Mullin v. Doe* did not address these new claims, much less foreclose them. *Mullin* declined to extend the judicial review bar to constitutional claims, like Plaintiffs' procedural due process claim. *See Mullin v. Doe*, Nos. 25-1083 & 25-1084, 2026 WL 1825840, at *11 (U.S. June 25, 2026). Plaintiffs' *ultra vires* claim was not squarely before the Court, which resolved more than a century ago that "[q]uestions which merely lurk in the record,

neither brought to the attention of the court nor ruled upon, are not to be considered as having been decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). Besides, *Mullin*'s rulings were self-avowedly "predictive," not "final," and therefore subject to being revisited in light of new arguments and claims. *Mullin*, 2026 WL 1825840, at *11.

Plaintiffs have been unlawfully deprived of constitutionally protected interests by an official with no authority to take the challenged action. This Court should grant interim relief.

## BACKGROUND

Plaintiffs incorporate the background set out in their prior motion to postpone, ECF No. 24, and this Court's Postponement Order. Congress enacted TPS to replace ad hoc executive relief with defined criteria and regular review. Postponement Order at 5-6. While a designation remains in effect, beneficiaries may not be removed, must receive employment authorization, and may not be detained on the basis of immigration status. 8 U.S.C. § 1254a(a)(1), (d)(4). At least sixty days before a designation expires, the authorized official must, "after consultation with appropriate agencies," review country conditions and determine whether the statutory conditions continue. *Id.* § 1254a(b)(3)(A). Unless the official determines that the country "no longer continues to meet" those conditions, the designation "is extended" automatically. *Id.* § 1254a(b)(3)(B)-(C).

Yemen was first designated for TPS in 2015 because its ongoing armed conflict made the forced return of Yemeni nationals a serious threat to their safety. Designation of the Republic of Yemen for Temporary Protected Status, 80 Fed. Reg. 53,319, 53,320 (Sept. 3, 2015). DHS repeatedly extended and redesignated Yemen. In July 2024, DHS again redesignated and extended Yemen's TPS designation on both ongoing armed conflict and extraordinary and temporary conditions, including violence throughout the country, repression in Houthi-controlled areas, explosive hazards, infrastructure collapse, mass displacement, food insecurity, and acute

malnutrition. Extension and Redesignation of Yemen for Temporary Protected Status, 89 Fed. Reg. 56,765, 56,767-70 (July 10, 2024).

On March 3, 2026, Secretary Noem published notice of the Termination, effective May 4. Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10,402 (Mar. 3, 2026) (the "Notice"). The Notice found that Yemen still experiences extraordinary and temporary conditions that "continue to challenge Yemeni nationals' ability to safely return home," yet terminated the designation on the ground that maintaining it is contrary to the national interest. Notice at 10,404-05. On May 1, this Court postponed the effective date after finding Plaintiffs likely to succeed on their consultation claim. Postponement Order at 30-31. On July 20, after *Mullin*, the Court stayed the Postponement Order and concluded that Plaintiffs were unlikely to succeed on the claims then before it. Mem. Op. and Order at 4-5, ECF No. 89 ("July 20 Order"). The July 20 Order did not adjudicate either claim presented here.

On July 13, 2026, Plaintiffs filed the Amended Complaint adding the two claims supporting this renewed request: (1) that the Termination is *ultra vires* because Congress assigned country-level TPS termination authority to the Attorney General and never transferred it to the DHS Secretary; and (2) that the Termination deprived Plaintiffs of protected interests without constitutionally adequate process. First Am. Compl. ¶¶ 185-92, ECF No. 85. Neither claim has been adjudicated.

## LEGAL STANDARD

The standard for postponement under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction. Plaintiffs must show a likelihood of success on the merits and irreparable harm, and that the balance of equities and public interest favor relief. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). The latter factors merge when the Government is the opposing

party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Section 705 authorizes the Court to issue "all necessary and appropriate process" both "to postpone the effective date" of agency action and "to preserve status or rights" pending conclusion of review. 5 U.S.C. § 705. The Court may therefore preserve the TPS protections at issue under § 705.

