**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| Abdo DOE, Hadeel DOE, Faiz DOE, Ebe DOE, Sam DOE, Ali DOE, and Fahad DOE, on their own behalf and on behalf of others similarly situated,<br><br><br>*Plaintiffs*,<br><br>- *versus* -<br><br>Markwayne MULLIN, Secretary, United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br><br>*Defendants*. | **Case No. 1:26-cv-2280-DEH**<br><br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY IN SUPPORT OF PLAINTIFFS' RENEWED MOTION TO POSTPONE
EFFECTIVE DATE OF AGENCY ACTION**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT........................................................................................................................2

  I.  This Court Has Jurisdiction to Review Plaintiffs' Claims .........................................2

     A.  The Judicial Review Bar Does Not Apply to Plaintiffs' Ultra Vires Claim ....................2

     B.  This Court May Review Plaintiffs' Procedural Due Process Claim ...............................2

  II.  Plaintiffs Are Likely to Succeed on the Merits ........................................................3

     A.  Plaintiffs' Ultra Vires Claim is Likely to Succeed ..........................................................3

        i.  No Statute Transfers TPS Authority to the Secretary ...................................................3

        ii.  Neither Courts nor Congress Have Addressed Whether TPS Authority Was Properly Transferred to the Secretary ...................................................................................5

     B.  Plaintiffs' Procedural Due Process Claim Is Likely to Succeed......................................7

        i.  Section 1254a's Mandatory Protections Create Protected Liberty and Property Interests .......................................................................................................................7

        ii.  DHS Omitted Required Safeguards ............................................................................9

        iii.  Due Process Applies Beyond Individual Adjudications ..........................................10

        iv.  The Termination Also Deprived Pending Applicants of Protected Interests ............13

  III.  The Remaining Factors Overwhelmingly Favor Plaintiffs ..................................14

CONCLUSION...................................................................................................................15

## **TABLE OF AUTHORITIES**

### **CASES**

*A.C.R. v. Noem*, 809 F. Supp. 3d 103 (E.D.N.Y. 2025) ........................................................6

*Atkins v. Parker*, 472 U.S. 115 (1985) ...........................................................................13

*Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260 (E.D.N.Y. 2018) ..................................11

*Bellin v. McDonald*, No. 24-341 (2d Cir. May 21, 2026) ..............................................8

*Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441 (1915) ................. 12–13

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) ..............................................................8–9

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ...................................................................2

*Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356 (2006) ......................................................6

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ..........................................8

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ..............................6–7

*Foucha v. Louisiana*, 504 U.S. 71 (1992) ......................................................................8

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ..........................................................................9

*García-Rubiera v. Fortuño*, 665 F.3d 261 (1st Cir. 2011) ...........................................13

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ........................................................................9

*Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123 (1951) ..........................12

*Kapps v. Wing*, 404 F.3d 105 (2d Cir. 2005) .................................................................8

*Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989) ...............................................8–9

*Mansor v. U.S. Citizenship & Immigr. Servs.*, No. 2:23-cv-00347-JLR, 2025 WL 4274509 (W.D. Wash. Dec. 1, 2025), clarified by 2026 WL 734278 (W.D. Wash. Mar. 16, 2026), appeal dismissed, No. 26-628 (9th Cir. July 6, 2026) ........................................................14

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ...................................................... 10–11, 14

*Morgan v. United States*, 304 U.S. 1 (1938) ...............................................................12

*Mullin v. Doe*, 146 S. Ct. 2121 (2026) ........................................................ 1–3, 5, 7

*Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178 (9th Cir. 2015), cert. denied, 580 U.S. 817

(2016) ......................................................................................................................11

*Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018).......................................11

*Rea v. Matteucci*, 121 F.3d 483 (9th Cir. 1997) .......................................................13

*Reid v. Bondi*, 132 F.4th 109 (2d Cir. 2024) .............................................................10

*Ret. Plans Comm. of IBM v. Jander*, 589 U.S. 49 (2020) ...........................................2

*Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768 (7th Cir. 2021) ....................9

*Romero Marroquin de Rodriquez v. Hyde*, No. 25-CV-13210-AK, 2026 WL 220416 (D. Mass.