Because the July 20 Order stayed the prior postponement while the claims presented here remained unadjudicated, effective § 705 relief must preserve continuity from that date. The Court should therefore direct Defendants to treat Yemen's designation, TPS status, and TPS-based employment authorization as continuously effective from entry of the July 20 Order, and to treat pending applications as remaining pending and eligible for adjudication without interruption. Otherwise, the pendency of judicial review could itself cause detention, removal, loss of employment, and lasting immigration consequences that no later ruling could undo.

## ARGUMENT

### I.     Plaintiffs are likely to succeed because Congress vested TPS Termination Authority Exclusively in the Attorney General

Congress vested in the Attorney General the authority to "review the conditions in" a foreign state designated for TPS and to "determine whether the conditions for such designation… continue to be met." 8 U.S.C. § 1254a(b)(3)(A), (B). Because the statute specifically vests this authority to terminate designations only in the Attorney General, the DHS Secretary lacks statutory authority to terminate a TPS designation. And the authorities the Secretary has cited to terminate designations in the past—various provisions of the Act—do not transfer TPS-termination authority to the Secretary.

#### A.  Congress has only ever authorized the Attorney General to terminate TPS

Because executive agencies are creatures of statute, they possess only the authority bestowed on them by Congress. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety*

*& Health Admin.*, 595 U.S. 109, 117 (2022); *see also Louisiana Pub. Serv. Comm'n*, 476 U.S. at 357 ("[A]n agency literally has no power to act ... unless and until Congress confers power upon it."). "Both their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is *ultra vires*." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013). In light of these constraints, an agency bears the burden to "identify statutory authority for any action it takes." *Nat'l Ass'n of Broadcasters v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022). And when an agency acts outside its statutory authority, the Administrative Procedure Act directs courts to "hold unlawful and set aside" the resulting agency action as "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2).

Congress expressly authorized one—and only one—executive official to terminate TPS designations: the Attorney General. By statute, a foreign-state designation "shall remain in effect until the effective date of the termination of the designation under paragraph (3)(B)." 8 U.S.C. § 1254a(b)(2)(B); *see also Nat'l TPS Alliance v. Noem*, 166 F.4th 739, 762-63 & n.12 (9th Cir. 2026) (termination process under paragraph (3)(B) sole process for ending TPS designation). Consistent with the broader TPS statute, which repeatedly vests authority in "the Attorney General," that paragraph provides that "[i]f the Attorney General determines under subparagraph (A) that a foreign state ... no longer continues to meet the conditions for designation ... the Attorney General shall terminate the designation." 8 U.S.C. § 1254a(b)(3)(B); *see also*, *e.g.*, *id*. § 1254a(b)(3)(C) ("Attorney General" shall otherwise extend designation); § 1254a(b)(5)(A) ("no judicial review of any determination of the Attorney General"); § 1254a(c)(1)(A)(ii) (a noncitizen is eligible for protected status "only if ... the alien has continuously resided in the United States since such date as the Attorney General may designate"). In contrast, the statute vests no such authority in the DHS

6

Secretary. She therefore acted in excess of statutory authority when she terminated Yemen's TPS designation, and the Termination must be "set aside." 5 U.S.C. § 706(2).

### B. Authorities DHS has invoked did not actually transfer authority to the Secretary

DHS has claimed that, as part of the reorganization implemented under the Act, the authority to terminate TPS status was transferred from the Attorney General to DHS. *See, e.g.*, DHS, Extension of the Designation of Honduras under Temporary Protected Status Program, 68 Fed. Reg. 23,744 (May 5, 2003) (extending foreign-state designation and claiming that because "the Immigration and Naturalization Service (INS) transferred from the Department of Justice to the Department of Homeland Security (DHS) ... [t]he responsibilities for administering the TPS program were transferred to the Bureau of Citizenship and Immigration Services ("BCIS"). But DHS has not identified any statutory provisions that actually effectuated the relevant transfer. And the principal provisions within the Act that transfer immigration authorities from DOJ to DHS do not effectuate such a transfer either.