Jan. 28, 2026).........................................................................................................10

*Sanchez v. Mayorkas*, 593 U.S. 409 (2021) ................................................................7

*Sessions v. Dimaya*, 584 U.S. 148 (2018) .................................................................15

*St. Cyr v. INS*, 229 F.3d 406 (2d Cir. 2000), aff'd, 533 U.S. 289 (2001) ....................7

*Thomas v. City of N.Y.*, 143 F.3d 31 (2d Cir. 1998) ..................................................12

*Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005) ..............................................9

*United States v. 1.04 Acres of Land, More or Less*, 538 F. Supp. 2d 995 (S.D. Tex. 2008)...........5

*United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224 (1973)......................................12

*United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952)..............................2

*United States v. Rubalcava Gonzales*, 179 F. Supp. 3d 917 (E.D. Mo. 2016).............5

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519 (1978) ........ 11–12

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ...............................................11

*Zadvydas v. Davis*, 533 U.S. 678 (2001)....................................................................8

iii

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V ................................................................................................. 1, 3, 7–14

## STATUTES

6 U.S.C. § 542 & note ...................................................................................................... 7

6 U.S.C. § 557.................................................................................................................... 3

8 U.S.C. § 1103(a) .......................................................................................................... 3–5

8 U.S.C. § 1103(a)(9)......................................................................................................... 5

8 U.S.C. § 1103(b) ............................................................................................................. 5

8 U.S.C. § 1103(g) .......................................................................................................... 3–4

8 U.S.C. § 1225(b) ............................................................................................................. 8

8 U.S.C. § 1226(a), (c) ....................................................................................................... 8

8 U.S.C. § 1231(a)(2) ......................................................................................................... 8

8 U.S.C. § 1254a(a)(1)–(2) ................................................................................................. 8

8 U.S.C. § 1254a(a)(4)(B) ......................................................................................... 7–8, 14

8 U.S.C. § 1254a(b)(2)(B)............................................................................................ 8, 12

8 U.S.C. § 1254a(b)(3) .................................................................................... 3, 6, 8, 10, 12

8 U.S.C. § 1254a(b)(5)(A)–(B)....................................................................................... 2, 14

8 U.S.C. § 1254a(c)(3) ....................................................................................................... 8

8 U.S.C. § 1254a(d)(4) ....................................................................................................... 8

8 U.S.C. § 1451(f)............................................................................................................... 5

8 U.S.C. § 1533(a)(1).......................................................................................................... 5

Homeland Security Act of 2002 § 1502, 6 U.S.C. § 542 note ........................................... 7

**REGULATIONS AND FEDERAL REGISTER MATERIALS**

8 C.F.R. ch. I ........................................................................................................................7

8 C.F.R. pt. 244 ....................................................................................................................7

8 C.F.R. § 244.5(b) ........................................................................................................ 8, 14

8 C.F.R. § 244.13 ........................................................................................................... 8, 14

8 C.F.R. § 244.14 ..................................................................................................................8

8 C.F.R. § 244.19 ................................................................................................................13

Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9,824

    (Feb. 28, 2003) ..............................................................................................................7

Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10,402

    (Mar. 3, 2026) ..............................................................................................................13

**OTHER AUTHORITIES**

American Immigration Lawyers Association, Testimony on INS Reorganization (Nov. 15,

    2001) .............................................................................................................................4

Brief for the United States, Mullin v. Doe, No. 25-1083 (U.S. Mar. 30, 2026) ............................3

Department of Justice, Department of Justice Files First Case in U.S. Alien Terrorist Removal

    Court to Deport Afghan Alien Who Supported Her Family's Plans for Election-Day Shooting

    (July 30, 2026) ..............................................................................................................5

Motion for Administrative Stay, Dorcas International Institute of Rhode Island v. USCIS, No.

    26-1703 (1st Cir. July 22, 2026), Dkt. 108480099 ...........................................................15

U.S. Citizenship & Immigration Services, Hold and Review of All Pending Asylum Applications

    and All USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2,

    2025) ...........................................................................................................................15

U.S. Citizenship & Immigration Services, USCIS Announces Rule Change to Asylum System to

    Reduce Backlog (July 27, 2026) ........................................................................................15

## **INTRODUCTION**

Plaintiffs are enduring catastrophic harms from their loss of TPS protections—loss of lawful status and employment authorization, and threats of detention and removal from the United States. Defendants have exacerbated these harms through a myriad of policies that cut off avenues for TPS holders to seek other forms of protection and immigration relief. In response to Plaintiffs' renewed request for preliminary relief, Defendants ask this Court to misapply the recent Supreme Court decision in *Mullin v. Doe* and bar claims that the parties in the Supreme Court never contested, including even the new constitutional claims. But neither of Plaintiffs' claims is barred by the TPS statute. The DHS Secretary lacked the power to terminate, and thus her termination decision was not a "determination" by the "Attorney General" subject to the jurisdictional bar. As to Plaintiffs' due process claim, neither the parties in *Mullin* nor the Court sought to foreclose judicial review of constitutional claims.

With regard to Plaintiffs' *ultra vires* claim, Defendants do not—and cannot—offer any statutory text delegating TPS termination authority to the Secretary. The government's reading of the Homeland Security Act would render key statutory provisions meaningless and take certain existing powers away from the Attorney General. On the procedural due process claim, Defendants do not seriously contest that the TPS statute's mandatory language brings the benefits conferred on TPS holders within the ambit of significant liberty and property interests, as numerous courts have accepted, and create a constitutional floor on the process Plaintiffs must be afforded. TPS holders have strong interests here that are protected by the Fifth Amendment, and it is those strong interests—created by statute—that "constitutionalize" their claims to statutory process.