For example, 8 U.S.C. § 1103(a)(1) outlines the DHS Secretary's authorities under the INA, providing that:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter [the INA] and all other laws relating to the immigration and naturalization of aliens, *except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General*, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: Provided, however, that determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

(emphasis added). Through its "except" clause, that provision clearly reserves "powers, functions, and duties conferred upon the ... Attorney General" from being transferred to the DHS Secretary. The authority to designate and terminate foreign states under the TPS statute is specifically and repeatedly "conferred upon the ... Attorney General," *id*., by the text of the TPS statute, *see* 8

U.S.C. § 1254a(b). Other provisions similarly confirmed that particular immigration-related powers would remain with the Attorney General. *See, e.g.*, 8 U.S.C. § 1103(g) (providing that the Attorney General would retain authority over functions "exercised by the Executive Office for Immigration Review").

To be sure, the Act did transfer many immigration-related functions—and even *some* TPS-related functions—from DOJ to DHS. For example, the Act created the Bureau of Citizenship and Immigration Services as a branch of DHS and "transferred" specific INS functions "from the Commissioner of Immigration and Naturalization [within DOJ] to the Director of the Bureau of Citizenship and Immigration Services" within DHS. *See* 6 U.S.C. § 271(b). Among the functions transferred were "all ... adjudications performed by the [INS] immediately before" the effective date of the Act. *Id*. § 271(b)(5). That included the authority to initially find individual aliens eligible and award protected TPS status, since those adjudications were performed by INS rather than the Attorney General before the Act was passed. But TPS country designations and terminations were not "performed by [INS] immediately before" the Act's "effective date," and so those broader authorities were not transferred to DHS by operation of 6 U.S.C. § 271.[1] Congress left the designation and termination power with the Attorney General, and that power was not

---

[1] Although DOJ adopted regulations that gave INS responsibility over much of the day-to-day workings of TPS, those regulations recognized that country-level foreign-state designations were made "by the Attorney General pursuant to section 244A(b) of the Act," Temporary Protected Status, 56 Fed. Reg. 618, 619 (Jan. 7, 1991) (codified at 8 C.F.R. § 240.1) and the Attorney General herself continued to make such designations through the effective date of the Act, *see, e.g.*, Extension of the Designation of Somalia under the Temporary Protected Status Program, 67 Fed. Reg. 48,950 (July 26, 2002).

merely formal on paper. The Attorney General exercised the termination power personally for more than a decade.[2]

The Act also required the President to submit an executive Reorganization Plan to Congress by "[n]ot later than 60 days after November 25, 2002" detailing "[t]he transfer of agencies, personnel, assets, and obligations to" DHS. 6 U.S.C. § 542(a). In accordance with that provision, the President issued an executive Reorganization Plan, which purported to "[t]ransfer the ... functions of [INS]"—including delegated functions "performed by" INS "immediately before" the transfer—to DHS. *See* Department of Homeland Security Reorganization Plan, H.R. Doc. No. 108-16, at 4, 12 (2002). But the Plan made no mention of TPS; nor did it address those immigration-related powers expressly vested in the Attorney General as opposed to the INS or other subsidiary divisions. By contrast, other portions of the Plan did specifically address the transfer of particular Attorney General functions. *See, e.g.*, *id.* (transferring "the National Domestic Preparedness Office of the FBI, *including the functions of the Attorney General relating thereto*" (emphasis added)).

The Notice for Yemen does not cite any source of authority vesting the power over this decision in the Secretary of Homeland Security. *See* 91 Fed. Reg. 10,402 (Mar. 3, 2026). In its opposition to the motion to postpone, the Government cited in passing to 6 U.S.C. § 557 as "transferring authority from the Attorney General to the Secretary." Defs' Opp. to Motion to

---

[2] *See, e.g.,* Termination of Designation of Kuwait Under Temporary Protected Status Program, 57 Fed. Reg. 2,930, 2,931 (Jan. 24, 1992); Termination of Designation of Lebanon Under Temporary Protected Status Program, 58 Fed. Reg. 7,582 (Feb. 8, 1993); Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension, 63 Fed. Reg. 15,437, 15,438 (Mar. 31, 1998); Termination of Bosnia-Herzegovina Under the Temporary Protected Status Program, 65 Fed. Reg. 52,789, 52,791 (Aug. 30, 2000); Extension of the Designation of Somalia Under the Temporary Protected Status Program, 67 Fed. Reg. 48,950 (July 26, 2002).