Plaintiffs have shown a likelihood of success on the merits, and all factors for preliminary relief weigh in their favor. The Court should grant Plaintiffs' motion.

1

## **ARGUMENT**

**I.    This Court Has Jurisdiction to Review Plaintiffs' Claims**

### **A.  The Judicial Review Bar Does Not Apply to Plaintiffs' *Ultra Vires* Claim**

Plaintiffs' *ultra vires* claim is justiciable. By its plain text, the TPS statute's judicial review bar applies only to TPS "determination[s] of the *Attorney General*," 8 U.S.C. § 1254a(b)(5)(A) (emphasis added), and *Mullin* did not adopt a different reading. In *Mullin,* the Supreme Court's analysis of the judicial review bar focused solely on whether the bar applied to procedural as well as substantive challenges to a termination—not on whether Congress had elsewhere effectively amended the statutory text such that the Secretary was the official shielded by the bar. *Mullin v. Doe*, 146 S. Ct. 2121, 2133-37 (2026). Instead*, Mullin* was "silent on the argument now before [this Court] for the simple reason that the parties in [the case] were silent on it too." *Retirement Plans Committee of IBM v. Jander*, 589 U.S. 49, 55 (2020) (Gorsuch, J. concurring). In an adversarial system, issues not contested by the parties cannot be considered precedentially decided—even by the Supreme Court. The government's argument that *Mullin* forecloses this Court's review of the *ultra vires* claim runs afoul of the well-settled principle that decisions lack precedential value on issues that they "never squarely addressed." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *see also United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (where an issue was not "raised in briefs or argument nor *discussed* in the opinion of the Court," "the case is not a binding precedent on this point" (emphasis added)).

### **B.  This Court May Review Plaintiffs' Procedural Due Process Claim**

*Mullin* left intact this Court's ability to review constitutional challenges to TPS determinations, 146 S. Ct. at 2137; indeed, the government never even argued that constitutional challenges to TPS determinations were unreviewable. *See* Br. for the United States at 45-52, *Mullin v. Doe*, No. 25-1083 (U.S. Mar. 30, 2026); Pls.' Mot. Br. (ECF No. 96) at 18. Plaintiffs' procedural

2

due process claim is no exception. The government contends that Plaintiffs' procedural due process claim is simply a statutory claim cloaked in constitutional terms. But the government ignores the core factor that distinguishes Plaintiffs' Fifth Amendment claim from those arising purely from statutory procedural failures: Plaintiffs' constitutionally protected liberty and property interests in TPS and its attendant benefits. Once a plaintiff has a liberty or property interest meaningful enough to be protected by the Due Process Clause, the constitutional bar for jurisdiction stripping rises—requiring Congress to speak with a much clearer intent than it did here before the courts will foreclose review of constitutional claims.

## II.     Plaintiffs Are Likely to Succeed on the Merits

### A.  Plaintiffs' *Ultra Vires* Claim is Likely to Succeed

#### i.  No Statute Transfers TPS Authority to the Secretary

After first arguing (in three different ways) that the *Mullin* Court already (silently) considered and decided the issue, Defs.' Br. (ECF No. 101) at 7-8, the government next argues that 8 U.S.C. § 1103(g) should be read to have transferred TPS termination authority to the Secretary. Defs.' Br. (ECF No. 101) at 9-10.[1] But 8 U.S.C. § 1103(a) explicitly and broadly carves out all authorities held by the Attorney General himself from the transfer of power, including the authority to terminate TPS.[2] Most of the bureaucratic reorganization accomplished by the Homeland Security Act involved the transfer of whole agencies within DOJ—including the INS[3]—and within other existing departments to the new department. Section 1103(g) specifically

---

[1]     Contrary to Defendants' claims, as discussed in Plaintiffs' opening brief, Pls.' Mot. Br. (ECF No. 96) at 9-10, 6 U.S.C. § 557 does *not* independently transfer any authorities to the Secretary. The provision clarifies statutory language related to transfers of power effectuated by other statutes or means of delegating authority—it does not serve as a transfer of authority itself.

[2]     *See* 8 U.S.C. § 1254a(b)(3)(B).

[3]     The Office of Domestic Preparedness was also transferred from DOJ to DHS. After the transfer the INS was split into USCIS, CBP, and ICE.

retains for the Attorney General authority over EOIR, whose continued independence from the INS was a point of contention in the debates over the Homeland Security Act.[4] *See* 8 U.S.C. § 1103(g) ("The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by [the Executive Office for Immigration Review (EOIR)]...").