Postpone at 3 (Apr. 6, 2026), ECF No. 32. Section 557 provides that "[w]ith respect to *any function transferred by or under this chapter* [on Homeland Security Organization, 6 U.S.C. §§ 101-681g] (including under a reorganization plan that becomes effective under section 1502 [6 U.S.C. § 542]) and exercised on or after the effective date of this Act, reference *in any other Federal law* to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred." 6 U.S.C. § 557 (emphases added). But that provision does not independently transfer any authority from DOJ to DHS. It simply streamlines the amendment of other parts of the U.S. Code by conforming them to transfers of authority specified in chapter 1 of Title 6 (again, 6 U.S.C. §§ 101-681g)—and none of those provisions takes the authority over TPS terminations from the Attorney General and passes it to the DHS Secretary.

DHS has also cited in litigation[3] a similar housekeeping provision, 6 U.S.C. § 552(d) (entitled "savings provisions"), which provides:

---

[3] *See, e.g.*, Brief for Petitioners, *Mullin v. Doe*, No. 25-1083 (U.S. Mar. 30, 2026), at 6 n.2, which was presumably the source for the mention of Section 552(d) in passing in the Supreme Court decision, *Mullin*, 2026 WL 1825840, at *4 (U.S. June 25, 2026). But the matter was not briefed or contested in the Supreme Court TPS litigation. It is well-established that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. at 511 (prior ruling was not precedential because relevant issue was not "suggested or decided" in that case); *see also Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (referencing *Webster v. Fall* and declining to resolve an issue based on a prior Supreme Court decision which "did not address" key, relevant considerations); *Whitman v. United States*, 135 S. Ct. 352, 353-54 (2014) (Scalia, J., statement respecting denial of cert.) (prior decision's "drive-by ruling . . . deserve[d] little weight" in part because the decision included "scarcely any explanation" on the issue).

Various lower courts have cited 6 U.S.C. § 552 and 557, among other provisions, as authority for the transfer in dicta. *See, e.g.*, *Najera v. United States*, 926 F.3d 140, 142 (5th Cir. 2019); *Cervantes v. Holder*, 597 F.3d 229, 231 n.2 (4th Cir. 2010); *Mejia Rodriguez v. DHS*, 562 F.3d 1137, 1140 n.3 (11th Cir. 2009). In none of those cases does it appear the issue was actually joined or seriously contested by the parties.

10

> References relating to *an agency that is transferred* to the Department in statutes, Executive orders, rules, regulations, directives, or delegations of authority that precede such transfer or the effective date of this chapter shall be deemed to refer, as appropriate, to the Department, to its officers, employees, or agents, or to its corresponding organizational units or functions.

(emphasis added). Section 552(d) is part of Subchapter XII, Part B, which relates to "transitional provisions." Its text refers to whole "agencies" transferred into DHS, *e.g.* the INS, not to powers independently assigned to the Attorney General or other officers. Given its placement and context, this provision should be taken to refer to situations where a clear transfer of authority was undertaken by statute or regulation, but where clarity is required as to whether a DHS transferee can be assumed to have had power exercised before the reorganization by another agency's official.[4] Nothing in the provision should be taken to actually effectuate a transition; instead, it intends to resolve ambiguous situations where a transfer was clearly accomplished by another authority but results in uncertainty due to the pendency of an action spanning the period of "transition."

Plaintiffs are likely to succeed on their claim that the decision to terminate TPS for Yemen was *ultra vires* and in excess of statutory jurisdiction, authority, or limitations in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).[5]

---

[4] For example, if an INS official had the power to both make a decision and revise her own earlier decision, the transfer passes all that official's powers to some new DHS official, so that if a question arises as to whether the new DHS official has the power to "reconsider" the earlier decision the INS official originally made, this "transitional" "savings" provision would clarify the situation by clarifying that the DHS official does have that power to revise.