Defendants' theory requires adding words to the statute. Defendants read Section 1103(g) as being exhaustive—*i.e.*, setting forth the *only* immigration-related powers that were reserved to the Attorney General—but section 1103(g) does not include the word "only" or any comparable language. Similarly, Defendants essentially read Section 1103(a)'s "except" clause as including a cross-reference to section 1103(g), but it does not. 8 U.S.C. § 1103(a) (DHS Secretary shall administer immigration and nationality chapter "except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the … Attorney General"). Defendants' reading makes the broad language of Section 1103(a) largely meaningless with respect to the Attorney General, while Plaintiffs' reading shows that *both* Sections 1103(a) and 1103(g) reserved some authorities for the Attorney General at the time of transfer.

Section 1103(g) cannot mean that the *only* functions retained by the Attorney General relate to EOIR. In fact, multiple provisions specify other immigration authorities retained by the Attorney General. *See, e.g.*, 8 U.S.C. § 1103(a)(9) (specifying the Attorney General's authority to authorize officers of a foreign country to be stationed at preclearance facilities in the United States). In 1996, Congress authorized the Attorney General to initiate removal proceedings against alleged "alien

---

[4]     *See, e,g.*, American Immigration Lawyers Association Testimony on INS Reorganization (Nov. 15, 2001), available at https://www.aila.org/library/aila-testimony-on-ins-reorganization. The redundancy between Sections 1103(a) and (g) can then be read as Congress taking a belt-and-suspenders approach on a particularly contentious reorganization issue.

terrorists" in a specialized Article III court that entirely bypasses EOIR. *See* 8 U.S.C. § 1533(a)(1). The Attorney General exercised that power this month.[5] Other examples abound.[6] If the government were correct, there would have been no point to the broad exception clause in § 1103(a)—the full set of powers that remain with the Attorney General would already be otherwise described in other portions of the statute.

In sum, the government cannot point to any textual provision that transfers TPS termination authority to the Secretary, because none exists.

### ii. Neither Courts nor Congress Have Addressed Whether TPS Authority Was Properly Transferred to the Secretary

Failing to find any textual support for their position, Defendants ask this Court to ignore the text and instead rely on the uncontested conclusion in *Mullin* to assert that the Supreme Court has settled these issues. Defs.' Br. (ECF No. 101) at 7-9 (quoting *Mullin*, 146 S. Ct. at 2129) ("[r]esponsibility for TPS decisions rests with the Secretary of Homeland Security."). But relying on this lone statement to foreclose a challenge to the Secretary's authority stretches far beyond the logic of the decision. *See supra* Section I.A (discussing this same principle in the context of the jurisdiction arguments).[7]

---

[5]    *See* Press Release (Jul. 30, 2026), *available at* https://www.justice.gov/opa/pr/department -justice-files-first-case-us-alien-terrorist-removal-court-deport-afghan-alien-who

[6]    *See, e.g.*, *United States v. Rubalcava Gonzales*, 179 F. Supp. 3d 917, 929 (E.D. Mo. 2016) (directing denaturalization certificate to Attorney General per 8 U.S.C. § 1451(f)); *United States v. 1.04 Acres of Land, More or Less, Situate in Cameron County*, 538 F. Supp. 2d 995, 997 (S.D. Tex. 2008) (noting Attorney General's exercise of land acquisition authorities under 8 U.S.C. § 1103(b)). All these provisions (including the Alien Terrorist Removal Court referred to in the text) are part of Chapter 12 ("Immigration and Nationality") of Title 8 of the U.S. Code, which is the "chapter" referred to in Section 1103(a).

[7]    Again, the question of the Secretary's authority was never raised in *Mullin*; nor are there any other cases that address this issue. Courts evaluate the questions presented to them, and their dicta on other matters are not binding in future decisionmaking when new questions are clearly presented. *See, e.g.*, *Cent. Virginia Cmty. Coll. v. Katz,* 546 U.S. 356, 363 (2006) ("The Court is not bound to follow its dicta in a prior case in which the point at issue was not fully debated.")

Bereft of statutory evidence or binding precedent, the government finally argues that Plaintiffs' challenge to the Termination based on the Secretary's lack of authority would, if successful, also invalidate the TPS designation for Yemen. *See* Defs.' Br. (ECF No. 101) at 11, 11 n.4. Not so. First, the TPS statute provides that the Attorney General may only terminate TPS designation if he determines, "after consultation with appropriate agencies of the Government" that the country "no longer continues to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3). There is no provision that allows for termination for other reasons, and Defendants cannot simply end TPS benefits by declaring a designation unlawful. *See A.C.R. v. Noem*, 809 F. Supp. 3d 103, 121 (E.D.N.Y. 2025) ("[A]n agency must always consider serious reliance interests, even when it concludes an earlier policy was unlawful."); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 33 (2020) (noting the need to accommodate particular reliance interests).[8] TPS holders have similar reliance interests to the DACA recipients in *Regents*—they have "embarked on careers," *id.* at 31, and the "consequences of the [termination]... would radiate outward" to their families, schools, and employers. *Id.* (citation modified). Moreover, TPS recipients have been granted their status (and TPS applicants have applied for that status) in reliance on regulations (governing the vetting and approval process) that were in fact

---

(citation modified). The same reasoning applies to the other cases the government cites, Defs.' Br. (ECF No. 101) at 10-11—the issue of the Secretary's authority was not contested in those cases, and references that assume a proposition without addressing the question directly are unpersuasive.