[5] If the Court agrees, that would not also invalidate the initial TPS designation for Yemen, for at least three reasons. First, this APA suit challenges only one final agency action—the Termination—and any challenge to the initial TPS designation would need to be considered in the context of a separate and otherwise justiciable lawsuit. Second, even when the cited basis for an agency program turns out to be invalid, the APA requires the government to explore alternatives to outright termination. *See, e.g.*, *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 24-28 (2020). Third, "mutually explicit understandings" related to TPS status and the legitimate reliance interests of TPS holders and applicants, reinforced by their individual vetting and approval by DHS pursuant

11

### C.  Plaintiffs' *Ultra Vires* Claim Presents a Question *Mullin* Did Not Decide

There is no obstacle to this Court's review of Plaintiffs' *ultra vires* claim. Just as the TPS statute vests termination authority exclusively in the Attorney General, its review bar applies exclusively to TPS terminations carried out by "the Attorney General." 8 U.S.C. § 1254a(b)(5)(A). Nor is review foreclosed by *Mullin*. In *Mullin*, no party advanced the argument that Plaintiffs advance now—i.e., the contention that the Attorney General alone has the authority to terminate a TPS designation. *Mullin* addressed the entirely different question whether the review bar reaches non-constitutional claims challenging how the Secretary exercised her (in that case) unchallenged TPS authority, not whether the Secretary could exercise that authority at all. *Cf. Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 608 (1st Cir. 1989) (declining to interpret a Supreme Court case as deciding an unpresented and unaddressed issue). Indeed, because the TPS statute's review bar does not apply to any determinations rendered by the Secretary, it does not in any way limit judicial review of the Secretary's actions.

*Mullin* was also decided in a preliminary posture, such that the Supreme Court is free to revisit its conclusions, including in light of new arguments. *Mullin* itself said that it "ma[de] only a predictive—not a final—decision about the outcome of the case" based on the Court's view of "the likelihood-of-success question." 2026 WL 1825840, at *11. And the Supreme Court has explained that because "courts determine if a plaintiff is likely to succeed on the merits" in awarding preliminary relief, those decisions "do not conclusively resolve legal disputes." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025).

### II.    The Due Process Clause Requires Invalidation of the Termination

---

to regulation, *see* Compl. ¶ 33, give rise to vested due process interests notwithstanding any statutory violation. *Perry v. Sindermann*, 408 U.S. 593, 601 (1972).

The Termination deprived Plaintiffs of concrete statutory protections without constitutionally adequate process. The Due Process Clause protects every person within the United States, including noncitizens whose presence is temporary. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (collecting cases); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). It constrains governmental decisions that deprive persons of liberty or property interests. *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *Bell v. Burson*, 402 U.S. 535, 539 (1971). Plaintiffs are likely to establish both protected interests and constitutionally inadequate process.

### A.  The Termination of TPS Implicates Significant Liberty and Property Interests

TPS confers significant property interests because Congress made its core protections mandatory after individual status is granted. During the TPS period, the Government "shall not remove" a TPS holder and "shall authorize" employment. 8 U.S.C. § 1254a(a)(1)(A)-(B). A TPS holder may not be detained based on immigration status, *id.* § 1254a(d)(4) and must be treated as maintaining lawful nonimmigrant status for adjustment- and change-of-status purposes, *id.* § 1254a(f)(4). Plaintiffs therefore have protected interests in TPS's removal protection, bar against status-based detention, employment authorization, and treatment as maintaining lawful nonimmigrant status for those specified purposes.

The INA's mandatory protections satisfy the governing test for a protected property interest. A person has a property interest in a benefit when governing law supplies a "legitimate claim of entitlement" rather than a "unilateral expectation." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Under Second Circuit law, a statutory scheme creates that entitlement when it "meaningfully channels official discretion by mandating a defined administrative outcome." *Bellin v. McDonald*, 177 F.4th 167, 181 (2d Cir. 2026); *see also Kapps v. Wing*, 404 F.3d 105, 113-15 (2d Cir. 2005). Once TPS is granted, DHS has no discretion to withhold the protections Congress prescribed while that status remains in force.

13

Congress also tied those protections to the duration of the country's designation. A designation remains effective until a termination takes effect, and it automatically extends absent the determination specified in § 1254a(b)(3)(B). 8 U.S.C. § 1254a(b)(2)(B), (b)(3)(B)-(C). The statutory protections continue during that extension. *Id.* § 1254a(a)(1)(A) -(B), (a)(2). The judgment involved in determining whether the termination predicate is satisfied does not make the benefits already in force discretionary. *See Bellin*, 177 F.4th at 190-92. The statutory framework requires the Government to extend TPS if the statutory criteria are met; it has no discretion to terminate TPS where conditions warrant maintaining it. Therefore, the statute gives Plaintiff TPS holders a legitimate claim of entitlement to, and expectation that, once a country is designated for TPS, it will retain such designation where conditions so warrant.