[8]     The government also attempts to limit the holding of *Regents* regarding reliance interests by arguing that because the DACA program was not wholly unlawful, the reliance interests of DACA recipients somehow differed from those of TPS holders. Defs.' Br. (ECF No. 101) at 11 n.4. But the holding in *Regents* refutes that false distinction—the Supreme Court held that the rescission of DACA was arbitrary and capricious on multiple grounds, including that the Secretary failed to "address[] the options of retaining forbearance *or* accommodating particular reliance interests." 591 U.S. at 33 (emphasis added). The inclusion of the word "or" indicates those matters are both separate holdings, and broadly that reliance interests must be evaluated even when an agency otherwise find a program to be illegal.

properly promulgated by DHS. *See* 8 CFR Part 244.[9] Second, the challenged agency action here for which Plaintiffs seek relief is the Termination. If the Defendants are arguing that the determination also is invalid, that must be adjudicated through a separate legal action. Third, rather than rescind TPS wholesale, the Executive Branch could identify independent authority for a TPS designation or part of the program. *See Mullin*, 146 S. Ct. at 2128 (noting that, before Congress enacted the TPS statute, "the Executive Branch sometimes provided similar relief as a matter of discretion without any express statutory authorization"). These alternatives bring any future rescission squarely within the *Regents* framework. [10]

### B. Plaintiffs' Procedural Due Process Claim Is Likely to Succeed

#### i. Section 1254a's Mandatory Protections Create Protected Liberty and Property Interests

Section 1254a gives TPS holders concrete protections that DHS may not withdraw at will. TPS "protects [holders] from removal and authorizes them to work here for as long as the TPS designation lasts." *Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021); *see also* 8 U.S.C. § 1254a(a)(4)(B) (conferring the same benefits to applicants who establish prima facie eligibility).

---

[9]     Individual applications for TPS status were processed by the INS prior to the Homeland Security Act's creation of DHS. The President issued an executive reorganization plan and amendment, as mandated by Section 1502 of the Homeland Security Act, now codified at 6 U.S.C. § 542. That reorganization plan "[t]ransfer[s] the ... functions of the Immigration and Naturalization Service"—including delegated functions "performed by" INS "immediately before" the transfer—to DHS. 6 U.S.C. § 542 note. After the passage of the Act, DOJ issued a rule reorganizing 8 CFR Chapter I—containing, among other things, the existing TPS regulations—in order to "reflect[] the transfer of functions of" the INS to DHS. DOJ, *Aliens and Nationality; Homeland Security; Reorganization of Regulations*, 68 Fed. Reg. 9824 (Feb. 28, 2003). (Existing TPS regulations were duplicated within the DHS regulations currently at Part 244 "because many of the decisions under temporary protected status are made by immigration judges and the Board of Immigration Appeals," which remained within DOJ under EOIR. *Id*. at 9827; *see also id*. at 9841-42.)

[10]    In addition, because "[t]he Constitution's safeguard against retroactivity is especially appropriate where it protects an unpopular group or individual," a retroactive termination of TPS status would likely raise significant due process concerns. *St. Cyr v. I.N.S.*, 229 F.3d 406, 416 n.6 (2d Cir. 2000), *aff'd*, 533 U.S. 289 (2001).

It also provides that a holder "shall not be detained...on the basis of the [noncitizen's] immigration status." 8 U.S.C. § 1254a(d)(4). Elsewhere, the INA permits or requires detention; here, Congress prohibited it. *See id*. §§ 1225(b), 1226(a), (c), 1231(a)(2). That guarantee protects "freedom from bodily restraint," a core liberty secured to "all persons within the United States." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

A recipient has a protected entitlement to an existing benefit when the government may withdraw it only on specified grounds. *Board of Regents v. Roth*, 408 U.S. 564, 576-78 (1972) (explaining that welfare recipients' property interest was grounded in the statute defining eligibility for benefits); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-41 (1985). Yemen's designation "shall remain in effect" until an effective termination. 8 U.S.C. § 1254a(b)(2)(B). The Attorney General "shall review" current conditions and "shall determine" whether the statutory conditions continue; absent a negative determination, the designation "is extended." *Id.* § 1254a(b)(3)(A)-(C). These are "substantive predicates" with a mandated outcome. *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 462-63 (1989); *see Bellin v. McDonald*, No. 24-341, slip op. at 17-18, 34 (2d Cir. May 21, 2026). TPS holders and applicants who are prima facie eligible therefore have a legitimate claim to those protections until DHS makes the required negative determination and termination becomes effective. *See* 8 U.S.C. § 1254a(a)(1)-(2), (a)(4)(B), (b)(2)(B), (b)(3)(A)-(C), (c)(3), (d)(4); 8 C.F.R. §§ 244.5(b), 244.13-.14.