The Government's official rules and practices reinforce that statutory entitlement. Property interests may arise from officially promulgated rules and "mutually explicit understandings" supporting a claim of entitlement. *Perry v. Sindermann*, 408 U.S. 593, 601-03 (1972). For more than a decade, DHS maintained Yemen's designation, granted TPS to individual beneficiaries, and administered the mandatory protections accompanying that status. Those official rules and practices reinforce the statutory entitlement created by the statute to the protections in force while Yemen's designation remained effective.

That conditional character does not remove the protections from due process. Welfare benefits may end when eligibility ceases, public employment may end for cause, and a driver's license may be revoked on specified grounds. Yet each remains protected against termination without constitutionally adequate procedures. *See Goldberg v. Kelly*, 397 U.S. 254, 262-63 (1970); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-41 (1985); *Bell*, 402 U.S. at 539.

14

Numerous other district courts have found that TPS recipients have either a property or liberty interest in designation.[6] *Ramos v. Nielsen* distinguished the Secretary's discretion over an initial TPS designation from the statutory requirements governing an existing designation and explained that plaintiffs challenging TPS terminations "arguably have a property interest in loss of TPS status." 321 F. Supp. 3d 1083, 1122 (N.D. Cal. 2018). Prima facie eligible applicants possess a distinct interest because the statute provides that they "shall" receive temporary removal protection and employment authorization until their individual eligibility is finally determined. 8 U.S.C. § 1254a(a)(4)(B). *Mansor v. USCIS* accordingly held that "a prima facie eligible TPS applicant has a property interest in temporary employment authorization subject to due process protections." 685 F. Supp. 3d 1000, 1013 (W.D. Wash. 2023).

TPS also protects substantial liberty interests. Its statutory bar against status-based detention protects freedom from physical restraint, which lies at the core of the Due Process Clause. *See Zadvydas*, 533 U.S. at 690. Termination also exposes holders to removal and family separation and withdraws the authorization through which they earn their livelihoods. *See Bridges v. Wixon*, 326 U.S. 135, 154-55 (1945) (finding a liberty interest at stake because deportation "visits a great hardship on the individual and deprives him of the right to stay and live in this land of freedom"); *Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *Loudermill*, 470 U.S. at 543 ("We have frequently recognized the severity of depriving a person of the means of livelihood."). This Court has already found that the Termination threatens Plaintiffs with arrest, detention, loss of

---

[6] *See Saget v. Trump*, 375 F. Supp. 3d 280, 333 (E.D.N.Y. 2019) (in holding that there was judicial review in a case challenging the government's termination of TPS for Haiti, stating that "[p]rotecting liberty interests such as those associated with TPS is vital to the proper functioning of the rule of law"); *Rodas v. Chertoff*, 399 F. Supp. 2d 697, 702 (E.D. Va. 2005) (recognizing, in a case involving 18 individuals challenging DHS's refusal to renew their TPS status, that a "plausible argument may be made that TPS is a property right that cannot be withdrawn without due process").

employment, disruption of critical medical care, removal, and family separation. Postponement Order at 31-34. The Termination therefore implicates both the statutory benefits Plaintiffs possess and the liberty those benefits protect.

### B. The Government's Process Was Not Constitutionally Sufficient

As this Court previously found in the May 1 Postponement Order, the Yemen termination did not meet the interagency consultation requirements established in law by Congress. Postponement Order at 23-31. Congress required the responsible official to consult appropriate government agencies, review current conditions in the designated country, and publish the resulting determination and its basis. *See* 8 U.S.C. § 1254a(b)(3)(A). Because Plaintiffs possess protected property and liberty interests in TPS, these statutory requirements comprise the minimum procedural protections guaranteed by the Due Process Clause.