The fact that the Attorney General may later determine that the statutory conditions for termination are met does not render current TPS protections "discretionary." *See Kapps v. Wing*, 404 F.3d 105, 116-17 (2d Cir. 2005) ("in cases involving the termination of benefits, federal courts do not ask whether the plaintiffs are entitled to the continuation of benefits, or whether they are … no longer eligible. Instead, the focus of the federal courts is on the adequacy of the procedures

used to make that determination.") (citing *Goldberg v. Kelly*, 397 U.S. 254, 256 n.2 (1970); *Roth*, 408 U.S. at 577 (observing that the benefits recipients in *Goldberg* "had not yet shown that they were, in fact, within the statutory terms of eligibility."); and *Fuentes v. Shevin*, 407 U.S. 67, 87 (1972) ("The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing. … It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake ....") (internal citation and quotation marks omitted))); *see also Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 773-76 (7th Cir. 2021) (holding that nursing-care facility operators had a protected entitlement to Medicaid reimbursement at the legally prescribed rate, even though a later audit could establish a lawful basis for reducing that rate). Defendants' cited cases, Defs.' Br. (ECF No. 101) at 15, instead involve decisions left to official discretion: whether to enforce a restraining order, or allow certain visitors access to a prison. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760-68 (2005); *Kentucky Dep't of Corrections v. Thompson*, 490 U.S 454, 462 (1989). They do not implicate the type of mandatory grants of work authorization and protection from removal that the TPS statute affords, which confer concrete liberty and property interests to Plaintiffs. Here, to borrow *Castle Rock*'s formulation, "the property" and liberty interest (the work authorization and protection) is "distinguishable from the procedural obligations imposed on state officials to protect it" (the consultation and other procedural requirements of the statute). *Castle Rock*, 545 U.S. at 772.

### ii. DHS Omitted Required Safeguards

Because TPS protections implicate vital liberty and property interests, due process requires at least the core safeguards Congress prescribed: consultation, review of current conditions, determination under statutory criteria, and publication of the determination and basis. 8 U.S.C. § 1254a(b)(3)(A)-(B). These safeguards constitute minimum process here because (1) Congress

9

mandated them, (2) each reduces the risk of error in a process Congress intended to be driven by expertise, and (3) requiring what Congress *already mandates* imposes no legally-cognizable additional burden on the government. *Cf. Mathews v. Eldridge*, 424 U.S. 319, 335, 343-49 (1976). Where Congress lays out an adjudicative, fact-finding process with a specific decisionmaker, the statute protects constitutional interests by avoiding the risk of erroneous deprivation.

Second Circuit precedent likewise recognizes that statutory or regulatory safeguards may overlap with due process when they protect an independently grounded right. *See Reid v. Bondi*, 132 F.4th 109, 127 (2d Cir. 2024) (remanding because the court could not "affirm on this record that Reid received a full and fair hearing, as guaranteed by the INA and the Due Process Clause"); *see also Romero Marroquin de Rodriquez v. Hyde*, 2026 WL 220416, at *4 (D. Mass. Jan. 28, 2026) (ICE's violation of its own regulation constituted a due process violation, citing eight similar cases).

### iii.    Due Process Applies Beyond Individual Adjudications

Defendants wrongly argue that procedural due process applies only to individual adjudications. Defs.' Br. (ECF No. 101) at 17-18. But this ignores the facts of this case, the nature of the constitutional right, and existing precedent applying due process in challenges to unconstitutional government actions that impact large groups.

First, this case involves benefits that are afforded to individual TPS holders, who each hold liberty and property interests. *See supra* Section II.B.i. Multiple courts assessing due process as it relates to TPS holders themselves have recognized these interests, and have applied an analysis of the property and liberty interests even where the government's policy impacted a group of TPS holders. *See Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1122 (N.D. Cal. 2018) (identifying protected "property interest in loss of TPS status").