Unlike typical due process challenges in the immigration context, *see, e.g.*, *Dep't of State v. Munoz*, 602 U.S. 899, 911 (2024); *DHS v. Thuraissigiam*, 591 U.S. 103, 107, 115, 131-32 (2020), Plaintiffs do not ask the Court to expand on the procedural protections guaranteed by the statute. They simply seek *the process mandated by statute* that Congress intended to protect the entire class of Yemeni TPS holders. Those safeguards also mirror familiar elements of procedural due process. For example, to mitigate "the risk of an erroneous deprivation," *Mathews*, 424 U.S. at 335, the statute provides that a TPS designation may be terminated only after "consultation with appropriate agencies of the Government" and a "review" of "the conditions in the foreign state." 8 U.S.C. § 1254a(b)(3)(A). These basic safeguards impose a minimal administrative burden on the government, while reducing the risk that termination decisions will be based on inaccurate information. *See Mathews*, 424 U.S. at 343-49 (emphasizing that the risk of erroneous deprivation was mitigated by extensive information gathering, agency review, and administrative reconsideration procedures). The requirement to publish the actual "basis for the determination"

16

in the Federal Register, 8 U.S.C. § 1254a(b)(3)(A), also serves a separate but equally important due process function: providing notice of the reasons for the government's decision. Both procedures minimize the possibility of factual error before the Attorney General terminates an existing designation.

Secretary Noem and DHS did not meaningfully provide that process here. The consultation consisted of four terse emails, and DHS neither requested nor received substantive information about conditions in Yemen. Postponement Order at 24–28. The State Department official also appeared to understand termination as already the Secretary's decision before the prescribed consultation concluded. *Id.* at 26 n.13, 28. That sequence shows that the consultation provided no meaningful opportunity for relevant information to affect the outcome. The omission was especially consequential because the Secretary found that conditions continued to impede Yemeni nationals' safe return. Notice at 10,404–05. Given that finding, the national-interest determination was indispensable to the Termination. 8 U.S.C. § 1254a(b)(1)(A), (C), (b)(3)(B)–(C). Yet this Court found that the Notice cited no substantiating evidence for the asserted criminal or gang nexus and that the cited materials supplied no empirical support for the migration pull-factor rationale. Postponement Order at 15–16. Those evidentiary gaps demonstrate why Congress required informed interagency consultation and country-conditions review before an existing designation could be terminated.

The apparent predetermination further demonstrates that the prescribed process did not operate as Congress required. Due process requires a fair decisionmaker, and a pretermination procedure must provide an "initial check against mistaken decisions." *Loudermill*, 470 U.S. at 545–46; see *Withrow v. Larkin*, 421 U.S. 35, 46–47 (1975). Here, the State Department communication appears to have confirmed an outcome already selected, even though the Secretary

17

herself found that conditions continued to impede safe return. A process that leaves no meaningful point for contrary information to affect the result provides no reliable protection against error.

Plaintiffs seek no procedures beyond those Congress prescribed. Because the Government withdrew Plaintiffs' protected TPS interests without meaningfully providing that mandatory country-level process, the Termination was constitutionally inadequate and must be set aside as "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

### C.  Plaintiffs' Procedural Due Process Claim Is Reviewable

Plaintiffs' procedural due process claim is reviewable because the TPS statute's review bar does not reach Plaintiffs' constitutional claims. The Government conceded at oral argument in *Mullin* that it would "have to be fighting with [Supreme Court precedent] ... to argue that there's no judicial review of the constitutional claims here" under Section 1254a(b)(5)(A). Tr. of Oral Arg. 26:22–27:8, *Mullin*, No. 25-1083 (U.S. Apr. 29, 2026). And in its opinion, the Supreme Court declined to extend the review bar to constitutional claims. *Mullin*, 2026 WL 1825840, at *7–10. Instead, the Court proceeded directly to the merits of the equal protection challenge, reaffirming the bedrock principle that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). Congress expressed no "clear" intent to bar constitutional claims here, as it has elsewhere. *Cf., e.g.*, 8 U.S.C. § 1252(b)(9) (precluding "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions").

### III.    The Remaining Factors Continue to Favor a Stay

This Court has already found the threatened injuries irreparable, and the July 20 Order left those findings intact. Postponement Order at 31-34; July 20 Order at 5. With the Postponement Order stayed, Plaintiffs now face arrest and detention, loss of employment authorization, family separation, disruption of critical medical care, and removal to a country where the Court found

18

there is "nowhere" they would be free from fear of targeted violence. Postponement Order at 32. Any effort to return after removal would occur against a legal regime that fully suspends the immigrant and nonimmigrant entry of Yemeni nationals, subject to defined scope provisions and exceptions. Proclamation No. 10998 §§ 2(l), 6, 90 Fed. Reg. 59,717, 59,718, 59,727 (Dec. 19, 2025). That entry bar reinforces why removal during this litigation cannot be treated as readily reversible. The Notice also states that "ICE is currently removing aliens to Yemen." Notice at 10,405. Relief after an arrest, detention, removal, job loss, or foreclosure of a pending application would come too late for that injury.