10

In other contexts, federal courts have found procedural due process violations even where the government makes a decision that impacts a large group of people who individually have constitutionally protected interests. For example, *Nozzi v. Hous. Auth. of City of L.A.* applied the notice principle from *Mathews* to a program-wide Section 8 reduction expected to affect approximately 45% of 45,000 recipients and held the notice of reduction inadequate. 806 F.3d 1178, 1186-87, 1192-99 & n.16 (9th Cir. 2015), *cert. denied*, 580 U.S. 817 (2016). Courts have applied procedural due process protections to immigration determinations that affect large groups of people at once. *See, e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1164-65 (9th Cir. 2017) (travel ban Executive Order); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 283-85 (E.D.N.Y. 2018) (DACA rescission). The Supreme Court has described situations "where a small number of people are exceptionally affected" by a generally-applicable rule as triggering the protections of due process, *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 542 (1978) (cleaned up), for example in the context of regulatory tariff or rate setting that affects a discrete but numerous group of market participants.[11]

Defendants argue that courts have "long distinguished between agency action that 'adjudicate[s] disputed facts in particular cases' and action involving 'the formulation of a basically legislative-type judgment, for prospective application only.'" Defs.' Br. (ECF No. 101) at 17 (quoting *Bi-Metallic* and *Fla. E. Coast Ry.*). But they have not done so by asking whether a group or a particular individual has been denied process. Instead, they have distinguished whether the executive action was "quasi judicial," *Vermont Yankee*, 435 U.S. at 542, that is, whether it was "designed to adjudicate facts," or instead sought to promulgate general policies or standards,

---

[11]  *See, e.g.*, *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224 (1973) (rail rates); *Morgan v. United States*, 304 U.S. 1, 14-15, 19-20 (1938) (stockyard fees).

*United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 244-46 (1973); *see also Thomas v. City of N.Y.*, 143 F.3d 31, 36 n.7 (2d Cir. 1998) (distinguishing adjudicative fact determinations from legislative decisions). The Supreme Court has similarly looked to whether a decision is the type as to which the executive (like the legislature) could "act summarily," *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 167-68 (1951); if so, it constitutes a "legislative process" that can't be challenged as violating procedural due process, *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441 (1915). If, in contrast, a statute sets forth constraints requiring the executive to "adjudicate facts," like the country-condition determinations at issue here, *and* individual vested interests are at stake, procedural due process applies. The TPS statute already supplies the governing policy specifying when a designation continues, the grounds permitting termination, and the country-level process for determining the "disputed facts" of whether those grounds exist. *See* 8 U.S.C. § 1254a(b)(2)(B), (b)(3)(A)-(C). That the Termination affected all Yemeni TPS holders at once does not convert this fact-bound statutory process into a "legislative-type judgment."[12]

Defendants mistake a rule against individual hearing for a rule against process altogether. Plaintiffs seek no such hearings. But *Bi-Metallic* relied on political accountability, explaining that affected persons' rights were protected by their political power over rulemakers. 239 U.S. at 445. TPS holders, as noncitizens, lack an electoral voice over those politically for the Termination. *Atkins* emphasized that implementation error remained correctable through a predeprivation

---

[12]     There is a spectrum "between legislative and adjudicative action for purposes of procedural due process analysis," *Garcia Rubiera v. Fortuno*, 665 F.3d 261, 274 (1st Cir. 2011), but even if a TPS termination were considered legislative, courts recognize "defects in the legislative process" as an exception to the general principle that legislative actions are not subject to due process protections. *See, e.g.*, *Rea v. Matteucci*, 121 F.3d 483, 485 (9th Cir. 1997) (legislative process that was "wholly arbitrary or irrational" or targeted individuals may be subject to due process challenge).

12

hearing with benefits continued. 472 U.S. at 128, 131 n.4. Here, § 244.19 makes termination automatic and administratively unappealable. Neither safeguard exists here.

### iv. The Termination Also Deprived Pending Applicants of Protected Interests

Prima facie eligible applicants possess a "distinct interest" in temporary removal protection and employment authorization until their individual eligibility is finally determined. Pls.' Mot. Br. (ECF No. 96) at 15. The Amended Complaint identifies a 425-member applicant class and alleges that the Termination deprived both classes of protected interests without due process. First Am. Compl. (ECF No. 85) at §§ 35, 141, 162-66, 185-189. Plaintiffs accordingly requested that pending applications remain pending and eligible for uninterrupted adjudication. Pls.' Mot. Br. (ECF No. 96) at 20.

The Termination identifies 425 applications pending as of December 8, 2025. 91 Fed. Reg. at 10,408 & n.84. Prima facie eligible applicants are entitled to temporary benefits upon a qualifying filing and until a final determination, with administrative review of any denial. 8 U.S.C. § 1254a(a)(4)(B), (b)(5)(B); 8 C.F.R. § 244.5(b). Defendants do not contend that DHS decided those applications or furnished the mandated benefits. And § 244.13(b) terminates temporary treatment benefits "in any case, sixty (60) days after the date that notice is published of the termination" of a designation, regardless of whether DHS had decided an application or ever furnished the benefits. On this record, the Termination cut off qualifying applicants' protected interests without any record of the mandated benefits, an individual decision, or administrative review. That is the context Defendants concede *Mathews* governs. Defs.' Br. (ECF No. 101) at 18.