The named Plaintiffs' injuries are immediate and specific. Abdo Doe depends on ongoing treatment and medication for chronic heart and spinal conditions. Hadeel Doe's child requires cardiac care unavailable in Yemen. Faiz Doe and Ali Doe face targeted Houthi retaliation because of their human-rights and government-associated work, while Sam Doe faces forced recruitment. Ebe Doe, Fahad Doe, and Faiz Doe would lose work through which they have built careers and support family members. First Am. Compl. ¶¶ 152-59.  No later judgment can restore liberty lost in detention, undo removal to danger, or repair those medical, family, and professional harms after they occur.

A lapse in TPS can also create immigration consequences that outlast this litigation. TPS holders are treated as maintaining lawful nonimmigrant status for adjustment and change-of-status purposes. 8 U.S.C. § 1254a(f)(4). A gap can therefore affect eligibility to adjust status from within the United States. *See id.* § 1255(c)(2); Expert Decl. of Stacy Tolchin ¶¶ 12, 25-29, ECF No. 23-7. Preserving continuous status prevents an interim lapse from creating a lasting barrier before the Court adjudicates the merits.

The balance of equities and public interest also favor relief. These factors merge when the Government is the opposing party. *Nken*, 556 U.S. at 435. The Court previously found that the Government identified only a generalized interest in implementing the statute as it saw fit, while Plaintiffs substantiated concrete and critical harms. Postponement Order at 35. The July 20 Order again recognized that the equities tip in Plaintiffs' favor. It granted a stay because the Court's merits analysis of the claims then before it outweighed that equitable showing. July 20 Order at 5. The requested relief would preserve protections that remained in place for more than a decade, including for eleven weeks under this Court's Postponement Order, while the Court adjudicates two different claims. That limited preservation prevents irreversible injury without preventing the Government from administering TPS under lawful authority and constitutionally adequate procedures.

## CONCLUSION

Plaintiffs respectfully request that, under 5 U.S.C. § 705, the Court issue all necessary and appropriate process to postpone implementation and enforcement of the Termination and preserve the status and rights at issue through final judgment. Specifically, Plaintiffs ask the Court to direct Defendants to treat Yemen's designation, TPS status, and TPS-based employment authorization as continuously effective from entry of the July 20 Order through final judgment, and to treat pending applications as remaining pending and eligible for adjudication without interruption.

Dated: July 21, 2026                               Respectfully submitted,

                                                  /s/ *Razeen Zaman*
                                                  Razeen Zaman
                                                  Helen Anne Schutz Lo
                                                  Dinesh McCoy*
                                                  Phi Nguyen*
                                                  Niji Jain

20

ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY 10013
Tel: (212) 966-5932
rzaman@aaldef.org
alo@aaldef.org
dmccoy@aaldef.org
pnguyen@aaldef.org
njain@aaldef.org

Shayana Kadidal [SK-1278]
Angelo Guisado
Baher Azmy [BA-8406]
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6438
Fax: (212) 614-6451
kadidal@ccrjustice.org
aguisado@ccrjustice.org
bazmy@ccrjustice.org

*Counsel for Plaintiffs*

*Application for admission Pro Hac Vice
forthcoming*

21

**CERTIFICATION OF WORD COUNT**

I hereby certify that the word count of this memorandum of law complies with the word limits of Local Rules of the United States District Courts for the Southern & Eastern Districts of New York § 7.1(c) and United States District Judge Dale E. Ho, Individual Rules and Practices in Civil Cases § 4(c). According to the word-processing system used to prepare this Memorandum of Law, the total word count for all printed text exclusive of the material omitted under Loc. R S.D.N.Y & E.D.N.Y § 7.1(c) and U.S. Dist. J. Dale E. Ho, Individual Rules and Practices in Civil Cases § 4(c) is 6,397 words and 20 pages.

Dated: July 21, 2026

New York City, New York

/s/ *Razeen Zaman*
Razeen Zaman