Defendants cite only *Mansor's* earlier decision, *id.* at 16, but its later summary-judgment ruling held that prima facie eligible initial applicants possess a property interest in interim employment authorization and that withholding it until final adjudication violates due process.

13

*Mansor v. U.S. Citizenship & Immigr. Servs.*, No. 2:23-cv-00347-JLR, 2025 WL 4274509, at \*5–8 (W.D. Wash. Dec. 1, 2025), clarified by 2026 WL 734278 (W.D. Wash. Mar. 16, 2026), appeal dismissed, No. 26-628 (9th Cir. July 6, 2026). Defendants' response that Yemen's designation has ended simply identifies the act that cut off those interests; it does not answer whether constitutionally adequate process preceded that loss.

### III.    The Remaining Factors Overwhelmingly Favor Plaintiffs

The remaining factors weigh decisively in Plaintiffs' favor. Defendants recycle their arguments that the government's immigration enforcement and purported national security interests are more urgent than the loss of employment, risk of arrest and detention, and family separation for vetted TPS holders. This Court has already decided that Plaintiffs face certain, immediate, and irreversible harms already recognized to outweigh the government's interests. *See* Op. and Order (ECF No. 54) at 31-36.

Plaintiffs may be immediately subject to arrest and detention pending deportation now that the Termination has gone into effect, *id.* at 31, 35. Plaintiffs with existing removal orders that predate the individual approval of their TPS status may be subject to immediate removal. Plaintiffs' credible fears of arrest and deportation are neither speculative nor reparable: The Supreme Court has long recognized that deportation is a "drastic measure, often amounting to lifelong banishment or exile," and "a particularly severe penalty." *Sessions v. Dimaya*, 584 U.S. 148, 157 (2018) (cleaned up). At the same time, this administration continues to diminish or eliminate alternative remedies, leaving Yemeni TPS holders with virtually no recourse.[13]

---

[13]    Last year, USCIS issued a pause on applications for alternative immigration benefits such as LPR status or asylum for nationals of countries subject to the travel bans, including Yemeni nationals. *See* Policy Memorandum, U.S. Citizenship & Immigr. Servs., Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025). This adjudication hold was enjoined by the District Court of Rhode

Defendants' remaining arguments regarding the harm to the public interest from interference with their policy agenda, Defs.' Br. (ECF No. 101) at 20-22, are addressed in Plaintiffs' Mot. Br. (ECF No. 96) at 20.

## CONCLUSION

Plaintiffs respectfully ask the Court to postpone the effective date of the Termination pending final judgment.[14]

Dated: August 5, 2026                          Respectfully submitted,

   /s/ Razeen Zaman
Razeen Zaman
Helen Anne Schutz Lo
Dinesh McCoy**
Phi Nguyen**
Niji Jain
ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY 10013
Tel: (212) 966-5932
rzaman@aaldef.org
alo@aaldef.org
dmccoy@aaldef.org
pnguyen@aaldef.org
njain@aaldef.org

Shayana Kadidal [SK-1278]
Angelo Guisado
Baher Azmy [BA-8406]
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor

---

Island in June, but the government swiftly appealed to the First Circuit, where last week, it moved for an administrative stay to restore the restrictive policy as soon as possible. *See Dorcas Int'l Inst. of Rhode Island v. USCIS*, 26-1703 (1st Cir. Jul 22, 2026) Dkt. 108480099.

   Just days ago, USCIS announced a rule change that would allow USCIS to deny affirmative asylum applications before the interview stage, effectively fast-tracking applicants to removal proceedings. *See USCIS Announces Rule Change to Asylum System to Reduce Backlog*, U.S. Citizenship & Immigr. Servs. (July 27, 2026), https://www.uscis.gov/newsroom/news-releases/uscis-announces-rule-change-to-asylum-system-to-reduce-backlog.

14   Plaintiffs believe oral argument would be helpful to a decision on this motion.

15

New York, New York 10012
Tel: (212) 614-6438
Fax: (212) 614-6451
kadidal@ccrjustice.org
aguisado@ccrjustice.org
bazmy@ccrjustice.org

*Counsel for Plaintiffs*

*\*Application for admission pending*

*\*\*Application for admission Pro Hac Vice forthcoming*

16

## CERTIFICATION OF WORD COUNT

I hereby certify that, according to the word-processing system used to prepare this Reply, the total word count for all printed text exclusive of the material omitted under Loc. R S.D.N.Y & E.D.N.Y § 7.1(c) and U.S. Dist. J. Dale E. Ho, Individual Rules and Practices in Civil Cases § 4(c) counted under Local Civil Rule 7.1(c), including footnotes, is 4,903 words and 15 pages.

Dated: August 5, 2026

New York City, New York

/s/*Razeen Zaman*

Razeen Zaman

17